# CIRCUIT COURT OF FAIRFAX COUNTY

In re Multi-Circuit
Episcopal Church
Property Litigation

January 10, 2012

Case Nos. (Civil) CL 2007-248724, CL 2006-15793, CL 2006-15792, CL 2007-556, CL 2007-1625, CL 2007-1235, CL 2007-1236, CL 2007-1237, CL 2007-1238, CL 2007-5249, CL 2007-5250, CL 2007-5364, CL 2007-5686, CL 2007-5685, CL 2007-5683, CL 2007-5682, CL 2007-5684, CL 2007-5902, and CL 2007-5903

BY JUDGE RANDY I. BELLOWS

## I. *Introduction*

On June 10, 2010, the Virginia Supreme Court remanded *Protestant Episcopal Church in the Diocese of Virginia v. Truro Church*, 280 Va. 6 (2010), to the Circuit Court, as follows:

> Accordingly, we hold that the circuit court erred in ruling that the CANA Congregations' petitions were properly before the court under Code § 57-9(A).
>
> By granting the CANA Congregations' Code § 57-9(A) petitions, the circuit court ruled that this "obviate[d] the need to address the merits of the Declaratory Judgment Actions filed by the Episcopal Church and the Diocese and thus render[s] them legally moot." In light of our holding that the circuit court erred in granting the Code § 57-9(A) petitions, the control and ownership of the property held in trust and used by the CANA Congregations remains unresolved. Accordingly, the declaratory judgment actions filed by TEC and the Diocese and the counterclaims of the CANA Congregations in response to those suits must be revived in order to resolve this dispute under principles of real property and contract law.

For these reasons, we will reverse the judgment of the circuit court and remand with directions to dismiss the CANA Congregations' Code § 57-9(A) petitions. We will further direct the circuit court to reinstate the declaratory judgment actions filed by TEC and the Diocese and the counterclaims of the CANA Congregations to those actions and conduct further proceedings thereon consistent with the views expressed in this opinion.

*Id.* at 29-30 (footnotes and citations omitted).

Pursuant to this remand, the Court conducted the trial of the declaratory judgment actions over the course of twenty-two days during April, May, and June 2011 and took testimony from over sixty witnesses. On June 2, 2011, the Court set a post-trial briefing schedule, permitting each side to file up to 600 pages of argument in three rounds of briefings. Both sides filed comprehensive and thorough post-trial briefings, with each side using up approximately 500 of its allotted 600 pages. A total of nine principal post-trial briefs have been filed by the parties. For clarity and simplicity sake, the briefs will be referred to in this opinion as follows: CANA Congregations' Corrected Opening Post-Trial Brief (CANA Brief # 1A); CANA Congregations' (Corrected) Proposed Findings of Fact for Their Opening Post-Trial Brief (CANA Brief # 1B); CANA Congregations' Post-Trial Opposition Brief (CANA Brief # 2); CANA Congregations' Corrected Post-Trial Reply Brief (CANA Brief # 3); The Episcopal Church's First Post-Trial Brief (TEC Brief # 1); Post-Trial Opening Brief for the Episcopal Diocese of Virginia (Diocese Brief # 1); Post-Trial Response Brief for the Episcopal Church and the Episcopal Diocese of Virginia (TEC/DOV Brief # 2); The Episcopal Church's Third Post-Trial Brief (TEC Brief # 3); Post-Trial Reply Brief for the Episcopal Diocese of Virginia (Diocese Brief # 3).

The Court, having thoroughly reviewed the thousand pages of post-trial briefings and the record of this matter and the applicable case law, is now prepared to rule. This Letter Opinion sets out the Court's rulings and the basis for these rulings. As further described below, the parties are to prepare a Final Order in accordance with this Letter Opinion.

## II. *Background of Litigation and Procedural History*

### A. *Background of Litigation*

The genesis of this litigation has already been set out in detail in the Court's Letter Opinion on the Applicability of Virginia Code § 57-9(A) dated April 3, 2008, *see In re Multi-Circuit Episcopal Church Prop. Litig.*, 76 Va. Cir. 785 (2008), as well as in the Virginia Supreme Court's opinion in this case. The Virginia Supreme Court, in its opinion on the applicability of § 57-9(A), described the background of the litigation as follows:

At the 2003 General Convention of TEC, three major points of controversy arose: the Convention's confirmation of the election of Gene Robinson, a homosexual priest, as a bishop of one of the dioceses of TEC; the adoption of a resolution permitting the blessing of same-sex unions; and the rejection of a resolution concerning the "historic formularies of the Christian faith." Following the 2003 General Convention, Peter James Lee, the bishop of the Diocese, who had supported the confirmation of Robinson as a bishop, received "hundreds of letters" opposing these actions taken by the General Convention. Additionally, several congregations opposed to the actions of the General Convention stopped paying pledges owed to the Diocese and TEC, placing the funds in escrow. As a result, Bishop Lee became concerned that the dissident congregations would "attempt to create a parallel province."

In response to the discord within the Diocese, in 2004, a "Reconciliation Commission" was formed "to find ways to bring about some peaceful conflict resolution." Despite this effort, dissent concerning the actions of the 2003 General Convention continued, and, in 2005, Bishop Lee created a new commission "to give attention to this rising threat of division in the Diocese." The following year, the commission promulgated a "Protocol for Departing Congregations." Under this protocol, the Diocese initiated procedures for congregations to conduct votes "regarding possible departure from the Diocese," and several congregations initiated procedures under the protocol to separate from the Diocese. However, Bishop Lee subsequently advised leaders of the dissident congregations that, due to a change in leadership in TEC, separation of congregations had become a matter of concern to the national church and that a vote to separate would not be binding on the Diocese or TEC.

Nonetheless, between December 2006 and November 2007, 15 congregations voted to separate from the Diocese. As a result, 22 members of the clergy associated with these congregations were deposed, or removed, from their pastoral duties in the Diocese by Bishop Lee. Congregations in other dioceses of TEC also took similar action to separate from their dioceses over the controversies arising from the 2003 General Convention. These congregations, as well as newly formed congregations of former members of TEC, began seeking to affiliate with other polities within the Anglican Communion in order "to be a part of the worldwide church."

The Church of Nigeria is a province of the Anglican Communion and governs the Anglican churches in the Federal Republic of Nigeria, a former British colony. In 2005, the Convocation of Anglican Nigerians in America was established as a mission of the Church of Nigeria to provide oversight for expatriate Nigerian congregations in

the United States. In 2006, the Church of Nigeria changed the name of this mission to the Convocation of Anglicans in North America ("CANA") and began accepting former TEC congregations. In 2006, the Anglican District of Virginia ("ADV") was formed as a district of CANA. By 2007, CANA included 60 congregations in eighteen states and 12,000 members, of which 10,000 were in congregations previously affiliated with dioceses of TEC.

280 Va. at 15-16 (footnotes and citations omitted).

To the above, the Court would add the following facts.

On January 18, 2007, the Standing Committee of the Diocese advised Bishop Lee of the names of the Clergy associated with the CANA Congregations who the Diocese stated "have abandoned the communion of the Episcopal Church." PX-COM-0253-001.

On January 22, 2007, Bishop Lee, in a document entitled "Notice of Inhibition" notified The Presiding Bishop of The Episcopal Church, Rev. Katharine Jefferts Schori, and others that, "[u]nder the provisions of Title IV, Canon 10, of the Constitution and Canons of the Episcopal Church, the Standing Committee of the Diocese of Virginia has determined that [21 named] priests canonically resident in the Diocese of Virginia have abandoned the communion of the Protestant Episcopal Church in the United States of America [and that Bishop Lee had] affirmed such determination." Bishop Lee then stated the following:

> Acting in accordance with the provisions of Title IV, Canon 10, Section 1, I have inhibited the clergy listed above from exercising their priestly ministry, including officiating in the Diocese of Virginia for six (6) months from this date, and from participating in the councils of this Church and Diocese. Unless, within six (6) months they shall fulfill the canonical requirements and transmit a retraction of their actions, they will be removed from the ordained ministry of the Church, under the provisions of Title IV, Canon 10.2.

PX-COM-0254-001.

Also on January 22, 2007, Bishop Lee as President of the Executive Board of the Diocese signed a resolution declaring the property of each of the seven churches to have been abandoned. *See* PX-TRU-0510 (Truro), PX-FALLS-0788 (The Falls Church), PX-APOST-0477 (Church of the Apostles), PX-EPIPH-0283 (Church of the Epiphany), PX-STMARG (St. Margaret's), PX-STPAUL-0764 (St. Paul's), and PX-SSH-0485 (St. Stephens). Each of the resolutions stated, in part, the following:

> (1) The Executive Board regards the real and/or personal property heretofore and formerly owned or used by the Congregation of [the

named church], a Church of The Episcopal Church in the Diocese of Virginia for purposes for which religious congregations are authorized to hold property under the provisions of the Code of Virginia, as abandoned property because such real and personal property has ceased to be so occupied or used by such Congregation.

(2) The Executive Board accordingly declares the real and/or personal property of [the named church] abandoned.

(3) The Executive Board hereby resolves to take charge and custody of such real and/or personal property.

(4) The Executive Board hereby directs the Trustees of [the named church] to transfer all such real and/or personal property to the Bishop forthwith.

*Id.*

On August 1, 2007, Bishop Lee, in a document entitled "Notice of Removal" notified The Presiding Bishop of The Episcopal Church, Rev. Katharine Jefferts Schori, and others that, in accordance with the provisions of Canon IV, 10.2 of the Constitution and Canons of the Episcopal Church, that with the "advice and consent" of the Standing Committee of the Diocese, certain named clergy, each of whom had been named in the January 22, 2007, Notice of Inhibition were "released from the obligations of ordained ministry and, for causes which do not affect their moral character, are deprived of the rights to exercise the gifts and spiritual authority conferred in Ordination." PX-COM-0275-001.

B. *Procedural History*

The instant litigation began with the filing of the § 57-9(A) petitions between December 2006 and July 2007 by nine congregations in the five circuit courts which had jurisdiction over the property. The nine congregations were as follows: Truro Church (Fairfax), The Church at the Falls, The Falls Church (Arlington), Church of the Apostles (Fairfax), Church of the Epiphany (Fairfax), St. Margaret's Church (Woodbridge), St. Paul's Church (Haymarket), St. Stephen's Church (Northumberland County), Church of the Word (Prince William County), and Church of Our Saviour (Loudoun County). TEC and the Diocese intervened in the cases and also filed declaratory judgment actions against the CANA Congregations. Individuals associated with the congregations, including former Episcopal Church rectors and vicars, vestry members, and property trustees, were also sued.

On or about January 31, 2007, the Diocese filed a complaint in the Circuit Court of Arlington County against The Church at the Falls, The Falls Church, and three separate complaints in the Circuit Court of Fairfax County against Truro Church, Church of the Apostles, and Church of The

Epiphany, respectively. On or about the same date, the Diocese also filed a complaint in the Circuit Court of Northumberland County against St. Stephen's Church. On or about February 1, 2007, additional complaints were filed in the Circuit Court of Prince William County against St. Margaret's Church and St. Paul's Church. Complaints against other churches were filed as well, but they are no longer a part of this litigation and not further described.

The Diocese's complaint against each of the congregations sought six forms of relief: (1) entry of a judgment that there has been an improper trespass, conversion, alienation, and use of the real and personal property of the church; (2) affirm the trust, proprietary, and contract rights of the Diocese; (3) restrain and enjoin individual defendants from further use and occupancy of the property; (4) direct and require the trustees of the property to convey and transfer the legal title to such property to the Diocesan Bishop; (5) direct and require individual defendants to convey and transfer control of such property to the Diocesan Bishop; and (6) order an accounting of the use of the real and personal property. A three-judge panel appointed by the Virginia Supreme Court under the Multiple Claimant Litigation Act, Virginia Code §§ 8.01-267.1, et seq., consolidated all these cases in the Circuit Court of Fairfax County.

On or about February 9, 2007, TEC filed a single complaint in the Circuit Court of Fairfax County against Truro Church, Church of the Apostles, Church of the Epiphany, The Church at The Falls, The Falls Church, St. Margaret's Church, St. Paul's Church, St. Stephen's Church, Christ the Redeemer Church, Church of the Word, Church of Our Saviour at Oatlands, and Potomac Falls Church. Four of the congregations initially sued by TEC, Christ the Redeemer Church, Church of the Word, Church of Our Saviour at Oatlands, and Potomac Falls Church, are no longer a part of this litigation.

TEC's complaint sought five specific forms of relief: (1) a declaration that each parish's real and personal property is held for the benefit of an Episcopal congregation or entity and must be used for the Church's ministry and mission; (2) a declaration that the defendants may not divert, alienate, or use the parishes real or personal property except in accordance with the constitution and canons of TEC and the Diocese; (3) issuance of a preliminary and permanent injunction ordering defendants to stop diverting, alienating, or using the parishes real or personal property, except as provided by the Constitution and Canons of TEC and the Diocese; (4) order an accounting of all real and personal property held by each parish; and (5) order the relinquishment of control of the real and personal property to the diocesan bishop.

Counterclaims and amended counterclaims were subsequently filed by the CANA Congregations. On February 8, 2011, this Court granted the CANA Congregations' motion for leave to amend, and the amended pleadings were

deemed filed. Specifically, the amended counterclaims, which were filed individually against TEC and the Diocese in January 2011, each sought the same relief: (1) a declaration that each of the properties at issue were in the sole and exclusive ownership of their respective congregation, free and clear of any claim of right or interest by TEC or the Diocese; (2) a claim for unjust enrichment/quantum meruit, if the Court should determine that TEC or the Diocese had rights to the individual church's real or personal property that were "superior or otherwise" to the rights of the CANA Congregation; and (3) a request for imposition of a constructive trust on TEC or the Diocese, if the Court should determine that TEC or the Diocese had rights to the individual church's real or personal property that were "superior or otherwise" to the rights of the CANA Congregation.

Also before the Court is a single question regarding The Falls Church Endowment Fund. All parties agree that the sole question before the Court is "which Vestry is the Vestry of The Falls Church, Episcopal Church, which has the authority to elect the Directors of the Endowment Fund." (*See* Diocese Brief # 1 at 80; *see also* Falls Church's Post-Trial Reply Brief Regarding the Endowment Fund.) Previously, this Court rejected the CANA Congregations' assertion that the Endowment Fund was subject to The Falls Church's § 57-9 petition and stated that the matter would be resolved in this declaratory judgment action. *See In re Multi-Circuit Episcopal Church Prop. Litig.*, 76 Va. Cir. 976, 986 (2008).

In this Letter Opinion, the Court resolves the Declaratory Judgment actions filed by TEC and the Diocese against the seven CANA Congregations, the CANA Congregations amended counterclaims, and the question described above regarding The Falls Church Endowment Fund.

### III. *Summary of Rulings*

In this Letter Opinion, the Court makes three principle rulings.

1. TEC and the Diocese have a contractual and proprietary interest in each of the seven Episcopal churches that are the subjects of this litigation. Specifically, the Court finds for TEC and the Diocese in their Declaratory Judgment actions and, among other relief, orders that all real property conveyed by the forty-one deeds, as well as all personal property acquired by the churches up to the filing date of the Declaratory Judgment actions (on or about January 31, 2007, or February 1, 2007) are to be promptly conveyed to the Diocese. Additional instructions are provided at the conclusion of this Letter Opinion.

2. The CANA Congregations' Amended Counterclaims are denied in their entirety. Specifically, the Court finds that the CANA Congregations, in that they are not *Episcopal* Congregations, do not possess either contractual or proprietary interests in the property of the seven Episcopal Churches at issue. They are, therefore, enjoined from further use or control of these

properties and must promptly relinquish them to the Diocese. Moreover, the Court finds no merit in the CANA Congregations' claims for unjust enrichment, quantum meruit, and constructive trust and grants TEC's and the Diocese's motions to strike these claims.

3. The vestry empowered to elect directors to the Falls Church Endowment Fund is the vestry recognized by the Diocese as the Episcopal vestry of The Falls Church, that is to say, the Continuing Congregation.

## IV. Description of the Parties

### A. Plaintiffs and Counter-Defendants

#### 1. The Protestant Episcopal Church in the United States of America ("TEC")

The following brief description of the Protestant Episcopal Church in the United States of America is taken from the Court's prior letter opinion of April 3, 2008, except that, to avoid confusion, the Court has replaced the short-hand reference used in the opinion to refer to the denomination ("ECUSA") with the short-hand reference used in this opinion to refer to the denomination ("TEC"). 76 Va. Cir. 785, 789-90 (citations omitted).

The Protestant Episcopal Church in the United States of America ("TEC") is "a constituent member of the Anglican Communion." The Anglican Communion is described in the same opinion as follows: "a 'family of churches . . . shar[ing] a kind of historical relationship, one with another . . . understanding and seeing [their] common ancestry in the Church of England through the See of Canterbury.' It is 'a family of . . . 38 . . . regional and national churches that share a common history of their understanding of the Church catholic through the See of Canterbury,' and 'a way by which . . . Anglicans say [they] are related to, [they] have a historic relationship with the Archbishop of Canterbury.' The Anglican Communion has also been described as 'a widely diverse international society of churches.' In the Lambeth Commission on Communion's 2004 Windsor Report, it formally referred to itself as that *part* of the Body of Christ which shares an inheritance through the Anglican tradition, that is, from the Church of England, whose history encompasses the ancient Celtic and Saxon churches of the British Isles, and which was given fresh theological expression during the period of the Reformation in the sixteenth and seventeenth centuries. . . . The core structures of the Anglican Communion include the Archbishop of Canterbury, who is known as the Anglican Communion's 'focus of unity,' along with three 'Instruments of Communion,' that are also known as 'Instruments of Unity.' These are: (1) the Lambeth Conference; (2) Anglican Consultative Council [hereinafter "ACC"]; and (3) the Primates' Meeting." *Id.* at 792-93.

It considers itself to be "a Fellowship within the One, Holy, Catholic, and Apostolic Church, of those duly constituted Dioceses, Provinces, and regional Churches in communion with the See of Canterbury, upholding and propagating the historic Faith and Order as set forth in the Book of Common Prayer." TEC's governing body is the General Convention, which consists of the House of Bishops and the House of Deputies. Essentially, the General Convention is a bicameral legislature, in that "[e]ither House may originate and propose legislation, and all acts of the Convention shall be adopted and be authenticated by both Houses." Each TEC bishop has a "seat and a vote in the House of Bishops," while the House of Deputies is composed of a mix of "ordained persons," Presbyters, Deacons, and laypeople. The House of Bishops elects TEC's Presiding Bishop, which is TEC's "Chief Pastor and Primate," by majority vote. TEC is further subdivided into either Dioceses, or Missions. Each Diocese chooses its Bishop or Bishop Coadjutor according to "rules prescribed by the Convention of that Diocese," while Bishops of Missionary Dioceses are "chosen in accordance with the Canons of the General Convention." Dioceses are grouped into geographical Provinces, except that, pursuant to TEC's Constitution, "no Diocese shall be included in a Province without its own consent." Each Province has a Synod, which has its own House of Bishops and House of Deputies.

The Virginia Supreme Court, in *Protestant Episcopal Church in Diocese of Virginia v. Truro Church*, 280 Va. at 14-15 (footnote omitted), provided the following additional description of TEC:

> TEC consists of 111 geographic dioceses with over 7000 congregations and over 2 million members. The highest governing body of TEC is the triennial General Convention, which adopts TEC's constitution and canons to which the dioceses must give an "unqualified accession." Each diocese in turn is governed by a Bishop and Annual Council that adopts the constitution and canons for the diocese. Each congregation within a diocese in turn is bound by the national and diocesan constitutions and canons. The Protestant Episcopal Church in the Diocese of Virginia ("the Diocese") is one of the diocese within TEC.

There is no dispute in this litigation that TEC is a hierarchical church. *Id.* at 12-14. A "hierarchical church" is a church "such as Episcopal and Presbyterian churches, that are subject to control by super-congregational bodies." 280 Va. at 13 (footnote omitted); *see also Baber v. Caldwell*, 207 Va. 694, 698 (1967). The term "hierarchical" includes "super congregational" and "connectional" churches. *Reid v. Gholson*, 229 Va. 179, 188 (1985). *Reid* provides the following description of a "hierarchical" church:

Hierarchical churches may, and customarily do, establish their own rules for discipline and internal government. They may, and frequently do, establish internal tribunals to decide internal disputes arising in matters of discipline and internal government. These tribunals may be guided by a body of internally-developed canon or ecclesiastical law, sometimes developed over a period of centuries. The decisions of such tribunals may be promulgated as matters of faith and are entirely independent of civil authority. One who becomes a member of such a church, by subscribing to its discipline and beliefs, accepts its internal rules and the decisions of its tribunals. For that reason, the civil courts will treat a decision by a governing body or internal tribunal of a hierarchical church as an ecclesiastical determination constitutionally immune from judicial review. To do otherwise would precipitate the civil court into the "religious thicket" of reviewing questions of faith and doctrine even when the issue is merely one of internal governance, because, in such churches, the resolution of internal government disputes depends upon matters of faith and doctrine.

*Id.* at 188-89 (citation omitted). As a part of the hierarchy, there are three dioceses affiliated with TEC in Virginia, of which the Diocese of Virginia is one. The Diocese of Virginia consists of thirty-eight counties in the northern and central parts of the Commonwealth. 280 Va. at 15.

2. *The Protestant Episcopal Church in the Diocese of Virginia ("the Diocese")*

All but the first sentence of the following description is taken from this Court's April 3, 2008, opinion. *See* 76 Va. Cir. 785, 790-91 (citations omitted).

The Diocese is an unincorporated religious body or association in Virginia and a constituent part of TEC. The Diocese's Constitution states that "[t]he order, government, and discipline of the Protestant Episcopal Church in the Diocese of Virginia shall be vested in the Bishop, and in the Council of the Diocese. . . ." The Council is comprised of the "Clerical order" and the "Lay order." The Clerical order is composed of "the Bishop or Bishops and all other ministers canonically resident in the Diocese of Virginia," while the "Lay order consist[s] of both the "Lay Delegates," and the "Lay members *ex officio*." The Lay Delegates consist of delegates from each church, as chosen by its Vestry. The Lay members *ex officio* include "the Lay members of the Standing Committee, the Lay members of the Executive Board, the Chancellor, the Presidents of the Regions, the President of the Episcopal Church Women of the Diocese, and five lay persons, not over twenty-one years of age at the time of election, to be elected on or before May 1 as Youth Delegates by five of the Regional Councils designated on an annual

rotating basis by the Standing Committee." The Council conducts annual meetings.

In addition to the Bishop, officers of the Diocese include a Secretary, Treasurer, Chancellor, and a Registrar. The Diocese's Constitution also mandates that a Standing Committee and an Executive Board "conduct . . . the affairs of the Diocese." The Standing Committee "consist[s] of twelve members, six of the Clerical order, and six of the Lay order," while the Executive Board consists of "[o]ne member elected by each Regional Council," and "[t]he Bishop, the Bishop Coadjutor if there be one, and the Suffragan Bishops if there be such." The Diocese of Virginia is divided into Regions, of which every Church in the Diocese is a member. Each Region has its own Regional Council. At the local level, each Church within the Diocese has a Vestry, which consists of three to twelve members who are elected by the Church's adult communicants. The Church's head pastor, known as the Rector, presides at Vestry meetings and is in fact elected by the Church's Vestry with "the advice of the Bishop and in compliance with General Convention Canon III. 17."

B. *Defendants and Counter-Plaintiffs*

1. *The Falls Church*

The Falls Church, located in Falls Church, Virginia, was founded in or around 1732 and, therefore, is the only church before the Court that existed before TEC and the Diocese came into existence. In 1746, John Trammole conveyed a two-acre parcel to the Vestry of Truro Parish for a churchyard, upon which the original sanctuary was built. By 1798, The Falls Church was no longer functioning as an Episcopal congregation, but, by 1819, there is evidence of a functioning congregation at The Falls Church that sought to participate in activities of the Diocese. In 1836, The Falls Church was admitted to the Diocese as a separate and distinct church. From 1837 to 1861, The Falls Church had an organized congregation. With the coming of the Civil War, the church suffered substantial disruption and building damage, which was repaired by the United States Army following the war. The church was formally reorganized, and a vestry was elected on November 27, 1873. The church has been continually in existence since then.

2. *St. Paul's Church*

St. Paul's, which is located in Haymarket, Virginia, began in or around 1832. In 1834, the historic church, which was previously a district courthouse, was consecrated. Except for a period of disruption during the Civil War, the church has been continually in existence to the present.

### 3. *Truro Church*

Truro Church, which is located in Fairfax, Virginia, was founded in 1843 by Rev. Richard Templeton Brown, who was then the Rector of The Falls Church. Until 1934, it was known as Zion Protestant Episcopal Church, but the name was changed to Truro by the congregation and vestry in that year. The congregation disbanded during the Civil War but partially re-formed as early as November 1866, when initial trustees were appointed. The Congregation of Zion Church erected a frame building around 1872, and the congregation has been in continued existence since then.

### 4. *St. Stephen's Church*

St. Stephen's, which is located in Heathsville, Virginia, came into existence in 1874, with the deeding of property for the purpose of erecting a "house for divine worship." Initially, the church was called Emmanuel P.E. Church, but the church was consecrated in 1881 as St. Stephen's Church. Since then, the original church building has been continuously used as a church.

### 5. *Church of the Apostles*

Church of the Apostles, which is located in Fairfax, Virginia, was formed as a mission of the Diocese in 1968. In June 1969, the congregation purchased a parcel of land on Pickett Road in Fairfax, Virginia, from the Diocese. Because the congregation had not achieved parish status, legal title remained in the Diocesan Missionary Society until Apostles was granted parish status at the 1970 Annual Council of the Diocese. A worship space was built on the property in 1980. Church of the Apostles has been in continual existence since it was formed as a mission in 1968.

### 6. *St. Margaret's Church*

St. Margaret's, which is located in Woodbridge, Virginia, grew out of the Diocese's program for church planting in the early 1960s. On October 6, 1963, St. Margaret's held its first worship service in a middle school classroom. On January 28, 1965, St. Margaret's was admitted to the Diocese as a Mission, and, on January 24, 1971, St. Margaret's was admitted to the Diocese as a church. St. Margaret's has been in continual existence since it was formed as a mission in 1965.

### 7. *Church of the Epiphany*

Church of the Epiphany, which is located in Herndon, Virginia, was founded in 1986 as a mission of Truro Church and that same year was

admitted by the Diocese of Virginia as a mission. It held its first worship service on February 1, 1986, at a local public school. On January 30, 1987, the Diocese of Virginia admitted the Church of the Epiphany as a church. In August 1987, the Church of the Epiphany acquired the property upon which its church would be built. Ground-breaking took place in March 1988, and the church was consecrated on April 23, 1989. Church of the Epiphany has been in continual existence since it was formed as a mission in 1986.

## V. *Neutral Principles of Law Legal Standard*

### A. *Key U.S. and Virginia Supreme Court Cases*

1. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440 (1969)*

*Hull* involved a church property dispute which arose when two local churches in Savannah, Georgia, withdrew from a hierarchical general church organization, specifically the Presbyterian Church in the United States. As the Supreme Court described the situation confronting Georgia courts:

> In 1966, the membership of the local churches, in the belief that certain actions and pronouncements of the general church were violations of that organization's constitution and departures from the doctrine and practice in force at the time of affiliation, voted to withdraw from the general church and to reconstitute the local churches as an autonomous Presbyterian organization. The ministers of the two churches renounced the general church's jurisdiction and authority over them, as did all but two of the ruling elders. In response, the general church, through the Presbytery of Savannah, established an Administrative Commission to seek conciliation. The dissident local churchmen remained steadfast; consequently, the Commission acknowledged the withdrawal of the local leadership and proceeded to take over the local churches' property on behalf of the general church until new local leadership could be appointed.
>
> The local churchmen made no effort to appeal the Commission's action to higher church tribunals, the Synod of Georgia or the General Assembly. Instead, the churches filed separate suits in the Superior Court of Chatham County to enjoin the general church from trespassing on the disputed property, title to which was in the local churches. The cases were consolidated for trial. The general church moved to dismiss the actions and cross-claimed for injunctive relief in its own behalf on the ground that civil courts were without power to determine whether the general church had departed from its tenets

of faith and practice. The motion to dismiss was denied, and the case was submitted to the jury on the theory that Georgia law implies a trust of local church property for the benefit of the general church on the sole condition that the general church adheres to its tenets of faith and practice existing at the time of affiliation by the local churches. Thus, the jury was instructed to determine whether the actions of the general church "amount to a fundamental or substantial abandonment of the original tenets and doctrines of the [general church], so that the new tenets and doctrines are utterly variant from the purposes for which the [general church] was founded." The jury returned a verdict for the local churches, and the trial judge thereupon declared that the implied trust had terminated and enjoined the general church from interfering with the use of the property in question. The Supreme Court of Georgia affirmed. [The Supreme Court of the United States] granted certiorari to consider the First Amendment questions raised.

*Id.* at 442-44. In determining that the First Amendment would not permit a civil court to adjudicate ecclesiastical issues, the Supreme Court set out some of the guiding principles for resolution of a church property dispute in a civil court.

"It is of course true that the State has a legitimate interest in resolving property disputes, and that a civil court is a proper forum for that resolution. Special problems arise, however, when these disputes implicate controversies over church doctrine and practice." *Id.* at 445.

[T]he civil courts [have] *no* role in determining ecclesiastical questions in the process of resolving property disputes." *Id.* at 447 (emphasis in original).

"Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. *And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.* But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *Abington School District v. Schempp,* 374 U.S. 203 (1963); the Amendment therefore

commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. *Id.* at 449 (emphasis added).

"The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied requires the civil judiciary to determine whether actions of the general church constitute such a 'substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. This determination has two parts. The civil court must first decide whether the challenged actions of the general church depart substantially from prior doctrine. In reaching such a decision, the court must of necessity make its own interpretation of the meaning of church doctrines. If the court should decide that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion, the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." *Id.* at 449-50.

*2. Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367 (1970)*

This case began in the Circuit Court of Washington County, Maryland, after a religious denomination called the General Eldership of the Churches of God in North America, filed suit against two congregations to prevent them from withdrawing from the Maryland and Virginia Eldership (which was one of the Elderships in the General Eldership) and to determine which of the two factions involved in the litigation should control the respective churches, their property, and their corporations. Ultimately, the Maryland circuit and appellate courts held for the local congregations, based on the determination that "so far as the use and control of property of the local congregation is concerned," the Church of God had a congregational (as opposed to a hierarchical) polity. *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 241 A.2d 691, 699 (Md. 1968). After *Hull* came down in 1969, the Supreme Court of the United States remanded the case back to the Maryland Court of Appeals to reconsider its decision in light of *Hull*. The Maryland Court determined that it had anticipated *Hull* in its decision and that its handling of the case

properly applied "neutral principles of law" and did not involve resolution of doctrinal issues as in *Hull*. When the case returned to the Supreme Court of the United States, they dismissed the appeal for want of a substantial federal question. In its entirety, the *per curiam* opinion reads as follows:

> In resolving a church property dispute between appellants, representing the General Eldership, and appellees, two secessionist congregations, the Maryland Court of Appeals relied upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property. Appellants argue primarily that the statute, as applied, deprived the General Eldership of property in violation of the First Amendment. Since, however, the Maryland court's resolution of the dispute involved no inquiry into religious doctrine, appellees' motion to dismiss is granted, and the appeal is dismissed for want of a substantial federal question.

396 U.S. at 367-68 (footnotes and citations omitted). Justice Brennan, in his concurrence, explained that a State could comply with the prescripts of *Hull* in a variety of ways and that a State "may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* at 368 (emphasis in original). Justice Brennan then went on to list three methodologies a State might adopt.

First, Justice Brennan referenced the approach of *Watson v. Jones*, 80 U.S. 679 (1872), enforcing the property decisions made within a church of congregational polity by a majority of its members or by such other "local organism as it may have instituted for the purpose of ecclesiastical government," and within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless "express terms" in the "instrument by which the property is held" condition the property's use or control in a specific manner. 396 U.S. at 368-69. Justice Brennan warned, however, that "the use of the *Watson* approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious polity." *Id.* at 370.

Second, Justice Brennan references the approach called "neutral principles of law, developed for use in all property disputes," citing *Hull, id.* "Under the 'formal title' doctrine, civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws. Again, however, general principles of property law may not be relied upon

if their application requires civil courts to resolve doctrinal issues." *Id.* He cites as an example a provision in a deed or a denomination's constitution for reversion of local church property to the general church upon a finding of departure from doctrine. *Id.*

Third, Justice Brennan references the possibility of "passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine." *Id.* He warns, however, that "[s]uch statutes must be carefully drawn to leave control of ecclesiastical polity, as well as doctrine, to church governing bodies." *Id.* (citation and footnote omitted).

### 3. *Norfolk Presbytery v. Bollinger, 214 Va. 500 (1974)*

In July 1972, a congregation in Hampton, Virginia, called Grace Covenant Presbyterian Church, which was a member of the Norfolk Presbytery and The Presbyterian Church in the United States, voted to sever its connection with the denomination and become an independent and autonomous church. In September of the same year, the Trustees of Grace Covenant filed a petition with the circuit court seeking permission to convey the real estate they held for Grace Covenant (which was used for a church, an elementary school, and a parsonage) to The Mary Atkins Christian Day School. The proceeding was *ex parte*, and the trial court, after noting that "the transfer of property was 'the wish of the congregation' and that the congregation was 'the governing body of said church,' directed the Trustees to effectuate the property transfer." *Id.* at 501.

Norfolk Presbytery filed a timely motion to set aside the order or, alternatively, to intervene. According to the subsequent Virginia Supreme Court opinion:

> [t]he motion for leave to intervene alleged that Grace Covenant was a duly constituted church of and subject to the jurisdiction, government, and discipline of The Presbyterian Church in the United States, a supercongregational body. The motion further alleged that the action of the congregation in undertaking unilaterally to withdraw, with its property, from the parent church was contrary to ecclesiastical law; that Norfolk Presbytery was the first ecclesiastical court having direct jurisdiction over Grace Covenant; that the Presbytery had a proprietary interest, as well as a jurisdictional and pastoral interest, in Grace Covenant and its property, which would be denied without due process of law if the order of September 22, 1972, became final. . . .

*Id.* The trial court denied Norfolk Presbytery's motion, and the case was appealed to the Virginia Supreme Court.

The Virginia Supreme Court, in a decision that construed *Hull* and *Maryland and Virginia Eldership Churches of God* and set out the elements

of a "neutral principles of law" analysis, reversed and held that the Norfolk Presbytery's motion to intervene should have been granted so that the Presbytery could present "whatever evidence it had tending to establish its interest in the Grace Covenant property." *Id.* at 503. This case warrants extended discussion because it, along with *Green v. Lewis*, 221 Va. 547 (1980), are the two principle Virginia Supreme Court decisions on this subject.

First, the Court construed Virginia Code § 57-15 "to require that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises." 214 Va. at 502. Where a "supercongregational church" was involved, "we hold that Code § 57-15 requires a showing that the property conveyance is the wish of the constituted authorities of the general church." *Id.* at 503. § 57-15 is discussed in greater detail in the "Statutes" section, below.

Second, the Court addressed the consequence of a finding that the general church had a "proprietary interest" in the local church's property. In that event, "the [trial] court's approval of the conveyance sought by the Trustees would unlawfully deprive the Presbytery of this property interest," and the Presbytery would be "entitled to a permanent injunction against the conveyance by the Trustees to the Day School." *Id.* If, on the other hand, "the Presbytery is unable to establish a proprietary interest in the property, it will have no standing to object to the property transfer." *Id.* (citation omitted).

Third, the Court addressed each party's contention that, regardless of statutory provisions, the constitutional principle of separation of church and state compelled a ruling in its favor. The Trustees of the local church argued that judicial review of the congregation's decision to become autonomous "would abridge the congregation's right to free exercise of religion and would establish the Presbytery as a state supported church." *Id.* The Presbytery argued the reverse: a ruling in the local congregation's favor "would be an impermissible establishment of the local church and a prohibited interference in the ecclesiastical law of the general church." *Id.* The Virginia Supreme Court "reject[ed] both of these contentions, for there is no constitutional prohibition against the resolution of church property disputes by civil courts, provided that the decision does not depend on inquiry into questions of faith or doctrine." *Id.* (citations omitted).

Fourth, the Court observed that it was not bound by the holding of *Watson v. Jones*, where "it was held that those who unite themselves with a hierarchical church do so with an implied consent to its government and take title to local church property subject to an implied trust for the general church." *Id.* at 504. The Court noted that *Watson* was based on federal law and, in any event, "did not hold that the implied trust doctrine was the only constitutional rule for resolving church property disputes." *Id.*

Fifth, the Court reviewed the holding of the Supreme Court in *Hull*, and noted that, "in *Hull*, the Supreme Court acknowledged that civil courts may properly adjudicate disputes over church property. The First Amendment requires only that such disputes be adjudicated according to `neutral principles of law, developed for use in all property disputes', and which do not involve inquiry into religious faith or doctrine." *Id.* (citation omitted). Significantly, the Court stated that "[w]e do not construe *Hull* as requiring that courts apply neutral principles of law by considering only the record title to church property." *Id.* at 505. The Court then turned to the Supreme Court's decision in the *Maryland and Virginia Eldership of Churches of God* case, where it dismissed the appeal of the Maryland decision, upholding a multi-faceted approach to the "neutral principles of law" analysis. The Court then held "that it is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds, and the provisions of the constitution of the general church." *Id.*

Sixth, the Virginia Supreme Court noted that, "[a]s express trusts for supercongregational churches are invalid under Virginia law, no implied trusts for such denominations may be upheld." *Id.* at 507. This did not mean, however, "that our civil courts are powerless to prevent a hierachical church from being deprived of contractual rights in church property held by trustees of a local congregation." *Id.* It then concluded:

> Norfolk Presbytery made sufficient allegations to be entitled to file its petition as an intervenor in order to have a determination made whether it had a proprietary interest in the property of Grace Covenant which could not be eliminated by unilateral action of the congregation. To this end, the language of the deeds and the constitution of the general church should be considered by the trial court in the application of neutral principles of law. As Norfolk Presbytery cannot rely on the implied trust theory, because of our statutes, it has the burden of proving that the Trustees of Grace Covenant have violated either the express language of the deeds or a contractual obligation to the general church.

*Id.*

### 4. *Jones v. Wolf*, 443 U.S. 595 (1979)

Once again, the Supreme Court of the United States addressed a Georgia case involving a dispute over the ownership of local church property following a "schism" in a local church affiliated with a hierarchical organization, specifically the Presbyterian Church in the United States.

First, the Supreme Court noted that Georgia's approach to church property litigation has "evolved" since *Hull* was handed down in 1969.

*Id.* at 599. Prior to *Hull*, noted the Court, the "Georgia Supreme Court resolved [a church property] controversy by applying a theory of implied trust, whereby the property of a local church affiliated with a hierarchical church organization was deemed to be held in trust for the general church, provided the general church had not `substantially abandoned' the tenets of faith and practice as they existed at the time of affiliation." *Id.* Because the Supreme Court in *Hull* reversed and found that Georgia "would have to find some other way of resolving church property disputes that did not draw the state courts into religious controversies," Georgia subsequently abandoned its implied trust theory "in its entirety," after concluding that it could not survive without the "departure-from-doctrine" element. *Id.* at 599-600. In its place, the Georgia Supreme Court adopted the "neutral principles of law" method for resolving church property disputes. In Georgia, that meant that "[t]he court examined the deeds to the properties, the state statutes dealing with implied trusts, and the Book of Church Order to determine whether there was any basis for a trust in favor of the general church." *Id.* at 600. (citation omitted).

Second, the Supreme Court reviewed prior case law establishing the limitations placed on a civil court by the First Amendment in resolving a church property issue: "Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976) (other citations omitted). As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." 443 U.S. at 602 (citations omitted). "Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes." *Id.* The Court then cited Justice Brennan's concurrence in *Maryland and Virginia Churches*, 396 U.S. at 368, for the proposition that "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." 443 U.S. at 602.

Third, the Supreme Court noted that the " `neutral principles of law' approach is consistent with [these] constitutional principles" and that the "primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity." *Id.* at 602-03. In particular, said the Court:

The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglements in

questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general, flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Id.* at 603-04.

Fourth, the Court warned that even the "neutral principles of law" approach was not "wholly free of difficulty." *Id.* at 604. For example, in Georgia, the approach requires a civil court to examine religious documents, such as a church constitution, for language of trust in favor of the denomination. "In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms." *Id.* And "where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property" and the interpretation of the document would require the civil court to resolve a religious controversy, "then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* (citation omitted).

Fifth, the Court noted that the problems of religious entanglement should be gradually eliminated as religious organizations come to recognize their obligation to structure their relationships so as not to require civil courts to resolve religious issues.

Sixth, the Supreme Court held that a State is "constitutionally entitled" to adopt neutral principles of law as a means of adjudicating a church property dispute. In addition, the Supreme Court rejected the notion that "the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved." *Id.* at 605.

Seventh, the Supreme Court noted that, under the neutral principles approach, "the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to

the result indicated by the parties, provided it is embodied in some legally cognizable form." *Id.* at 606 (footnote omitted).

Eighth, the Supreme Court addressed the circumstances of the controversy before it, which had as a factor distinguishing it from prior cases a division between a majority of local congregation members who wished to withdraw from the denomination and a minority of local congregation members who wished to maintain the affiliation. The Court stated that "[i]f in fact Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, we think this would be consistent with both the neutral-principles analysis and the First Amendment." *Id.* at 607. "Most importantly," added the Court, "any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing, in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it. Indeed, the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy." *Id.* at 607-08 (footnote omitted).

Finally, the case was remanded to the Supreme Court of Georgia for it to determine what the law of Georgia was regarding majority rule. The Court noted that there was some "indications" in the record that, under Georgia law, the process of identifying the faction that represents the local church involves considerations of religious doctrine and polity and that Georgia law requires "that `church property be held according to the terms of the church government,' and provides that a local church affiliated with a hierarchical religious association `is part of the whole body of the general church and is subject to the higher authority of the organization and its laws and regulations'." *Id.* at 608 (citations omitted). This suggested to the Supreme Court the possibility that the "identity" of the local church named in the deeds "must be determined according to the terms of the Book of Church Order, which sets out the laws and regulations of churches affiliated with [the denomination]." *Id.* at 609. The Court concluded:

> Such a determination, however, would appear to require a civil court to pass on questions of religious doctrine, and to usurp the function of the commission appointed by the Presbytery, which already has determined that petitioners represent the "true congregation" of the [local] church. Therefore, if Georgia law provides that the identity of the [local] church is to be determined according to the "laws and regulations" of the [denomination], then the First Amendment requires that the Georgia courts give deference to the presbyterial commission's determination of that church's identity.

*Id.* (footnotes omitted).

After the Supreme Court issued *Jones*, TEC decided to avail itself of the Supreme Court's suggestion that a denomination might amend its governing documents to recite an express trust in favor of the denomination. The General Convention adopted a canon (now Canon I.7(4)), called either the "Dennis Canon" or the "1979 Trust Canon," which provides:

> Sec. 4. All real and personal property held by or for the benefit of any Parish, Mission, or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission, or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission, or Congregation otherwise existing over such property so long as the particular Parish, Mission, or Congregation remains a part of and subject to this Church and its Constitutions and Canons.
>
> Sec. 5. The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust.

TEC-18-2, Tr. 1214. The Annual Council of the Diocese of Virginia adopted a parallel canon, current Diocesan Canon 15.1, in 1983. PX-COM-222. *See also* TEC Brief # 1 at 13. For the reasons stated in the Statutes section of this opinion, the Court concludes that neither the Dennis Canon nor Diocesan Canon 15.1 had their intended effect in the Commonwealth, given the fact that the Commonwealth did not validate denominational trusts.

### 5. *Green v. Lewis, 221 Va. 547 (1980)*

On October 11, 1977, the congregation of a Chesterfield County church called "Lee Chapel, African Methodist Episcopal Zion Church" decided to separate itself from its parent organization, the African Methodist Episcopal [A.M.E.] Zion Church. At a meeting held on November 20, 1977, the congregation adopted a resolution to become an independent Methodist Episcopal Church free of its former affiliation with the A.M.E. Zion Church in Virginia and the A.M.E. Zion Church in America. The resolution also stated that "all decisions concerning the Lee Chapel Methodist Episcopal Church and its property and all of its affairs shall be lawfully made by its local membership and congregation, through their duly elected officers or trustees." *Id.* at 550. Thereafter, Wesley J. Green, pastor of Lee Chapel, sought an injunction against certain members of the church to prevent them from entering or using the premises of Lee Chapel in a manner contrary to the wishes of the proper officials of the A.M.E. Zion Church. The trial judge

granted a temporary injunction but subsequently dissolved it on motion of members of the congregation who petitioned to intervene. Ultimately, the trial found that the general church "had failed to establish that it had a proprietary interest in the property of Lee Chapel and decreed that the trustees of the local congregation and the congregation should enjoy the ownership, control, and use of the real and personal property in controversy to the exclusion of the general church." *Id.* at 548-49.

The issue before the Virginia Supreme Court in *Green* was essentially the same one before the Virginia Supreme Court in *Norfolk Presbytery,* i.e., whether the general church had a contractual or proprietary interest in the local church property. *Green* is particularly significant for two reasons.

The first reason is that *Green* gives a trial court guidance on the types of evidence that a trial court might rely upon in performing the "neutral principles of law" analysis. In the course of the opinion, the Virginia Supreme Court noted the following pertinent facts.

(1) The A.M.E. Zion Church "is a hierarchical church composed of local pastors, deacons, elders, presiding elders, and bishops, whose duties are specified in the Discipline." *Id.* at 549. The Court noted that the "rules, regulations, and doctrines governing and controlling the operation of the church are found in 'The Doctrines and Discipline of the African Methodist Episcopal Zion Church,' revised in May 1972, and hereinafter referred to as 'the Discipline'." 221 Va. at 549.

(2) "The structure of the A.M.E. Zion Church and its general plan of operation are not unlike that of other supercongregational or hierarchical churches." *Id.* Specifically, the Court took note of the following eight aspects of the Church: (a) It has a "home mission" department, which makes grants and loans to local churches; (b) it has a publishing house in Charlotte, North Carolina, which provides literature for local churches and Sunday Schools and publishes the Discipline and hymnals; (c) the Church operates a college and two junior colleges and makes scholarships available for students to attend these colleges; (d) the church also runs a seminary which trains its pastors; (e) the church does missionary work in foreign countries; (f) the church is financed by assessments paid by members of local churches to the general church; (g) pastors are appointed by the bishops and a local congregation could not refuse to accept a pastor; and (h) guidelines for worship are set forth in the Discipline and are followed by local pastors. *Id.*

(3) The local church property consisted of a one acre lot conveyed by deed in 1875 to the "Trustees of the A.M.E. Church of Zion for the purpose of erecting an A.M.E. Church of Zion to be known as Lee Chapel." *Id.* at 549. CANA argues that, if the denomination had not been the grantee in the deed, the denomination "would not have gotten to first base in establishing a proprietary interest." CANA Brief # 1A at 23. The Court disagrees. First, given the fact that denominational trusts are not recognized in Virginia, the deed must necessarily be read as a deed by which the trustees hold the

property on behalf of the local church itself. Thus, naming the denomination as grantee gave the denomination no greater or lesser rights. Second, *Norfolk Presbytery* makes it clear that a Court applying "neutral principles of law" does not look just at the record title holder.

(4) Lee Chapel was constructed on the deeded property and operated continuously as an A.M.E. Zion Church until October 1977, when the controversy arose. The original church building burned down in 1939 and was replaced by the present building, which was a church that had been used and abandoned by another church. The Virginia Supreme Court noted: "All labor incident to the removal of the building to the Lee Chapel site was performed by the local membership. No funds of the A.M.E. Zion Church, state or national, were used incident to the reconstruction of the church or to pay for any improvements subsequently made thereon." *Id.* at 550.

(5) Until the controversy erupted, all pastors of Lee Chapel were installed by the Annual Conference and their appointment accepted by the congregation of Lee Chapel. *Id.*

(6) The local church owes no funds, assessments, or other monies to the denomination or its Annual Conference. *Id.*

(7) It was unknown whether the original church had ever been formally dedicated. As to the present church, evidence was presented that it was never dedicated. A witness testified that in the A.M.E. Zion Church, "dedication of property was not required because it regarded a dedication as a ceremonial matter, more spiritual in nature than legal." *Id.* at 551. The Court rejected the claim made by Lee Chapel members that the fact that there was never a formal dedicatory ceremony meant that the church never became a member of the denomination: "[W]e conclude that 100 years of continuous service in the church by the pastors supplied Lee Chapel by the A.M.E. Zion Church constitutes an adequate dedication of the property for its intended spiritual and ecclesiastical purposes." *Id.* at 554.

(8) At the meeting in October 1977, when Lee Chapel voted to withdraw from the general church, sixty-four of seventy active members were present. *Id.* at 551.

(9) As to the reasons why Lee Chapel moved to disaffiliate from A.M.E. Zion Church, various members of the congregation noted that they had become "thoroughly disenchanted with the hierarchy" and "with those who operated the church above the level of the congregation." *Id.* Specifically, they complained that the general church had failed to lend any financial assistance during a $12,000 remodeling project; they objected to the levied assessments that the local congregation was required to meet; and they claimed that "the assessments were out of line, excessive, and beyond the financial ability of the congregation." *Id.* One quoted witness, who said it was his understanding that the church and its property belonged to the people in the community, complained that the benefits the general church

now claimed it provided to Lee Chapel "all fade away when it comes down to getting any results from the affiliation." *Id.* at 552.

(10) The trial court also heard from the Presiding Elder, who testified that he did receive complaints from Lee Chapel about the assessments but stated that both the clergy and laity had the opportunity to "speak pro or con, to ask that it be changed, or whatever they want to ask about it." *Id.* at 552. He also indicated that a representative of the Lee Chapel had approached him about funds to make improvements, and he advised him that the local church could make an application for assistance, that the local church could even direct the application directly to the Presiding Elder, and that he would "see that they got it," but that Lee Chapel had never applied for assistance. *Id.*

(11) The Virginia Supreme Court stated that, until October 1977, Lee Chapel operated in a manner not unlike any other small church in a rural area with a limited congregation that is part of a supercongregational denomination. Their "frustrations" were "not uncommon." *Id.*

(12) The Virginia Supreme Court summarized the hierarchical nature of the church as follows:

> Concerning the status of Lee Chapel, a reference to the original deed discloses that Lee Chapel has been an A.M.E. Zion Church for more than 100 years. The grantors conveyed the property to "Trustees of the A.M.E. Church of Zion." The conveyance was for the purpose of erecting an A.M.E. Church of Zion (to be known as Lee Chapel), not a church of some other denomination, or an independent church. And that is what occurred. The church was organized, the building was constructed, and it functioned as an A.M.E. Zion Church until October 1977. It became and was an integral part of the supercongregational or hierarchical structure of the A.M.E. Zion Church. The general church supplied the ministers and provided the organization and structure which is necessary if a church is to function and to fulfill its mission. A Sunday School was organized, and its materials were furnished by the general church. Hymnals and other literature were provided. Baptisms, marriages, and funerals were conducted from the church's Discipline. Revival services were held. The central church, of which Lee Chapel was a part, conducted world missions and sent missionaries abroad. Colleges were founded, scholarships provided, and loans and grants made available when, in the discretion of the general church, they were needed. And the members of Lee Chapel, by payment of their assessments and in numerous other supportive ways, contributed to this state, national, and international ecclesiastical organization, and they presumably benefitted from the association, spiritually and otherwise.

*Id.* at 553-54.

The second reason why *Green* is particularly significant is because of a number of general statements in the opinion that provide a trial court guidance as to the "neutral principles of law" method of resolving church property disputes. Specifically, the Virginia Supreme Court noted the following.

(1) "In determining whether the AME Zion Church has a proprietary interest in the Lee Chapel property, we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties." *Id.* at 555.

(2) The Court also defined what constituted a proprietary right: "A proprietary right is a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls." *Id.*

(3) The Court made it clear that it was not within the scope of a "neutral principles of law" analysis to determine whether or not the grievances of the membership of a local church were valid. The issue now before the Court "is legal, not ecclesiastical, and involves an order of the court below, vesting title and ownership of the property in controversy in the trustees of the local congregation of Lee Chapel, upon the premise that the A.M.E. Zion Church has no proprietary interest therein." *Id.* at 552.

(4) The Court reviewed § 57-9 and § 57-15, with regard to the distinction between independent churches and those that are part of a supercongregational hierarchy. It quoted the language in *Norfolk Presbytery* that construes § 57-15 to require "that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises. . . . [The statute] now contemplates that the general church, or a division thereof, or certain ecclesiastical officials may be the proper parties to approve such a property transfer." *Id.* at 553 (citation omitted). It also noted that, in both *Norfolk Presbytery* and *Baber v. Caldwell*, 207 Va. 694 (1967), the Court "pointed out the distinctions, enunciated in Code § 57-9, between an autonomous congregation and one which is part of a supercongregational or hierarchical denomination where a determination of property rights is involved." 221 Va. at 553. It noted that, in *Norfolk Presbytery*, the Court had held "that, in the case of a supercongregational church, Code § 57-15 'requires a showing that the property conveyance is the wish of the constituted authorities of the general church'." *Id.* (citation omitted).

(5) As to the fact that the deed at issue did not include a provision that the property was held in trust for the national church, the Court stated that "[t]he addition of a trust clause to the deed would have provided the A.M.E. Zion Church with no additional or further interest in the Lee Chapel property." *Id.* at 554. The Court noted that the property was "already held by the trustees for that church and no other," and, as stated in *Norfolk Presbytery*,

"express trusts for supercongregational churches are invalid under Virginia law," as are implied trusts. *Id.* at 554-55.

The Discipline of the A.M.E. Zion Church required that a trust clause be incorporated in all conveyances of churches and parsonages to the A.M.E. Zion Church, providing that the property is held in trust for the national church. The requirement is waived, however, for deeds, like the 1875 deed at issue in this case, that pre-dated the adoption of the current Discipline. As to the deeds previously executed, the Discipline also stated that the absence of a trust clause did not relieve a local church of its responsibilities to the denomination, "provided that the intent and desire of the founders and/or the later congregations and boards of Trustees is shown by any or all of the following indications: (a) the conveyance of the property to the trustees of the local African Methodist Episcopal Zion Church or any of its predecessors: (b) the use of the name, customs, and policy of the African Methodist Episcopal Zion Church in such a way as to be thus known to the community as a part of this denomination: (c) the acceptance of the pastorate of ministers appointed by a bishop of the African Methodist Episcopal Zion Church, or employed by the presiding elder of the district in which it is located." 221 Va. at 554.

Given the foregoing, the Virginia Supreme Court concluded that A.M.E. Zion Church did have a proprietary interest in the property of Lee Chapel, concluding its opinion as follows:

> Here the A.M.E. Zion Church is the grantee in the deed, the property having been conveyed to trustees of that church to establish an A.M.E. Zion Church thereon. The provisions of this deed have remained unchanged since 1875, and since that time we find that the name, customs, and policies of the A.M.E. Zion Church have been used in such a way that Lee Chapel is known, recognized, and accepted to be an A.M.E. Zion Church. All religious services and ceremonies conducted by the pastors of that church have followed its Discipline. The literature used by the church and by the Sunday School came from the publishing house of the A.M.E. Zion Church. The various conferences to which the membership of Lee Chapel's congregation sent delegates were all organized and held under the direction of the A.M.E. Zion Church.
>
> It is reasonable to assume that those who constituted the original membership of Lee Chapel and who established the church in the manner directed by the grantors in the deed and those members who followed thereafter united themselves to a hierarchical church, the A.M.E. Zion Church, with the understanding and implied consent that they and their church would be governed by and would adhere to the Discipline of the general church. And para. 437(1) of the Discipline requires that all property transfers be approved by the bishop.

The fact that the general church has made no loans or grants for the benefit of Lee Chapel and that, in fact, it may have refused to contribute to the remodeling program of the local church is not dispositive. A proprietary interest or a contractual obligation does not necessarily depend upon a monetary investment. The contractual obligation which the A.M.E. Zion Church assumed has its genesis in the 1875 deed. From that time until October 1977, when the congregation sought to disassociate itself from the general church, the A.M.E. Zion Church had assumed its responsibility, fulfilled its obligation, and exercised dominion, control, and supervision over Lee Chapel, albeit not always in accordance with the wishes of all the members of the local church.

We find from the language of the deed involved, the Discipline of the A.M.E. Zion Church, and the relationship which has existed between the central church and the congregation over a long period of years that the A.M.E. Zion Church does have a proprietary interest in the property of Lee Chapel and that its interest in the church property cannot be eliminated by the unilateral action of the congregation. The Discipline of the A.M.E. Zion Church requires that all property transfers be approved by the bishop of the district of the Annual Conference, and such approval has not been given.

*Id.* at 555-56 (footnote omitted).

6. *The Protestant Episcopal Church in the Diocese of Virginia v. Truro Church, 280 Va. 6 (2010)*

The instant case was appealed upon this Court's decision holding that the disaffiliating congregations had properly invoked § 57-9(A). The Virginia Supreme reversed, ruling that the disaffiliating congregations had proven the existence of a division within TEC and the Diocese but had failed to prove that by affiliating with CANA or the Anglican District of Virginia ("ADV") that it had joined a "branch" of TEC or the Diocese. The Court found that, "while CANA is an `alternative polity' to which the congregations could and did attach themselves, we hold that, within the meaning of Code § 57-9(A), CANA is not a `branch' of either TEC or the Diocese to which the congregations could vote to join following the `division' in TEC and the Diocese as contemplated by Code § 57-9(A)." 280 Va. at 28. The Court explained the "branch" requirement as follows: "While the branch joined may operate as a separate polity from the branch to which the congregation formerly was attached, the statute requires that each branch proceed from the same polity, and not merely a shared tradition of faith." *Id.* at 28-9. The Court also found that this Court "erred in its holding that there was a division in the Anglican Communion for purposes

of the application of Code § 57-9(A) in these cases." *Id.* at 22. While the bulk of the opinion relates specifically to the § 57-9(A) litigation, there are a number of statements made by the Court that are directly germane to this declaratory judgment action.

(1) The Court noted at the outset that "[t]hese appeals arise from a dispute concerning church property between a hierarchical church and one of its dioceses in Virginia and a number of the diocese's constituent congregations." 280 Va. at 12.

(2) The Court reviewed the structure of TEC: "The highest governing body of TEC is the triennial General Convention, which adopts TEC's constitution and canons to which the dioceses must give an `unqualified accession.' Each diocese in turn is governed by a Bishop and Annual Council that adopts the constitution and canons for the diocese. Each congregation within a diocese in turn is bound by the national and diocesan constitutions and canons. The Protestant Episcopal Church in the Diocese of Virginia (`the Diocese') is one of the dioceses within TEC." *Id.* at 15 (footnote omitted).

(3) The Court reviewed the denomination's and dioceses' control over its priests: "Priests of TEC are `canonically resident' within a specific diocese and may not function as priests in any other diocese of TEC without the permission of the local bishop. Similarly, a priest ordained by a diocese of TEC may not function as a priest for one of the other regional or national churches that participate in the Anglican Communion without permission from the local authority of that church." *Id.*

(4) The Court found that the evidence presented by the CANA Congregations "clearly establishes that a split or rupture has occurred within the Diocese and, given the evidence of similar events in other dioceses of TEC, the split or rupture has occurred at the national level as well." *Id.* at 27. And, significantly, the Court found that "[t]here was not, nor could there be, any serious dispute that, until the discord resulting from the 2003 General Convention, the CANA Congregations were `attached' both to TEC and the Diocese because they were required to conform to the constitution and canons of TEC and the Diocese." *Id.*

The parties disagree as to what significance this Court should attach to the Virginia Supreme Court's statements that: (1) "Each congregation within a diocese in turn is bound by the national and diocesan constitutions and canons;" and (2) "The CANA Congregations were `attached' both to TEC and the Diocese because they were required to conform to the constitution and canons of TEC and the Diocese." The Diocese argues that they are the governing "law of the case." Diocese Brief # 1 at 40. The CANA Congregations argue that they were just a "passing reference." CANA Brief # 3 at 59. This Court does not agree that these were merely "passing reference[s]." Nevertheless, the Court does not need to reach the "law of the case" question because the evidence before the Court clearly supports

the conclusion, and the Court so finds, that the Congregations were, indeed, "bound" by the national and diocesan constitutions and canons, and were, indeed, required to "conform" to them.

(5) Finally, the Court ordered reinstatement of the declaratory judgment actions and counterclaims, to be resolved "under principles of real property and contract law." *Id.* at 29.

## B. *Other Circuit Court Decisions*

There are two circuit court decisions, one in 1977 and one in 1979, which this Court has found helpful in deciding the instant case and which warrant extended discussion. Both cases involve TEC and one of its Virginia dioceses, and both cases involve factual circumstances similar to the instant case. Because both cases were decided after the Supreme Court of the United States handed down *Hull* and *Maryland and Virginia Eldership of the Churches of God* (the 1979 case also had the benefit of the *Jones* decision, issued four months earlier) and after the Virginia Supreme Court handed down *Norfolk Presbytery*, both cases apply the "neutral principles of law" method to resolve a church property dispute between the denomination and a local congregation.

### 1. *Diocese of Southwestern Virginia of the Protestant Episcopal Church in the United States of America v. Buhrman, 5 Va. Cir. 497 (1977) (Stephenson, J.)*

*Buhrman* involved a suit "brought by the Diocese of Southwestern Virginia of the Protestant Episcopal Church in the United States of America, a trustee of St. Andrew's Episcopal Church of Clifton Forge, Virginia, and by twelve members of St. Andrew's against the remaining four trustees of the church and the Parish Rector to obtain a judicial determination of the status of St. Andrew's Parish real and personal property." *Id.* at 497. The property at issue were two parcels of real property in the City of Clifton Forge. On one parcel was the church and parish house, and on the other was the rectory. *Id.* There were two deeds involved in the litigation. The first deed, dated November 6, 1893, was to the church and parish house parcel. It stated that it was "for the erection of a church building to be used as a place of worship by the Episcopal congregation of Clifton Forge Parish." *Id.* at 497-98. The second deed, dated January 16, 1905, was to the rectory parcel. It had no stated purpose, but it was to "certain named persons as Trustees of St. Andrew's Episcopal Church of Clifton Forge, Virginia." *Id.* at 498.

St. Andrew's was a unit of the Diocese of Southwestern Virginia, which in turn is a constituent part of TEC. According to then-Judge Roscoe B. Stephenson, Jr., St. Andrew's "[t]hroughout its history" has always been

a part of TEC, although it was connected to different TEC dioceses within the Commonwealth at various points in its history. *Id.* Prior to 1974, St. Andrew's was a mission of TEC and the Diocese and gained parish status in January 1974.

In connection with its formal petition to the Diocese to be be advanced to parish status, the members of St. Andrew's promised and declared that the "[p]arish shall be forever held under the Ecclesiastical Authority of the Diocese of Southwestern Virginia and in conformity with the Constitution and Canons of the Diocese of Southwestern Virginia, the authority of which we do hereby recognize." 5 Va. Cir. at 499. In the same writing, the members did "solemnly engage and stipulate that all real estate consecrated as a church or chapel, of which the said Parish is or may become possessed, shall be secured against alienation from the Protestant Episcopal Church in the Diocese of Southwestern Virginia, unless such alienation is in conformation with its Canons." *Id.* at 499.

The controversy giving rise to the litigation arose out of resolutions passed by a "substantial" number of the members of St. Andrew's in October 1976 formally withdrawing itself from TEC, effective in December 1976, and a letter from the Rector of the Parish dated December 12, 1976, in which he resigned from the TEC ministry. Since the end of December 1976, the members who withdrew from St. Andrew's and the resigned rector (until his death) "have continued to use, control, and possess the real and personal property of St. Andrew's." *Id.* at 500. Further, "[c]hurch officials and lay members of The Episcopal Church, including the complainants, have been precluded from using these properties for the furtherance of The Episcopal Church and its activities." *Id.*

On December 16, 1976, the Standing Committee of the Diocese requested the Bishop "to advise the rector, wardens, and trustees of St. Andrew's" that, unless the October 1976 resolutions adopted by the local congregation were rescinded, the use of the parish's property by the local congregation and its minister "would constitute use of said property for purposes unrelated to the purposes of the Episcopal Church or Diocese" and would thereby constitute "abandonment of said property" or "alienation" of the property without court approval and the written consent of the Bishop and Standing Committee in violation of the Church's and Diocese's canons. *Id.* On January 15, 1977, the Diocese's Executive Board adopted a resolution declaring the property abandoned or illegally alienated and called upon the Trustees of St. Andrew's to transfer the title and possession of the property to the Diocese. On May 5, 1977, a committee of the Diocese wrote the Trustees, Rector, and Wardens of St. Andrew's requesting that the parish property be vacated and that its trustees convey the property to the Diocese. The defendants failed to comply with this request, and the litigation ensued.

After determining that, under *Norfolk Presbytery*, it was proper to resolve the dispute by considering the statutes of Virginia, the express language in

the deeds and the provisions of the constitution of the general church, the Court noted the following.

First, the Court observed that, from its beginning, St. Andrew's was a "component" of TEC and that it has been part of a hierarchical or supercongregational church organization. "Because of this it is, and always has been, subject to the ecclesiastical authority and to the Constitutions and Canons of both The Episcopal Church and the Diocese." *Id.* at 502-03.

Second, the Court considered two statutes of the Virginia Code, as follows: "By statute, Code §§ 57-8 and 57-13, the legal title (as opposed to the beneficial ownership) to all property of a local church (whether the church be independent or a unit of a supercongregational organization) is held by local church trustees who are appointed by the circuit court. Section 57-13 provides that `any one or more members of any church diocese or religious congregation may, in his or their names, on behalf of such church diocese or congregation, commence and prosecute a suit in equity against any such trustee to compel him to apply such real or personal estate for the use or benefit of the church diocese or congregation, as his duty shall require." 5 Va. Cir. at 503.

Third, the Court examined the deeds at issue, in particular, noting that one deed stated that the conveyance was "for the erection of a church building to be used as a place of worship by the Episcopal Congregation of Clifton Forge Parish" and that the other deed was made to named "Trustees of St. Andrew's Episcopal Church of Clifton Forge, Virginia," and stated that "[i]t is evident that the designated *cestui que trust* in each deed was a unit or component of The Protestant Episcopal Church in the United States of America within the then existing diocese. [According to *Black's Law Dictionary* (Ninth Edition), the definition of *"cestui que trust"* is "[o]ne who possesses equitable rights in property" and "beneficiary."] It cannot be successfully questioned that the abbreviated and commonly accepted name for that church is and always has been `The Episcopal Church.' Therefore, a reasonable interpretation of these deeds leads inescapably to the conclusion that the trustees cannot hold title to the subject property for persons or groups who are withdrawn from and not under the authority of The Episcopal Church." *Id.* (footnote omitted).

Fourth, the Court considered the evidence related to the provisions of the "constitution of the general church," after first noting that the Virginia Supreme Court in *Norfolk Presbytery* gave that phrase "a rather broad meaning which included contractual rights of the various levels and units within a supercongregational church." *Id.* at 504. On this issue, the Court noted that, at the time the congregation sought parish status, it expressly promised the Diocese that the parish would always be held under the ecclesiastical authority of the Diocese and in conformity with its constitution and canons and that all consecrated property would be secured

against alienation from the Diocese, unless in conformity with the Diocese's Canons.

One of the ways in which the CANA Congregations seek to distinguish the instant case from that of *Buhrman* is to argue that the CANA Congregations, "by contrast, made no such agreements, pledges, or representations." CANA Brief # 3 at 51. The Court disagrees. There is a wealth of evidence before the Court — see the "course of dealings" section of this opinion, below — which demonstrates the congregations' "agreements, pledges, or representations," as manifested by vestry oaths, vestry minutes, vestry handbooks, local church constitutions, innumerable acknowledgements of fidelity to TEC's and the Diocese's Constitutions and Canons, and other documents. Moreover, Judge Stephenson makes it clear in his opinion that such "express promises" were not necessary to his finding that the Diocese had contractual rights in the local church's property. Significantly, the Court stated that, even without these "express promises, however, the contractual rights of the Diocese in the subject property are implicit in the Constitution and Canons of The Episcopal Church and in the Constitution and Canons of the Diocese." *Id.* at 505. These provisions, noted the Court, are "binding" on all units of TEC, including the parish. The Court then proceeded to cite various provisions of the canons and constitution, such as the provision preventing alienation of property without permission of the Diocese and the provision declaring that every congregation within the Diocese was "bound equally by every rule and Canon which shall be framed by any Council, acting under this Constitution." *Id.* at 506. The Court stated that such constitutional and canonical provisions "are what gives The Episcopal Church its hierarchical character, and this supercongregational characteristic is the reason that the Diocese has a proprietary interest in the subject property." *Id.*

Fifth, the Court cited the Diocesan Canon regarding the Executive Board's power to declare property to be "abandoned" and to direct the trustees holding legal title to the property to transfer it to the Diocese's trustees. It then noted that, in fact, the Executive Board had declared St. Andrew's property to have "been abandoned within the context of church law, and it is most doubtful if that determination is subject to review by this court." *Id.* at 507 (citations omitted). Even if the property was not deemed abandoned, noted the Court, it was being used by "those who no longer claim allegiance" to TEC, contrary to the express promise made by the Congregation that the property would be "secured against alienation" from the Diocese. *Id.* The Court added that such use also violated the Diocesan Canon that prevented alienation without the consent of the Bishop. *Id.*

Judge Stephenson concluded his opinion as follows:

> By whatever term the defendants' actions are called (be it abandonment, alienation, or something else), it is undisputed that the local church

trustees who have withdrawn from The Episcopal Church claim to hold title to the subject property for those persons who have likewise withdrawn from The Episcopal Church. Moreover, they have expressly renounced the control and authority of The Episcopal Church. Their appointment as trustees was for the purposes of a church which they have since renounced, and they have placed the St. Andrew's property beyond the reach, use, and control of those parishioners who have remained loyal to The Episcopal Church as well as the Diocese to which St. Andrew's belongs.

The Court holds, therefore, that the withdrawn trustees, having violated the express language of the deeds and their contractual obligations to the general church, have no further right or interest in the subject property, that neither they nor the others who have renounced The Episcopal Church have any proprietary or possessory rights in said property. Until such time as other trustees, loyal to The Episcopal Church, can be appointed, the lone remaining trustee, being one of the complainants, shall hold title to said property for the sole benefit of St. Andrew's as a unit of The Protestant Episcopal Church in the United States of America as contemplated by and in accordance with the deeds and the constitution of that church.

*Id.* at 508 (citation omitted).

2. *Diocese of Southwestern Virginia of the Protestant Episcopal Church in the United States of America v. Wyckoff*, 83 Va. Cir. 493 (Amherst County, 1979) (Koontz, J.)

*Wyckoff*, like *Buhrman*, also involved TEC, as well as a Virginia diocese of TEC, and a local congregation which had decided to leave TEC. In this case, the departing congregation, called Ascension Episcopal Church, in Amherst, Virginia, voted to renounce their allegiance to the Diocese and affiliate with the Anglican Catholic Church. Then-Judge Lawrence L. Koontz, Jr., reached a similar result to that of Judge Stephenson in *Buhrman*.

There were two properties at issue in *Wyckoff*, one conveyed by deed in 1847 and one conveyed by deed in 1860. The 1847 deed stated, in pertinent part, that, on the property conveyed, "preparations are now being made to erect a new brick church for the use and benefit of the Protestant Episcopal Church," the conveyance being "upon this special trust and this special confidence, however, that they the said [grantees] and the survivor of them and the heirs and assigns of them and the survivor of them shall and will forever have and hold the said piece or parcel of land with all the improvements and appurtenances thereunto belonging for the use and benefit of the Protestant Episcopal Church as they the said [grantees] and the survivor of them and the heirs and assigns of them and the survivor

of them shall deem most likely to promote the interest of said church. . . ." *Wyckoff*, 83 Va. Cir. 493 at 494. The 1860 deed said that the property conveyed was for "the same use and for the same purposes and upon the same conditions and upon the same trusts" as in the 1847 deed described above. *Id.* at 494.

In ruling for the Diocese, Judge Koontz applied the same "neutral principles of law" method used in *Norfolk Presbytery* and noted that the recent United States Supreme Court decision in *Jones* "does not change but rather affirms this [neutral principles of law] approach as one valid means of resolving church property disputes." *Id.* at 496. In the course of his decision, Judge Koontz noted the following:

First, he observed that the church had been used continuously for Protestant Episcopal Church services for over one hundred years. Moreover, the Ascension Episcopal Church had "remained loyal" to the Ecclesiastical Authority and its constitution.

Second, the Court noted that it is "well settled under the law of this Commonwealth that trusts created by language in deeds purporting to convey property to named individual trustees for indefinite beneficiaries are invalid. Furthermore, such trusts expressed or implied for general hierarchical churches are invalid." *Id.* at 495 (citations omitted). The type of language in the deeds cited above, Judge Koontz held, "create a conveyance of the property for the use of the local congregation." *Id.* (citation omitted).

Third, Judge Koontz turned to the significance of the congregational vote to leave the Episcopal Diocese and join the Anglican Catholic Church. "It is obvious and uncontested that members of the congregation had the right to withdraw from the Episcopal Church and to transfer their allegiance to any other church. It is also obvious that, in so doing, even a majority could not thereby require the minority to transfer their allegiance or be put out of existence as a church entity. . . . The result, nevertheless, is that the Protestant congregation of Ascension Episcopal Church, Amherst, while perhaps reduced in number still existed as it had prior to the vote." *Id.* at 496.

Fourth, Judge Koontz found that, using the neutral principles of law approach, "this Court has found no provision of the constitution or canons of the general church or the diocese which permit a vote of even the majority of the local congregation to alienate the real property of the church without the written consent of the Bishop acting with the advice and consent of the Standing Committee of the Diocese. In fact, Canon 21 expressly prohibits such alienation." *Id.* at 496.

Fifth, Judge Koontz noted that, while § 57-9 did provide for a method to address a division within a hierarchical church, the vote of the congregation was not taken in accordance with the requirements of the statute. (He also noted that, in any event, § 57-9 might not be applicable to these deeds, both of which predated the passage of the statute; nor was he satisfied that

a division had occurred as contemplated by the statute.) "The net result, therefore, based on the constitution and canons of the church and the state statutes, is that the effect of the congregational vote in May 1978 on the title to the real property in question was that title remained exactly where it was prior to the vote, that is, in the trustees for the benefit of the local Protestant Episcopal congregation." *Id.* at 497.

Finally, Justice Koontz concluded as follows:

> The result of the May 1978 congregational vote did not and could not extinguish that part of the Protestant Episcopal congregation known as Ascension Episcopal Church, Amherst, remaining loyal to the Diocese of Southwestern Virginia and the national Episcopal Church. The vote may well have indicated that fifty-nine members of that congregation transferred their allegiance to the Anglican Catholic Church, which is unquestionably a separate entity. Nothing, however, has occurred under neutral principles of law to transfer the title and control of the property in question from the beneficial use of the remaining congregation of the Ascension Episcopal Church, Amherst, as represented by the complainants herein.
>
> For these reasons, the primary prayer of the complainants will be granted and the present trustees will be directed and required to hold the property in question for the sole use and benefit of the congregation of Ascension Episcopal Church, Amherst, as a unit of the Episcopal Church subject to the canonical authority of the Diocese of Southwestern Virginia. [Respondents] will be enjoined from further use and occupancy of the property.

*Id.* at 497-98.

## C. *General Discussion Regarding Neutral Principles of Law*

The parties are in sharp disagreement on a number of issues related to the "neutral principles of law" approach. Each is discussed in turn.

### 1. *In a "neutral principles of law" analysis, should a court consider the "course of dealings" between the local church and the general church?*

The CANA Congregations argue that the "course of dealings" between the parties is not a proper consideration in a "neutral principles of law" analysis, largely because it was not stated as one of the factors under consideration in *Norfolk Presbytery*. The Court finds, however, that under the Virginia Supreme Court's subsequent holding in *Green*, a trial court must (and, at a minimum, may) consider the "course of dealings" between the parties. While it could be argued that *Green* established "course of

dealings" evidence as an *additional* factor in the "neutral principle of law" analysis, it makes more sense to simply view "course of dealings" evidence as instructive to understanding the hierarchical nature of the polity in practice as well as in theory and each parties' awareness of, and agreement to, the rules governing a supercongregational church.

CANA argues, however, that the only reason the Court in *Green* considered "course of dealing" evidence was to determine if the congregation in *Green* had manifested its intent to be legally bound by a denominational proprietary interest by engaging in specific conduct indicating their connection to the denomination. (CANA Brief # 1A at 83.) The problem with this argument is that the Virginia Supreme Court never said this, nor did it even imply this, and its review of the evidence does not suggest it is the case.

*2. In examining the general church's governing documents, is the Court limited in its consideration to the constitution of the denomination and diocese, or should the Court also consider the canons and any other governing documents that may exist?*

CANA argues that this Court may only consider the Constitution of TEC and the Constitution of the Diocese because *Norfolk Presbytery* used the word "constitution," rather than "constitution and canons." The Court disagrees. As Judge Stephenson said in *Buhrman*, the Virginia Supreme Court in *Norfolk Presbytery* gave the reference to "constitution" a "rather broad meaning." 5 Va. Cir. at 504. This Court views the reference to "constitution" to require an examination of the governing laws of the church, which most certainly includes both the Constitution of TEC and the Diocese, as well as their Canons.

CANA argues, however, that canons are different than constitutions, because canons are enacted "without the standstill periods or two-reading requirements that apply to constitutional changes." (CANA Brief # 1A at 2, 39-45.) Even if true, there is no basis upon which this Court could or should conclude that canons are entitled to less weight than constitutions. CANA asks this Court to parse the manner in which the denomination amends its constitution versus amending its canons, and conclude that "[o]nly constitutional provisions may create a trust interest." TEC and the Diocese state that for the Court to do this would infringe on their First Amendment rights. The Court does not need to resolve that question, because the Court concludes that there is no basis in the "neutral principles of law" analysis for a Court to ignore canonical provisions because the Court believes it would have been fairer or more equitable to accomplish a canonical objective by constitutional amendment.

*3. In a "neutral principles of law" analysis, are the deeds "first among equals" when considering the other factors?*

CANA argues that "[d]eeds are generally the predominant consideration in real property disputes and according them such weight here is consistent with both the Virginia Supreme Court's mandate that this Court apply normal principles of 'real property' law and the fact that 'neutral principles' are principles 'developed for use in *all* property disputes'." (CANA Brief # 3 (emphasis in original, citations omitted).) The Court does not agree. There is no suggestion in *Norfolk Presbytery* or *Green* that, in the resolution of a church property dispute, this Court should accord the deeds "predominant" weight over, for example, the constitution of the general church. Rather, at the core of the "neutral principles of law" methodology is the requirement that the Court give full consideration to *each* of the factors and determine whether the plaintiffs have proven that they have a "proprietary" interest in the property at issue.

*4. In a case where the trial court finds that the general church has a contractual or proprietary interest over local church property, does that mean that control and ownership of the local church property necessarily transfers from the trustees of the local church to the diocese? In other words, does the local congregation retain a proprietary interest to prevent a transfer to the diocese? Does that question turn on whether the local congregation has disaffiliated from the denomination and/or on whether the diocese, under its canons, has declared the property abandoned?*

Whether or not it is possible to hypothesize a scenario under which both a hierarchical denomination and a local disaffiliated congregation would have competing "proprietary interests" in local church property, that is not the case now before the Court. The CANA Congregations are not *Episcopal* Congregations. Their rectors are not *Episcopal* rectors. Their vestries are not *Episcopal* vestries. The Rector of an *Episcopal* church must be an *Episcopal* priest, TEC Canon III.9(3)(a)(3), and the Vestry of an *Episcopal* church must be composed of *Episcopalians*. Diocesan Canon 11.4. Therefore, they have no contractual or proprietary interest in these *Episcopal* Churches. Thus, this Court rejects the premise of the CANA Congregations' claim, at page 77 of CANA Brief # 2, that it is entitled to compensation for improvements it made to the church properties. In support of that argument, CANA asserts that the Virginia Supreme Court in *Green* "did not state that the denomination's [proprietary] interest extinguished the [proprietary] interest of the congregation," nor did the Court in *Green* state that "the congregation's interest could be extinguished without compensating it for the improvements it had made to the property." *Id.* While it is undoubtedly true that the Court in Green did not make these statements, it is equally true

that CANA's assertions depend on a finding that the CANA Congregations hold a "proprietary" interest in *Episcopal* church properties, which this Court has found they do not. As Judge Stephenson said in *Buhrman*, 5 Va. Cir. at 508: "The Court holds, therefore, that the withdrawn trustees, having violated the express language of the deeds and their contractual obligations to the general church, have no further right or interest in the subject property, that neither they nor the others who have renounced The Episcopal Church have any proprietary or possessory rights in said property."

As to the "abandonment" resolution by the Diocese, it must first be stated that the resolution did not "extinguish" the CANA Congregations' "interest" in the seven church properties, for the CANA Congregations are not in authorized possession of *Episcopal* church property and, therefore, have no "interest" in the properties capable of being extinguished. See this statement from CANA Brief # 2 at 78: "[TEC and the Diocese] may not be required to pay to acquire a proprietary interest, [but] nothing in *Green* absolves them of the duty to compensate the Congregations, should they wish to extinguish the Congregations' interest in the property." The fallacy in this statement is the presumption, which this Court rejects, that the CANA Congregations possess an "interest" in *Episcopal* church property. And while it is true that the Executive Board's January 22, 2007, resolution declaring the seven church properties to have been abandoned was the canonical predicate for the Executive Board's instruction to the trustees to transfer the property to the Bishop, that obviously did not happen. At this point, any conveyances that take place will occur pursuant to the instant declaratory judgment actions and the orders that will ultimately issue. More to the point, this Court's determination that TEC and the Diocese have a proprietary interest in the seven church properties does not depend on the Executive Board's "abandonment" resolution, nor is that a condition precedent to the Court's determination.

*5. In determining whether a denomination or diocese has a "contractual" or "proprietary" interest in a constituent member's local church property, must the court apply traditional concepts of contract law, such as the requirement of consideration, mutuality of remedies in the event of breach, and so on?*

CANA argues that TEC and the Diocese cannot have a contractual interest in the properties because they did not provide "consideration" for them. (CANA Brief # 1A at 55.) CANA also argues that there cannot be an enforceable contract where the plaintiff fails to establish the requirements of mutual obligation and mutual remedy. (*Id.* at 58.) CANA also makes a related argument that its claim that TEC and the Diocese breached their spiritual obligations to the CANA Congregations is unenforceable in a

civil court under First Amendment precepts and, hence, where there is no remedy for breach, there can be no enforceable contract. (*Id.* at 63.)

TEC and the Diocese argue that these concepts were not considered by the Virginia Supreme Court in *Norfolk Presbytery* or *Green* and, therefore, are not part of the "neutral principle of law" analysis. The CANA Congregations argue, correctly, that the fact that a party in unrelated litigation may not have made a particular argument does not prevent a party in the instant litigation from making the same argument in this case. The Court agrees with that proposition. Nevertheless, the Court does not find the claims to be meritorious.

## VI. *Neutral Principles of Law Analysis*

### A. *Statutes*

The starting point in a "neutral principles of law" approach to a church property dispute is a fair consideration of the applicable and pertinent statutes. *See, generally, Norfolk Presbytery*, 214 Va. at 505 ("We hold that it is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds, and the provisions of the constitution of the general church."); and *Green*, 221 Va. at 555 ("In determining whether the A.M.E. Zion Church has a proprietary interest in the Lee Chapel property, we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties."). Obviously, it is not necessary that a statute be dispositive to be pertinent, and, in this case, the Court finds that there are four statutes warranting discussion, Virginia Code §§ 57-7.1, 57-9, 57-15, and 57-16.1.

### 1. *Virginia Code § 57-7.1*

Virginia Code § 57-7.1 (2011) reads as follows:

§ 57-7.1. *What transfers for religious purposes valid.* Every conveyance or transfer of real or personal property, whether *inter vivos* or by will, which is made to or for the benefit of any church, church diocese, religious congregation, or religious society, whether by purchase or gift, shall be valid.

Any such conveyance or transfer that fails to state a specific purpose shall be used for the religious and benevolent purposes of the church, church diocese, religious congregation, or religious society as determined appropriate by the authorities which, under its rules or usages, have charge of the administration of the temporalities thereof.

No such conveyance or transfer shall fail or be declared void for insufficient designation of the beneficiaries in any case where the church, church diocese, religious congregation, or religious society has lawful trustees in existence, is capable of securing the appointment of lawful trustees upon application as prescribed in § 57-8, is incorporated, has created a corporation pursuant to § 57-16.1, or has ecclesiastical officers pursuant to the provisions of § 57-16.

Not surprisingly, both sides have focused considerable attention on whether the Virginia Code now permits trusts for denominations and the dioceses of those denominations. TEC and the Diocese acknowledge that, historically, Virginia statutes did not validate trusts for general churches. (*See* Diocese Brief # 1 at 39.) They assert, however, that this changed in 1993, when the General Assembly repealed § 57-7 and enacted § 57-7.1. They argue that § 57-7.1 "should be construed as validating trusts for denominational churches," and that "[s]uch a trust is stated by TEC's Dennis Canon and Diocesan Canon 15.1." (*See id.* at 41.) The CANA Congregations, in contrast, argue that neither § 57-7.1, nor its predecessors, legalize denominational trusts and point to fourteen Virginia Supreme Court decisions in support of their position. (*See* CANA Brief 1A at 14-16.)

This Court has previously had occasion to rule on this matter. In its Letter Opinion of June 27, 2008, 76 Va. Cir. 884, 894, the Court held that "57-7.1 did not change the policy in Virginia, which is that church property may be held by trustees for the local congregation, not for the general church." This policy has a long pedigree in Virginia. *See, generally, Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428, 431 (1879) ("The deed is the same in substance as the deed in *Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301 (1856), and the construction must be the same. According to that construction, the conveyance is not for the use of the Methodist Episcopal Church in a general sense. Such a conveyance in this state would be void."); *Norfolk Presbytery*, 214 Va. at 507 ("As express trusts for super-congregational churches are invalid under Virginia law, no implied trusts for such denominations may be upheld."); *and Reid*, 229 Va. at 187 ("Because of this strong tradition, we have, for instance, refused to adopt the 'implied trust' theory in favor of hierarchical churches.").

While the issue arose in a different context, the matter was fully briefed and decided. TEC and the Diocese had argued that the Court had to make a preliminary determination of church property ownership before embarking on a § 57-9 analysis. The Court found that position to be without merit "because § 57-7.1 did not change long-established precedent in Virginia regarding trusts for general hierarchical churches." *See* 76 Va. Cir. at 893. Among other matters, the Court noted that the Virginia Supreme Court in *Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc.*, 249 Va. 144, 152 (1995), held that "Code § 57-7.1 validates transfers, including

transfers of real property, for the benefit of local religious organizations." The Court also noted that Clause 3 of the 1993 Act, which enacted § 57-7.1, states that it is "declaratory of existing law."

While TEC and the Diocese invite the Court to revisit this matter and, more particularly, to hold that the Virginia Code does recognize trusts for denominations and their dioceses, the Court declines to do so. Put simply, the Court believes its prior decision on this issue was correct. In particular, the Court is not persuaded by the argument put forward by TEC and the Diocese that the Commonwealth must recognize denominational trusts because § 57-7.1 and § 57-14 both refer to property held by trustees for church dioceses. As the CANA congregations note in their response brief: "*[S]ome* property, such as ecclesiastical residences, *can* be held in trust for a diocese, and that has been true since 1962. . . . Accordingly, plaintiffs are wrong to suggest that the Court's reading of § 57-7.1 `render[s] meaningless' the law's reference to `diocese'." (*See* CANA Brief # 2 at page 11.) Nevertheless, several additional points should be noted with regard to § 57-7.1.

First, TEC and the Diocese argue that, "[i]f § 57-7.1 does not allow church property to be held in trust for the Diocese . . . it is unconstitutional." (*See* Diocese Brief # 1 at 41.) While it is true that the Court might need to reach and address the constitutional issue if its construction of § 57-7.1 was in any sense determinative of the matters before it, that is not the case. As stated above, the Court finds on the record before it that the evidence and law clearly favor TEC and the Diocese. Thus, whether or not a construction of § 57-7.1 in favor of denominational trusts or a holding regarding the constitutionality of § 57-7.1 might provide an alternative or additional basis to grant TEC and the Diocese the relief they seek, that does not warrant addressing these issues.

Second, the CANA congregations argue that, if this Court were to find that the Dennis Canon or Diocesan Canon 15.1 did give TEC and the Diocese a trust interest in the church properties, plaintiffs' claims would be barred by the United States and Virginia Constitutions. CANA states: "Granting their canons legally dispositive weight would violate not only principles of free exercise and disestablishment, but also the Contracts Clause (as applied to pre-1993 conveyances), basic notions of due process, and the Equal Protection Clause." (CANA Brief # 1A at 123.) To the extent that CANA's constitutionality argument is based solely on concerns regarding the Dennis Canon and Diocesan Canon 15.1, the Court obviously does not need to reach the issue because the Court has not found that these Canons establish valid trust interests in the Commonwealth. To the extent that CANA's argument is broader than this, in other words, to the extent that CANA is arguing that this Court cannot base a finding of a contractual or proprietary interest by considering and giving weight to *any* portion of the Constitution and Canons of TEC and the Diocese, this Court rejects

CANA's claim of unconstitutionality. In this Letter Opinion, this Court applies *Norfolk Presbytery* and *Green*, which in turn are based on United States Supreme Court precedent that permits the resolution of church property disputes through the application of "neutral principles of law." Those "neutral principles of law" are not limited to "the neutral default rules of state property law," as CANA appears to argue they should be. (*Id.* at 135.) They also include consideration of the constitution and canons of the denomination (*Norfolk Presbytery* and *Green*), and the "course of dealings" between the parties. When applied in accordance with governing precedent, this Court does not find any constitutional infirmity.

Third, the CANA Congregations argue that, even if § 57-7.1 legalizes denominational trusts, such trusts cannot be found to exist with regard to deeds that predate the 1993 effective date of the statute. The CANA Congregations also argue that the manner in which TEC and the Diocese purported to establish their trust interest, i.e., through the Dennis Canon and Diocese Canon 15.1, was flawed and ultimately ineffective. The Court, having concluded that trusts for denominational churches remain invalid in Virginia, sees no reason to further address these issues.

Fourth, the Diocese argues that even if this Court concludes that denominational trusts remain invalid even after 1993, this Court should nevertheless rely on the Dennis Canon and Diocesan Canon 15.1 as a "partial expression of the contractual relationships among the parties." (*See* Diocese Brief # 3 at 14.) To the extent the Diocese is suggesting that this Court should consider the Dennis Canon and Diocesan Canon 15.1 in the context of that portion of the "neutral principle of law" analysis related to the constitution of the church, the Court is not persuaded it should do so given its finding that neither canon actually accomplished the objective of establishing denominational trusts in the Commonwealth. However, to the extent the Diocese is suggesting that the interaction of the parties regarding these canons could be considered in the context of that portion of the "neutral principle of law" analysis related to "course of dealings" between the parties, the Court agrees that this interaction can be considered and given such weight as the Court deems warranted. For example, in notes to a financial statement, Church of Epiphany stated that the church "is a constituent part of the Episcopal Church, U.S.A., and the Episcopal Diocese of Virginia. The canons of the Episcopal Church, U.S.A., and the Diocese of Virginia require the real property of all Episcopal parishes to be held in trust for the national church and the Diocese even though the individual churches hold legal title for all other purposes." PX-EPIPH-048-040.

Fifth, the Diocese argues that the Virginia Supreme Court in its remand of this matter, implicitly: (1) recognized that § 57-7.1 changed the law of the Commonwealth by validating denominational trusts; (2) rejected the CANA Congregations assertions that § 57-7.1, even if it validated denominational trusts, could not be applied retroactively to property acquired prior to

1993; and (3) rejected the CANA Congregations assertions that, even if denominational trusts were now valid in principle, TEC and the Diocese had not gone about acquiring their trusts in a proper manner. (*See* Diocese Brief # 3 at 15.) All this is based on the following paragraph at the conclusion of the remand:

> In light of our holding that the circuit court erred in granting the Code § 57-9(A) petitions, the control and ownership of the property held in trust and used by the CANA Congregations remains unresolved. Accordingly, the declaratory judgment actions filed by TEC and the Diocese and the counterclaims of the CANA Congregations in response to those suits must be revived in order to resolve this dispute under principles of real property and contract law. *See*, e.g., Code § 57-7.1; *Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc.*, 249 Va. 144, 452 S.E.2d 847 (1995); *Green v. Lewis*, 221 Va. 547, 272 S.E.2d 181 (1980); *Norfolk Presbytery v. Bollinger*, 214 Va. 500, 201 S.E.2d 752 (1974).

280 Va. at 29 (emphasis added). This Court cannot assume or infer from this reference to § 57-7.1 that the Virginia Supreme Court implied that they had reached any of the judgments attributed to them by the Diocese. The Court does assume and infer from this reference to § 57-7.1 that the Virginia Supreme Court intended this Court to consider the applicability of § 57-7.1 in its "neutral principles of law" analysis, which it has done.

### 2. *Virginia Code § 57-9*

Virginia Code § 57-9 (2011) reads as follows:

§ 57-9. *How property rights determined on division of church or society.*
    A. If a division has heretofore occurred or shall hereafter occur in a church or religious society, to which any such congregation whose property is held by trustees is attached, the members of such congregation over 18 years of age may, by a vote of a majority of the whole number, determine to which branch of the church or society such congregation shall thereafter belong. Such determination shall be reported to the circuit court of the county or city, wherein the property held in trust for such congregation or the greater part thereof is; and if the determination be approved by the court, it shall be so entered in the court's civil order book, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and be respected and enforced accordingly in all of the courts of the Commonwealth.

150

B. If a division has heretofore occurred or shall hereafter occur in a congregation whose property is held by trustees which, in its organization and government, is a church or society entirely independent of any other church or general society, a majority of the members of such congregation, entitled to vote by its constitution as existing at the time of the division, or where it has no written constitution, entitled to vote by its ordinary practice or custom, may decide the right, title, and control of all property held in trust for such congregation. Their decision shall be reported to such court, and if approved by it, shall be so entered as aforesaid, and shall be final as to such right of property so held.

The fact that the CANA Congregations did not meet the statutory requirements of § 57-9(A) in the instant case does not render the statute irrelevant. As the Diocese notes in its reply brief: "Code § 57-9 is no longer directly at issue, but its careful distinction between hierarchical and congregational churches remains relevant." (*See* Diocese Brief # 3 at 18.) Indeed, it is precisely because of the CANA Congregations inability to meet the additional branch-attachment requirement applicable only to churches that are part of a hierarchical denomination that the Virginia Supreme Court in *Protestant Episcopal Church in Diocese of Virginia v. Truro Church*, 280 Va. 6 (2010), ordered that the congregations' § 57-9(A) petitions be dismissed upon remand. Similarly, the construction given the word "branch" by the Virginia Supreme Court in that decision, that "the [§ 57-9(A)] statute requires that each branch proceed from the same polity, and not merely a shared tradition of faith," is also significant, because it excludes from the reach of the statute any situation where a local church departs from one polity and affiliates with a wholly unrelated polity. 280 Va. at 28-9.

TEC argues that the criteria for considering a Virginia statute as part of the "neutral principles of law" analysis is not whether the statute *by its own application alone* establishes the hierarchical church's proprietary or contractual interest in local church property. (*See* TEC Brief # 3 at 17.) Rather, argues TEC, "the inquiry under *Green* is whether the general statutory climate supports finding a proprietary interest" and whether "Virginia statutes are hospitable to the proposition that a hierarchical church may have an interest in local church property." (*Id.* at 17-8.) While TEC does not cite § 57-9 as evidence in support of this proposition (which is certainly not surprising given their previous constitutional challenge to § 57-9), it must nevertheless be noted that § 57-9(A), especially when viewed in comparison to the division requirements applicable to a congregational church, *see* § 57-9(B), reflects a recognition that hierarchical churches in their organization and structure are different from congregational churches

and that a Virginia statute designed to address divisions within a church may properly reflect that recognition.

3. *Virginia Code § 57-15*

Virginia Code § 57-15 (2011) reads as follows:

§ 57-15. *Proceedings by trustees or members for similar purposes, exception for certain transfers.*

A. The trustees of such a church diocese, congregation, or church or religious denomination, or society or branch or division thereof, in whom is vested the legal title to such land held for any of the purposes mentioned in § 57-7.1, may file their petition in the circuit court of the county or the city wherein the land, or the greater part thereof held by them as trustees, lies, or before the judge of such court in vacation, asking leave to sell, encumber, extend encumbrances, improve, make a gift of, or exchange the land, or a part thereof, or to settle boundaries between adjoining property by agreement. Upon evidence being produced before the court that it is the wish of the congregation, or church or religious denomination or society, or branch or division thereof, or the constituted authorities thereof having jurisdiction in the premises, or of the governing body of any church diocese, to sell, exchange, encumber, extend encumbrances, make a gift of, or improve the property or settle boundaries by agreement, the court shall make such order as may be proper, providing for the sale of such land, or a part thereof, or that the same may be exchanged, encumbered, improved, or given as a gift, or that encumbrances thereon be extended, and in case of sale for the proper investment of the proceeds or for the settlement of such boundaries by agreement.

When any such religious congregation has become extinct or has ceased to occupy such property as a place of worship, so that it may be regarded as abandoned property, the petition may be filed either by the surviving trustee or trustees, should there be any, or by any one or more members of such congregation, should there be any, or by the religious body which by the laws of the church or denomination to which the congregation belongs has the charge or custody of the property, or in which it may be vested by the laws of such church or denomination. The court shall either (i) make a decree for the sale of the property or the settlement of boundaries between adjoining properties by agreement, and the disposition of the proceeds in accordance with the laws of the denomination and the printed acts of the church or denomination issued by its authority, embodied in book or pamphlet form, shall be taken and regarded as the law and acts of such denomination or religious body or (ii) at the request of the surviving trustees and after notice in accordance with law to all

necessary parties, make such order as may be proper providing for the gift of such property to any willing local, state, or federal entity or to a willing private, nonprofit organization exempt from taxation under § 501(c)(3) of the Internal Revenue Code, provided the court finds that (a) the property includes a historic building or landmark so designated by the Commonwealth and (b) the purpose of such gift is historical preservation of the property.

The court may make such order as to the costs in all these proceedings as may seem proper.

B. As an alternative to proceeding under subsection A, (i) the trustees of a church or religious body that incorporate may transfer the title to the real and personal property of the church or religious body held by them to the incorporated church or religious body; and (ii) the trustees of a church or religious body that do not incorporate under subdivision (i) hereof may transfer title to the real and personal property of the church or religious body held by them to a corporation created pursuant to § 57-16.1 without, in either instance, obtaining court permission if the transfer is authorized in accordance with the church's or religious body's polity. If no petition seeking to set such a transfer aside is filed within one year of the recordation of the trustees' deed transferring title to the real estate, or the date of the transfer of any personal property, it shall be conclusively presumed that the transfer was made in accordance with the church's or religious body's polity insofar as a good faith purchaser or lender is concerned.

C. No transfer made pursuant to subsection A or B shall operate as a transfer for purposes of a provision contained in any note or deed of trust that purports to accelerate an indebtedness upon a transfer of title. Any such transfers of real estate shall be entitled to the exemptions set forth in § 58.1-811.

D. Any transfer of real or personal property made pursuant to subsection B, and any similar transfer made pursuant to subsection A after April 23, 2002, shall be deemed to assign to the incorporated church or religious body, or the corporation created pursuant to § 57-16.1, as the case may be, the beneficial interest in every policy of insurance of every kind, type, and description, relating to the property transferred, contemporaneously with the transfer, and the transferee shall have all of the rights and obligations of the transferor relating thereto.

The significance of § 57-15 to the instant litigation lies in the following excerpt from the statute: "Upon evidence being produced before the court that *it is the wish of the congregation, or church or religious denomination or society, or branch or division thereof, or the constituted authorities thereof having jurisdiction in the premises, or of the governing body of any*

*church diocese*, to sell, exchange, encumber, extend encumbrances, make a gift of, or improve the property or settle boundaries by agreement, the court shall may such order as may be proper." (Emphasis added.)

To underscore the importance of this passage, this Court need do no more than quote the following language from *Norfolk Presbytery*:

> We construe Code § 57-15 to require that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises. Under predecessor statutes, only the congregation's wishes were to be considered in a proceeding to authorize a church property conveyance, but Code § 57-15 now contemplates that the general church, or a division thereof, or certain ecclesiastical officials may be the proper parties to approve such a property transfer. In determining the proper party to approve the property transfer, the trial court must look to the organizational structure of the church. *See* Code § 57-9, which recognizes a distinction between an autonomous congregation and one which is part of a supercongregational. or hierarchical denomination in providing for the determination of property rights upon a division of a church or congregation. In the case of a super-congregational church, we hold that Code § 57-15 requires a showing that the property conveyance is the wish of the constituted authorities of the general church.

214 Va. at 502-03 (footnote and citation omitted) (emphasis added). The evolution of the statute is, itself, significant. As the Virginia Supreme Court details at footnote 2 of the *Norfolk Presbytery* opinion, the statute initially required only congregational approval as a basis for a court order authorizing a property conveyance. In 1904, the statute was amended to require proof that the proposed conveyance was "the wish of said congregation, or church or religious denomination or society, or branch or division thereof." 214 Va. at 503. In 1924, the statute was further amended to add the phrase "or the constituted authorities thereof having jurisdiction in the premises." *Id.* Finally, in 1962, language relating to a church diocese was added. This holding could not be clearer, nor its implications. *See also Green*, 221 Va. at 552-53, which reaffirmed this holding: "It is well settled in Virginia that it is the right of a majority of the members of a divided congregation to control the use of the church property if the church, in its organization and government, is a church or society entirely independent of any other church or general society. Code § 57-9. *Baber v. Caldwell*, 207 Va. at 695. . . . In both [*Baber* and *Norfolk Presbytery*] we pointed out the distinctions, enunciated in Code § 57-9, between an autonomous congregation and one which is part of a supercongregational or hierarchical denomination where a determination of property rights is involved. We held that, in the case

154

of a supercongregational church, Code § 57-15 'requires a showing that the property conveyance is the wish of the constituted authorities of the general church'." As the Diocese states in its reply brief: "Needless to say, the Congregations have not carried their burden of proving that it is the wish of TEC and Diocese that the properties be transferred to the CANA Congregations, which is precisely the relief that they seek in the first prayer for relief in their Amended Counterclaims." (*See* Diocese Brief # 3 at 12-13.)

The parties disagree on the proper interpretation of both § 57-15 and *Norfolk Presbytery*. CANA argues that § 57-15 is only relevant where the denomination has already established its proprietary interest in the property at issue; absent such proof, argues CANA, *Norfolk Presbytery* stands for the proposition that the denomination has no standing to object to the conveyance of the property. The Diocese argues that CANA is confusing the jurisdictional issue of standing with the substantive requirement in § 57-15 that, where a supercongregational church is involved, a church cannot obtain circuit court approval for a conveyance of church property without proof that it is the wish of the constituted authorities of the general church. TEC makes a slightly different (but related) point in its reply brief. In *Norfolk Presbytery*'s discussion regarding standing, it was referring only to standing to object to a transfer under § 57-15; it was not addressing "under what circumstances a hierarchical church might have standing to pursue a declaratory judgment action to enforce its interest in local church property, much less about whether and when a hierarchical church would have standing to assert the identity of its own leaders." (*See* TEC Brief # 3 at 40.)

The Court does not agree entirely with either parties' interpretation of *Norfolk Presbytery*'s reference to § 57-15. Under *Norfolk Presbytery*, the significance of § 57-15 is that it establishes a statutory framework for consideration of property transfers when churches (either autonomous or hierarchical) are involved. If it is determined: (1) that a local church is part of a hierarchy; and (2) that the general church has a contractual or proprietary interest in the property at issue based upon the deeds before the Court and the constitution governing the relationship between that local church and that general church, then § 57-15 recognizes that a church property conveyance cannot occur without proof that the general church has approved the conveyance.

*Norfolk Presbytery* did not address the relevance of "course of dealing" evidence to the proprietary interest analysis. The parties disagree whether "course of dealing" evidence is a proper consideration in every "neutral principles of law" analysis or only under the circumstances of *Green*. As stated above, the Court does consider "course of dealing" evidence a proper consideration in a "neutral principle of law" analysis. Moreover, as described below, the Court has fully evaluated the "course of dealing"

evidence presented in this litigation and concludes that it supports its finding that the denomination and diocese have proprietary interests in the properties at issue. It should be emphasized, however, that, even if the Court did not consider the "course of dealing" evidence in the instant case, it would not change the Court's ultimate conclusion.

The Diocese notes that, during the § 57-9 litigation, the CANA congregations expressed a similar understanding of § 57-15, quoting from CANA Congregations' Reply Memorandum of Law on Scope of Hearing on Congregational Determinations Pursuant to Va. Code § 57-9 (filed August 31, 2007) at 8: "Section 57-15's requirement of denominational approval . . . applies in cases such as *Norfolk Presbytery* and *Green*, where one or more congregations break away from a supercongregational church . . . without joining any branch." (*See* Diocese Brief # 3 at 11-2.) In other words, in a case involving a supercongregational church (as here), where § 57-9 has been determined to be inapplicable (as here), the requirement of denominational approval applies.

One more point must be emphasized. TEC and the Diocese appear to be arguing that if a church is deemed "hierarchical" or "supercongregational," it is *a fortiori* a church with a contractual or proprietary interest in local church property. In support of that proposition, TEC and the Diocese rely on the language in *Norfolk Presbytery* that states: "In the case of a supercongregational church, we hold that Code § 57-15 requires a showing that the property conveyance is the wish of the constituted authorities of the general church." 214 Va. at 503. But if it were true that *hierarchy equals proprietary interest*, without more, why would the Virginia Supreme Court have held that a trial court must examine the constitution of the general church (as in *Norfolk Presbytery*) or the constitution of the general church and "course of dealing" evidence (as in *Green*)? One possibility, of course, is that such an examination is necessary to determine if a church is truly hierarchical. But, in *Green*, that issue was conceded, *see, e.g.*, this language from *Green*: "There is little conflict in the evidence. Appellees do not deny that Lee Chapel has been an A.M.E. Zion Church and through the years has been a part of that hierarchical organization." 221 Va. at 551. And yet the Virginia Supreme Court undertook the entire neutral principles of law analysis. The better answer, to this Court, is that a local church might, at least in theory, be part of a hierarchy, yet be empowered with complete authority and autonomy over local church property. That is the reason why, in this Court's opinion, the Virginia Supreme Court in *Norfolk Presbytery* found *both* that Norfolk Presbytery had a right to intervene in the proposed property conveyance at issue and that Norfolk Presbytery might ultimately fail to establish its proprietary interest in the property at issue. Similarly, in *Green*, the Virginia Supreme Court defined a "proprietary right" in terms that, to this Court, mean more than proof that a local church was part of a hierarchy. In *Green*, the Supreme Court stated the following:

In determining whether the A.M.E. Zion Church has a proprietary interest in the Lee Chapel property, we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties. A proprietary right is a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls.

*Id.* at 555.

Therefore, this Court concludes that hierarchy does not automatically equate with a proprietary interest. There are circumstances where the resolution of this issue could be outcome determinative. However, the present case does not present such a circumstance, because this Court concludes that TEC and the Diocese have carried their burden of proof under *either* theory, i.e., if all they are required to do is prove that they and the local churches are part of a hierarchical church, they have certainly done so; and if they must also prove that there is substantial added indicia to prove their contractual or proprietary interest, they have done that as well. However, where a hierarchical church has established its proprietary interest in local church property, § 57-15 will afford it relief, including the possibility contemplated in *Norfolk Presbytery* of a permanent injunction against a proposed conveyance.

### 4. *Virginia Code § 57-16.1*

In the wake of *Falwell v. Miller*, 203 F. Supp. 2d 624 (W.D. Va. 2002), the General Assembly enacted § 57-16.1, permitting Virginia churches to incorporate. The parties disagree as to the significance of § 57-16.1 in the neutral principles of law analysis. To understand their disagreement, it is necessary to begin with the words of the statute:

Whenever the laws, rules, or ecclesiastic polity of an unincorporated church or religious body provide for it to create a corporation to hold, administer, and manage its real and personal property, such corporation shall have the power to (i) acquire by deed, devise, gift, purchase, or otherwise, any real or personal property for any purpose authorized and permitted by the laws, rules, or ecclesiastic polity of the church or body, and not prohibited by the law of the Commonwealth and (ii) hold, improve, mortgage, sell, and convey the same in accordance with such law, rules, and ecclesiastic polity, and in accordance with the law of the Commonwealth.

Va. Code § 57-16.1 (2011).

The CANA Congregations argue that the reference in the statute to a "church or religious body" is intended to be a reference to a local church only, not to a denomination or diocese. CANA notes that other provisions of Title 57 specifically reference "denominations" or "dioceses" and, therefore, the fact that § 57-16.1 does not do so must mean that it was intentionally excluded by the legislature. (*See* CANA Brief # 2 at 6-7.) Thus, argues CANA, § 57-16.1 "does not grant the denomination a proprietary interest." *Id.* at 10.

TEC and the Diocese do not suggest that § 57-16.1 *by itself* grants the denomination a proprietary interest, but they do argue that it supports the assertion that "[m]odern Virginia statutes embody . . . a policy of respect for the autonomy of churches and for the governance and property arrangements made by churches, whatever they may be." (*See* TEC/DOV Brief # 3 at 12.) Specifically, TEC and the Diocese assert the following:

> Section 57-16.1 does not refer only to "rules" of a "church or body." It refers, twice, to "the laws, rules, or ecclesiastic polity" of an unincorporated church or religious body. The Episcopal Church and the Diocese are unincorporated churches or religious bodies. The "ecclesiastic polity" of the Episcopal Church is undeniably hierarchical. And the "laws" and "rules" of a member of any hierarchical institution include the laws and rules, here the Constitutions and Canons, of each higher level of the hierarchy, here the Diocese and TEC. In the context of a hierarchical church, the "laws" and "rules" of each subordinate institution *necessarily* include the laws and rules of superior levels in the hierarchy, and indeed each of the *local* churches in these cases expressly incorporated those rules in their own governing documents.

(*See* Diocese Brief # 3 at 13-14 (citations and footnotes omitted).) This Court agrees that the phrase "church or religious body" includes a denomination or diocese. But even if that were not the case, there is no question that, when that local church is part of a hierarchical denomination, the "laws, rules, or ecclesiastic polity of the church or body" necessarily include and incorporate the rules, laws, and polity of the denomination of which they are a constituent member. The use of the term "polity" in the statute is significant. As the Virginia Supreme Court noted in *Protestant Episcopal Church in Diocese of Virginia v. Truro Church*, 280 Va. at 12 (citation omitted), "When used in reference to religious entities, the term 'polity' refers to the internal structural governance of the denomination."

But CANA argues the following: § 57-16.1 also states that the church must act "in accordance with the law of the Commonwealth" and since the law of the Commonwealth does not validate denominational trusts, any argument that the corporate articles for the CANA Congregations were

invalid because they do not specify that the Congregations' property is held in trust for plaintiffs "would be unavailing." (*See* CANA Brief # 2 at 9.)

This Court agrees that the Commonwealth does not validate denominational trusts. But, in this Court's view, that is not the significance of § 57-16.1. Rather, it is this: when a local church that incorporates is a constituent member of a supercongregational church, § 57-16.1, in effect, provides that it cannot acquire, encumber, or dispose of its real or personal property except in accordance with the laws, rules, and polity of the denomination and diocese to which the local church belongs. To hold otherwise would be to hold that the General Assembly, by enacting § 57-16.1, essentially created a mechanism by which a hierarchical church could become a congregational church by the simple act of incorporation. To put it another way, while the statute does not provide a denomination or a diocese *more* control over a constituent member that incorporates, it ensures that the act of incorporation will not result in a denomination or diocese having *less* control over a constituent member.

This is far from an academic discussion. Each of the seven CANA Congregations incorporated in either 2006 or early 2007, *see* CANA Brief # 1B at 20, ¶ 98 (The Falls Church), at 45, ¶ 266 (St. Paul's), at 85, ¶ 537 (Truro), at 90, ¶ 574 (St. Stephen's), at 108, ¶ 686 (St. Margaret's), at 126, ¶ 803 (Church of the Apostles), and at 134, ¶ 867 (Church of the Epiphany), at a time of profound discord between the local churches and the Diocese and TEC. Regardless of what may have been the other consequences of incorporation — and what is cited in CANA Brief # 1A includes the following: (1) "to gain the advantages of the corporate form" (*see* ¶ 98); and (2) "as a matter of sound business practice" (*see* ¶ 266) — one consequence that the congregations could not realize given the language of § 57-16.1 is to separate themselves from the obligations and responsibilities of being members of a hierarchical church.

Thus, § 57-16.1, although not explicitly referencing denominations and dioceses, ensures that, when a local church which is a member of a hierarchy acts to incorporate, its new form as an incorporated entity does not relieve it of its obligation to continue to comply with the laws, rules, and ecclesiastical polity of its hierarchy with regard to the acquisition, encumbrance, and disposition of church property.

## B. *Deeds*

### 1. *The Specific Deeds at Issue*

The Court counts forty-one deeds at issue, as does TEC and the Diocese. CANA, however, counts forty-two deeds at issue.

### a. *The Falls Church*

The Falls Church was founded in or around 1732 when the vestry of Truro Parish made plans to establish a church, engaged a minister to preach, and entered into a contract to construct the church building. (DX-FALLS-0060; 2008-TECEDV-066.) The Falls Church was one of two congregations in Truro Parish, according to the testimony of the Diocese's expert witness, Professor Edward Bond. (Tr. 925.) In 1746, John Trammole conveyed a two-acre parcel to the Vestry of Truro Parish for a churchyard, upon which the original sanctuary was built. (DX-FALLS-0002; DX-FALLS-0060.) In 1765, the colonial legislature divided Truro Parish into Fairfax Parish and Truro Parish, and the two-acre Trammole property became part of the new Fairfax Parish. *See* 76 Va. Cir. at 987.

On December 19, 2008, this Court issued a letter opinion resolving a number of remaining issues in the § 57-9 litigation. One of those issues was TEC's and the Diocese's claim that the true legal successor in connection with the Trammole two-acre parcel was not The Falls Church but, rather, Christ Church, Alexandria. The Court rejected this claim, holding that the vestry of The Falls Church was the legal successor of the vestry of Truro Parish as to the two-acre parcel, and holding, therefore, that the two-acre parcel was subject to The Falls Church's § 57-9(A) petition. At ¶ 39 of the CANA Brief # 1B, CANA notes: "This Court has already concluded [in its December 19, 2008, Letter Opinion] that plaintiffs, the Diocese of Virginia and The Episcopal Church, have acknowledged and admitted that defendant The Falls Church, and no other entity, is the owner of this two-acre parcel." The purpose of this note is to make it clear that, in citing these admissions in connection with the § 57-9(A) litigation, the Court was neither judging their relevance in connection with the instant litigation or suggesting that either the Diocese or TEC had conceded the ultimate issue now before the Court as to whether they hold a proprietary interest in the property in question. Simply put, the Court referenced the Diocese's and TEC's admissions as evidence rebutting their claim that the two-acre parcel should not be subject to The Falls Church's § 57-9(A) petition because the property was actually owned by Christ Church, Alexandria.

Construction of a brick church on the two-acre parcel was completed in 1769. (DX-FALLS-0060.) Thus, The Falls Church came into existence prior to the creation of TEC in 1789. Similarly, The Falls Church came into existence prior to the creation of the Diocese; indeed, The Falls Church was one of the congregations that founded the Diocese. (Tr. 1109.)

According to a grant application prepared by TFC in December 1983, the Rev. David Griffith, who was chosen as rector of Fairfax Parish (Christ Church, Alexandria, and The Falls Church) in 1779, "was, by 1783, one of the leaders in the effort to transform the Anglican parishes in Virginia into a new diocese and to initiate a Protestant Episcopal Church in the United

States of America as the successor to the Church of England in the new nation, independent of governmental establishment. On Easter Monday 1785, the Fairfax parish vestry, meeting at The Falls Church, declared itself in conformance to the 'Doctrine, Discipline, and Worship of the Protestant Episcopal Church.' Since then, The Falls Church has been a church of the Protestant Episcopal Church in the United States of America, the Diocese of Virginia." (*See* Restoration of the Falls Church, DX-FALLS-068-015-016.)

By 1798, The Falls Church was no longer functioning as an Episcopal congregation. (Tr. 929; *see also* CANA Brief # 1B at 12-13, 58-63.) From 1819 forward, there is evidence of a functioning congregation at The Falls Church that sought to participate in activities of the Diocese. *Id.* at ¶¶ 64, 68. In 1836, The Falls Church petitioned the Diocesan convention, which admitted The Falls Church "as a separate and distinct church," pursuant to Diocesan Canon XII, enacted in 1815. 76 Va. Cir. at 988. The Falls Church's first parochial report was printed in the Journal of the Annual Council of the Diocese in 1837. (PX-COM-073-014.) From 1837 to 1861, The Falls Church had an organized congregation. With the coming of the Civil War, the church suffered substantial disruption and building damage. (DX-FALLS-0060.) According to a history written by Senior Warden Charles A. Stewart that was completed in 1941, *see* PX-FALLS-053, "[t] he old building . . . was restored [by the Federal government] within twelve months after the war closed and turned over to the Bishop in February 1866." (PX-FALLS-053-195, -205.) The church was formally reorganized and a vestry was elected on November 27, 1873. (DX-FALLS-060-064; DX-FALLS-201-002; PX-FALLS-044-045.)

There are eleven deeds in connection with The Falls Church.

The first deed is dated March 20, 1746, and it concerns the two-acre Trammole parcel that was conveyed to "the vestry of the said parish of Truro in Fairfax county." (DX-FALLS-002.) This was in exchange for 50 shillings paid by the Vestry. *Id.* This was the parcel upon which the original church building and vestry house of The Falls Church was built in the Eighteenth Century.

The second deed is dated December 16, 1852, and is to "Trustees of the Episcopal Church, known and designated as the 'Falls Church' in Fairfax County, of the County of Fairfax in the State of Virginia'." (DX-Falls-003, 003A.)

The third deed, dated October 1, 1918, is to "Trustees for the Falls Church Episcopal Church." (DX-FALLS-004.)

The fourth deed is dated October 29, 1953, and is to "Trustees of The Falls Church." (DX-FALLS-005.) This deed concerns the rectory property at 1008 Broadmont Terrace in Falls Church. (Tr. 2441.)

The fifth deed is dated February 27, 1956, and is to "Trustees of The Falls Church, Falls Church, Virginia." (DX-FALLS-006.)

The sixth deed is dated September 15, 1956, and is to "Trustees of The Falls Church, Falls Church, Virginia." (DX-FALLS-007.)

The seventh deed is dated August 30, 1963, and is to "Trustees of The Falls Church (Episcopal)." (DX-FALLS-008.)

The eighth deed is dated December 15, 1986, and is to "The Trustees of the Falls Church (Episcopal)." (DX-FALLS-009.)

The ninth deed is dated October 31, 1996, and is to "The Trustees of the Falls Church (Episcopal)." (DX-FALLS-010.)

The tenth deed is dated January 3, 2000, and is to "Trustees, of The Falls Church (Episcopal)." The Congregation paid $1.65 million for this property. (DX-FALLS-011.)

The eleventh deed is dated December 1, 2005, and is to "Trustees of the Falls Church (Episcopal), a Parish Church of the Protestant Episcopal Church in the Diocese of Virginia." (DX-FALLS-012.)

b. *St. Paul's Church*

There are five deeds at issue in connection with St. Paul's, not including a lost deed from 1830, which led to the appointment of a special commissioner in 1993 to convey the 1830 property to the trustees of the church, which is further described below.

The first deed is dated January 18, 1900, and it is to certain named "trustees, to be held as a Rectory for the use and benefit of St. Paul's P.E. Church, Haymarket, Virginia." (DSTP-297-04320, DSTP-297A-04321A.) Later in the same deed, the church is referred to as "St. Paul's Protestant E. Church of Haymarket, Va." By this deed, St. Paul's purchased for $525 a parcel on which a frame house originally used as a Rectory was built. (DSTP Exs. 297, 297A.) In 1926, the vestry of St. Paul's adopted a resolution authorizing it to borrow $2,000 to fund repairs to the Rectory. (DSTP Ex. 9-00671.) And in 1975, the Vestry replaced the Rectory roof. (DSTP Ex. 12-01406.) The building is now used for offices and meetings. (Tr. 1807.)

The second deed is dated April 21, 1904, and it is to certain named "trustees of St. Paul's Episcopal Church at Haymarket, Va." (DSTP-293, 293A.) In consideration of support given the grantors by the St. Paul's women's auxiliaries for "a number of years" and $5, the grantors conveyed to the church certain property with a frame house. *Id.* The property is used as the Parish Hall and also houses the St. Paul's School. (Tr. 1808-1809.)

The third deed is dated July 28, 1993, and it is to "Trustees of St. Paul's Episcopal Church of Haymarket, Virginia." (DSTP 294.) This deed concerns the historic church, which was built originally in 1801 as a district courthouse. (PX- STPAUL 596.) According to St. Paul's 1996 parish profile, the church building "was deeded to the Episcopal church in 1830 and became St. Paul's three years later." (PX-STPAUL 108.) (The deed itself is

lost, according to a petition filed by "trustees of the religious congregation of St. Paul's Episcopal Church" under Virginia Code § 57-17, which allows conveyances where there is "no deed of record," reciting possession since 1830.) Diocesan Bishop William Meade consecrated the building in 1834 as St. Paul's Episcopal Church. (PX-COM 071.) Except for a period during the Civil War, it has been used ever since as an Episcopal Church. (PX-STPAUL-005, 596; Tr. 984-85.) Over the years, the Congregation of St. Paul's expended various sums of money on remodeling and repairs. (*See* CANA Brief # 1B at 42-3, ¶¶ 242-47.) Much of the construction work was performed by members of the congregation. *Id.* In July 1993, St. Paul's trustees sought the appointment of a special commissioner authorized to convey to them the historic church parcel on the grounds that St. Paul's had been in continuous and undisputed possession of the parcel since the 1830s. *Id.* That conveyance was accomplished by the deed dated July 28, 1993.

The fourth deed is dated February 19, 1998, and it is to certain named "Trustees of St. Paul's Episcopal Church of Haymarket, Virginia." The deed concerns a vacant parcel of land behind the original Rectory, for which St. Paul's paid $50,000. (DSTP Ex. 295.)

The fifth deed is dated September 22, 1999, and it is to certain named "Trustees of St. Paul's Episcopal Church of Haymarket, Virginia." (DSTP-296.) St. Paul's paid $209,900 for an improved parcel containing a frame house named the Meade House after one of the Nineteenth Century residents of the house. (*Id.*; Tr. 1810.) Meade House is now rented to a third party not associated with St. Paul's. (Tr. 1810.)

### c. *Truro Church*

Truro Church was founded in 1843 by the Rev. Richard Templeton Brown, who was then the Rector of The Falls Church. (CANA Brief # 1B at 55, ¶ 18.) It was previously known as Zion Protestant Episcopal Church, but the name was changed by the congregation and vestry to Truro Church in 1934. *Id.* at n. 15. According to CANA, the congregation disbanded during the Civil War but partially re-formed as early as November 1866, when initial trustees were appointed. (CANA Brief # 2 at 56, ¶ 325.) The Congregation of Zion Church erected a frame building around 1872, and the congregation has been in continued existence since then. *Id.* at ¶¶ 327-28. The 1872 structure was used by the congregation of Zion Church up through early 1934 (PX-TRU-0187-001), when the "historic chapel" was completed. (DX-TRU-146.0050.)

There are eleven deeds in connection with Truro.

The Court does not discuss here the two Instruments of Donation that Truro executed in 1934 and 1974. (PX-TRU-003-001; PX-TRU-004-001.) These instruments are associated with the consecration of Truro's "Historic Chapel" (1934) and the consecration of Truro's Main Sanctuary (1974).

(*Id.; see also* PX-TRU-369.) TEC and the Diocese argue that they are valid and enforceable but, even if not, "they show that Truro accepted that its property must be used for the mission and ministry of the Episcopal Church and the Diocese" and "strongly support the Diocese's claims of proprietary and contractual rights." (Diocese Brief # 1 at 110-12.) The CANA Congregations argue that "such documents are literally part of TEC's liturgy and have only symbolic significance" and that they are not "legally cognizable." (CANA Brief # 2 at 56-61.) Because neither TEC nor the Diocese assert that they were recorded as deeds, they are not further discussed in this section; however, they are discussed below in the "Course of Dealings" section of this opinion.

First, there is a deed (called the "Rumsey Deed") dated December 3, 1874, to "Trustees for Zion Protestant Episcopal Church . . . to have and to hold . . . forever but upon the following purposes, uses, trusts, and conditions and none other, that is to say, for the use of the members and congregation of the Protestant Episcopal Church of the Diocese of Va. worshipping and to worship in the building on said lot known as and called 'Zion Church,' subject to the Constitution, canons, and regulations of the Protestant Episcopal Church of the Diocese of Va." (DX-TRU001.) This deed purports to be a replacement deed from William T. Rumsey, but no prior deed is recorded. *Id.* at ¶ 333. The property conveyed by the 1874 deed is a one-half acre parcel where the "historic chapel" now sits. (Tr. 1637.) With the exception of a small grant from a Diocesan fund toward the construction of the 1872 structure, nearly all costs of improvements to the real property of Truro were funded by the congregation. (CANA Brief # 1B at 66, ¶¶ 406-08.) No recorded deed was introduced into evidence for any parcel of property held by the Trustees of Zion Church prior to 1874. (CANA Brief # 1B at 55, ¶ 321.)

Second, there is a deed (called the "Simpson Deed") dated December 1, 1882, to "trustees of Zion Protestant Episcopal Church . . . in trust nevertheless to be held by [the trustees] for the sole use and benefit of the said Zion Protestant Episcopal Church, with power in said trustees, with consent of the vestry of said church, to charge, encumber, sell, and convey said property." (DX-TRU002, TRU002a.) This deed concerns a seven acre parcel known as the "Simpson Property." The structures that currently sit on this parcel are the Main Sanctuary and the Gunnell House. The Main Sanctuary was completed in 1959. In order to finance construction of the Main Sanctuary, the Trustees filed a petition in Circuit Court in November 1957 seeking to encumber property in the amount of $250,000. Then-Circuit Court Judge Harry L. Carrico entered an order approving the petition upon finding that it was "the desire of the members of the congregation" to encumber the property. In December 1957, Truro Church requested permission of the Board of the Department of Christian Stewardship to borrow the funds necessary to build the new church building. The Board

approved the request, noting that it was approving the request to incur the debt "for the specific purpose of erecting a church on property now owned by that church." (CANA Brief # 1B at 69-70, ¶¶ 431-42; CANA Brief # 2 at 59, ¶ 338.) According to CANA, the Main Sanctuary was not completed until 1959, but the Gunnell House was built in 1835. *Id.* at 1339.

In 1908, 1913, and 1921, portions of the original seven acre parcel were sold to John W. Rust, pursuant to petitions filed in the Circuit Court. (CANA Brief # 2 at ¶¶ 341-42.) CANA notes in its argument that neither the Diocese nor TEC joined in the petition and no evidence was introduced that either was consulted about the sale, nor about a sale of property in 1939, and another sale of property in 1960. *Id.* at ¶¶ 343-56. In 1960 and 2002, there were other sales of property, again pursuant to petition, and CANA notes that neither the Diocese nor TEC joined in the petition. *Id.* at ¶¶ 365-68, 396-99.

Third, there is a deed (called the "Kirkpatrick Deed") dated May 19, 1952, to "Trustees of Truro Episcopal Church." (DX-TRU006.) The Parish Hall, constructed in 1952 with congregational funds and a loan, is partially on this property and partially on the Rumsey deed property conveyed in 1874. (CANA Brief # 1B at 68-9, ¶¶ 424-30.)

Fourth, there is a deed dated July 3, 1956, to "Trustees for Truro Episcopal Church." (DX-TRU007.) According to CANA, this is where the education building currently sits. (CANA Brief # 2 at 62, ¶ 364.) CANA acknowledges that there is evidence that Truro Church sought permission from the Diocese to encumber property for the 1965 loan, but notes that no evidence was submitted regarding any approval by the Diocese. (CANA Brief # 1B at 71, n. 27.)

Fifth, there is a deed dated January 4, 1982, to "Trustees for Truro Episcopal Church." (DX-TRU008.) This property currently serves as a parking lot. (Tr. 1657.)

Sixth, there is a deed dated March 15, 1987, to "Trustees of Truro Episcopal Church." (DX-TRU011.) This deed concerned the International Christian Ministry Building, which Truro purchased for $1.4 million. CANA notes that neither the Diocese nor TEC were parties to the contract to purchase the building. (CANA Brief # 1B at page 63, ¶ 380.) The property is located across the street from Truro's main campus and is used as an office building. *Id.* at ¶ 381.

Seventh, there is a deed dated April 26, 1991, to "Trustees for Truro Episcopal Church, Fairfax, Va." The deed provided "[t]he principal dwelling house on the Property shall be used and occupied as a rectory or dwelling for members of the clergy of Truro Episcopal Church." This deed retained a life estate for the grantor, which life estate was conveyed in the deed dated July 30, 1992. (DX-TRU012.) The deed also states that: "In the event that, within thirty-five years from the date of this deed Truro Church shall cause or allow the dwelling house to be demolished or shall cease to

use the principal dwelling house as a rectory or residence for the benefit of the clergy of Truro Church, title to the property shall revert to the estate of the Grantor and shall be distributed in accordance with her last will and testament." *Id.*

Eighth, there is a deed dated March 2, 1992, to "Trustees for Truro Episcopal Church." (DX-TRU009.) CANA notes that the deed was based on a contract of sale to sell a parcel of property to Truro Church that was executed by Truro's senior warden and that neither the Diocese nor TEC was a party to the contract. (CANA Brief # 1B at 64, ¶¶ 387-90.)

Ninth, there is a deed dated July 30, 1992, to "Trustees for Truro Episcopal Church, Fairfax, Va., conveying the life estate retained in the April 26, 1991, deed. (DX-TRU013.)

Tenth, there is a deed dated May 31, 2001, to "Trustees for Truro Episcopal Church." (DX-TRU010.) The purchase price for the property was $1.25 million, financed by a promissory note executed by Truro's Rector and Senior Warden. CANA notes that neither the Diocese nor TEC was an obligor under the promissory note and did not contribute money toward the purchase. CANA Brief # 1B at 65, ¶¶ 392-95.

Eleventh, there is a deed dated December 13, 2006, consisting of a Quitclaim Deed of Gift from Trustees of Christ the Redeemer Episcopal Church to "Truro Church" (PX-TRU-001-040), replaced by a December 21, 2006, deed of correction to "Truro Church by its trustees." (DX-TRU015.) This property was the subject of footnote 12 of the Virginia Supreme Court's decision in *Protestant Episcopal Church in Diocese of Virginia v. Truro Church*, 280 Va. 6, which reads in part as follows: "The Diocese has also assigned error to the circuit courts' determination that it lacked jurisdiction to reconsider an order entered in a prior proceeding approving the transfer of property from Christ Redeemer Church to Truro Church. While we agree with the circuit court that the Diocese was attempting to bring an improper collateral attack on a final judgment, it is nonetheless evident that, as the property is held for the benefit of Truro Church, the ultimate determination of ownership and control of that property will be resolved in the proceedings on the declaratory judgment actions."

d. *St. Stephen's Church*

There are eight deeds in connection with St. Stephen's.

The first deed is dated November 20, 1874, and followed the appointment in October 1874 of nine individuals to serve as trustees of the Protestant Episcopal Church in Northumberland County. The deed is to certain named individuals as "trustees duly legalized and appointed by the Circuit Court," such property to be held:

In trust nevertheless and for the sole use and benefit of the religious society and congregation known as the Protestant Episcopal Church for the purpose of erecting a house for divine worship and such other houses as said congregation may need, And said church or house for divine worship when so built shall be used and enjoyed by said religious society or congregation according to the laws and canons of said church not inconsistent with the laws and constitution of Virginia.
. . .

(DSTS-005-031, 015-098-099.) St. Stephen's Church dates from this point in time, when "[a] renewed interest in an Episcopal Church for Northumberland prompted the purchase of land in 1874 for the purpose of erecting a house of divine worship," which initially was known as Emmanuel P.E. Church. (PX-SSH-149-005; National Register of Historic Places nomination, DSTS Ex. 15.) The "house for divine worship" was built over a period of several years at a cost of about $1,100, funded largely by the congregation. (CANA Brief # 1B at 87, ¶ 551.) On April 30, 1881, Bishop Francis M. Whittle consecrated the building as St. Stephen's Church. (PX-COM-118-047, -051; PX-SSH-002-026; Tr. 994-96.) Since completion in or about 1881, the original church building has been continuously used as a church. CANA Brief # 1B at ¶ 553. Over time, St. Stephen's has expended various sums of money to modify and repair the church and to build a new parish hall. *Id.* at ¶¶ 554-56. Other than $1,000 contributed by Bishop Peter Lee out of his Discretionary Fund, the costs of the parish hall and renovations and repairs have been paid by the congregation and its supporters. (*Id.; see also* Tr. 3686.)

Unlike almost all of the other deeds before the Court, the 1874 deed contains additional and explicit language regarding the intended use of the deeded property. The CANA Congregation, in fact, filed a separate post-trial brief regarding the 1874 deed. In that brief, CANA argues as follows: (1) the language in question does not constitute an enforceable restrictive covenant; (2) if it does constitute a restrictive covenant, it has no continuing force because the purpose of the covenant has been substantially met; (3) if it does constitute a restrictive covenant, it has been nullified by inconsistent uses in the form of six conveyances out of the 1874 deed parcel; (4) in any event, neither TEC nor the Diocese has asked the Court to find the language to constitute a restrictive covenant.

In support of its argument that the quoted language above does not constitute a restrictive covenant, CANA asserts that the reference in the deed to the "Protestant Episcopal Church" is "manifestly language of identification only and, as such, cannot fairly be read to restrict the use of the property solely by those affiliated with a particular denomination." (St. Stephen's Church Post-Trial Brief Re Its 1874 Deed at 7 (citations omitted).) Further, CANA argues that, since a 1874 deed could only be a

conveyance to a local congregation and not to a denomination (*see Brooke v. Shacklett*, 54 Va. 301, and *Hoskinson v. Pusey*, 73 Va. 428), the language's reference to "religious society and congregation" can only be a reference to the local church itself. (St. Stephen's Church Post-Trial Brief Re Its 1874 Deed at 7.) Thus, argues CANA, the language quoted above only obligated St. Stephen's to build a church and to use it in accordance with "the *congregation's* own governing rules." *Id.* at 8 (emphasis in original). In other words, argues CANA, "the language of the 1874 Deed cannot fairly be read to mean that the property must be used by a congregation attached to . The Episcopal Church." *Id.* Finally, CANA argues that the quoted language is much less specific and explicit than that used in *Brooke, Hoskinson*, or *Finley v. Brent*, 87 Va. 103 (1890).

The Court disagrees. Even if the reference to "religious society or congregation" is a reference to the local church and not to the Diocese or the denomination, that local church is clearly identified as an *Episcopal* church and the language states that the church "shall be used and enjoyed by said religious society or congregation *according to the laws and canons of said church* not inconsistent with the laws and constitution of Virginia." (DSTS-005 (emphasis added).) In a hierarchical church, the "laws and canons" of a local church necessarily include the governing rules of the hierarchical church. Therefore, the Court rejects CANA's argument that the language in St. Stephen's 1874 deed is a "purely descriptive reference to the local congregation and with no direction that the property be used for the worship of members of a particular denomination." (St. Stephen's Church Post-Trial Brief Re Its 1874 Deed at 8-9, n. 6.) Rather, the Court reads this deed as manifesting the intent by the grantor that the property be used for the worship of members of The Episcopal Church.

CANA also argues in the alternative, i.e., if the language is held to be enforceable, it was satisfied when the church was completed, and, in any event, the language has been "nullified" by various conveyances and easements granted over time. The Court finds neither of these arguments to be persuasive. In particular, the Court notes that the obligations under the deed were not completed when the church was completed. Rather, the language quoted above also required that the "house for divine worship when so built shall be used and enjoyed by said religious society or congregation according to the laws and canons of said church not inconsistent with the laws and constitution of Virginia." (DSTS-005-031, 015-098-099.) In short, the language of the deed contemplates both construction *and* use; and the specific use contemplated was by an *Episcopal* church subject to the "laws and canons" of the church. The Diocese also makes the argument that, at the time the deed in question was executed in 1874, TEC had adopted (in 1868 and 1871) its anti-alienation canon for consecrated property, which made clear that such property was protected from removal from the Church to another denomination. (TEC Brief # 3 at 31.)

The second deed is dated August 27, 1957, and it is to "Trustees of Saint Stephens Parish of the Protestant Episcopal Church, Northumberland County, Virginia, for the use and benefit of Saint Stephens Protestant Episcopal Church of Heathsville, Virginia." (DSTS-006-033.) The deed was for a 2.5 acre parcel encompassing the church cemetery and a frame house. (DSTS Exs. 6, 53; Tr. 3677.) The property cost St. Stephen's $9,250. *Id.* Subsequently, St. Stephen's expended $12,977 to remodel the house so that it could be used as a parish house. (DSTS Ex. 53-01010; Tr. 3677.) The project was funded with funds on hand, a $12,000 loan secured by the deed to the parcel, and a $3,500 contribution from the Diocese. (DSTS Ex. 53-01009-10; Tr. 3677.) The frame house is now used as the Thrift Shop. (Tr. 3676.)

The third deed is dated January 12, 1967, and it is to "Trustees of Saint Stephens Parish of the Protestant Episcopal Church of said county and state, for the use and benefit of Saint Stephens Protestant Episcopal Church of Heathsville, Virginia." (DSTS-007-040.) St. Stephen's purchased the property for $1,200 for the purpose of building a new rectory. (PX-SSH-17; DSTS Ex. 7; Tr. 3678.) St. Stephen's vestry authorized the church to borrow $15,000 from a bank to build the new rectory. (DSTS Ex. 90-01428.)

The fourth deed is dated April 14, 1967, and it is to "Trustees of Saint Stephens Parish of the Protestant Episcopal Church, Northumberland County, Virginia, for the use and benefit of Saint Stephens Protestant Episcopal Church of Heathsville, Virginia." (DSTS-008-042.)

The fifth deed is dated December 21, 1967, and it is to "Trustees of Saint Stephen's Parish of the Protestant Episcopal Churches of Northumberland County, Virginia." (DSTS-009-044.)

The sixth deed is dated October 18, 1972, and it is to "Trustees of St. Stephens Protestant Episcopal Church, Heathsville, Virginia." (DSTS-010-046.)

The seventh deed is dated April 1, 1996, and it is to "Trustees of St. Stephens Parish of the Protestant Episcopal Church, P.O. Box 609, Heathsville, Virginia 22473." (DSTS-011-048.)

The CANA Congregations describe the 1967, 1972, and 1996 deeds as follows. "Between 1967 and 1996, St. Stephen's acquired four small parcels of property for the purpose of rounding out its existing land. In 1967, it acquired through two gifts two separate strips of land. In 1972, St. Stephen's acquired another small strip of land adjacent to its rectory parcel. In 1996, St. Stephen's acquired the fourth small parcel near the church parcel. Neither TEC nor DVA [Diocese of Virginia] contributed funds for the acquisition of any of these four small parcels." (CANA Brief # 1B at 86, ¶¶ 545-46 (citations omitted).)

The eighth deed is dated November 20, 1998, and it is to "Church Trustees of St. Stephen's Episcopal Church." (DSTS-012-053). St. Stephen's

purchased the land for $40,000, which is used for overflow parking and other outdoor activities. According to CANA, there is no evidence that either TEC or the Diocese contributed to the acquisition of this parcel. (CANA Brief # 1B at 89, ¶¶ 567-69 (citations omitted).)

e. *Church of the Apostles*

There are three deeds at issue in connection with the Church of the Apostles.

The first deed is dated April 20, 1971, and is by and between the "Diocesan Missionary Society of Virginia (formerly known as Trustees of The Diocesan Missionary Society of Virginia, a Virginia Corporation)" and certain named "Trustees for The Church of the Apostles, Fairfax County, Virginia." The deed is signed by Bishop Samuel B. Chilton. (Apostles Ex. 033.0001.) The property involved is commonly called the "Pickett Road" property and had been acquired by the Diocese in 1958. (PX-APOST-0289-002.)

The second deed is dated November 17, 1999, and it is to certain named "Trustees for Church of the Apostles (Episcopal)." The property involved is commonly called the "Spencer" property. (Apostles Ex. 034.0001.)

The third deed is dated May 8, 2001, and is to certain named "Trustees of the Church of the Apostles (Episcopal)." The property involved is commonly called the "Swart" property. (Apostles Ex. 035.0001.)

The background associated with these deeds is as follows.

Church of the Apostles was formed as a mission of the Diocese in 1968, "through planning and coordination between the Diocese and Truro Episcopal Church and after receiving the requisite approvals from the Diocese's Board of Missions and leadership of existing Episcopal churches in the area." (Diocese Brief # 1 at 161.) Apostle's first service was held in a local elementary school in March 1968. *Id.*

On October 27, 1968, the congregation approved purchase of a parcel of land on Pickett Road in Fairfax, Virginia, from the Diocese. (PX-APOST-0311.) Apostles paid the Diocese $11,983 for the property in June 1969. (Tr. 3067-3071; PX-APOST-0319A; PX-APOST-320.) Because the congregation had not achieved parish status, legal title remained in the Diocesan Missionary Society until Apostles was granted parish status at the 1970 Annual Council of the Diocese. The Diocesan Missionary Society transferred the parcel to Apostles' trustees by deed in April 1971, as described above.

This deed demonstrates how closely the Diocese and a mission church worked together to provide the land for construction of a church. First, the property was owned by the Diocese well before the Church of the Apostles existed, even as a mission. Second, the Diocese held onto the property until Church of the Apostles was granted parish status at the Diocese's 1970

Annual Council and could name its own trustees. *See* this excerpt at page 162 of Diocese Brief # 1:

> As Apostles recognized, and as the Diocese's Chancellor explicitly told Apostles, the appropriate time for a transfer to locally-appointed trustees was after achieving parish status. *See* PX-APOST-311 -002 ("The phrase 'within the legal provisions of canon law' was used to authorize having legal title remain in the Dioceses Missionary Society [*sic*] until the Church of the Apostles can attain a status permitting us to name our own trustees."). Third, the property was conveyed by deed directly from the Diocesan Missionary Society to the Trustees of the Church of the Apostles, in a deed signed by the Bishop. While it is true that Church of the Apostles paid for the property, that does not undermine the clear record that the property was conveyed by the *Episcopal* Diocese to an *Episcopal* church for the purpose of providing a place upon which to build an *Episcopal* church sanctuary.

A worship space was built on the property in 1980. (Apostles Ex. 013.0032-34.) The construction was paid for by Apostles' membership. (Apostles Ex. 013.0032-27.) They also paid for an expansion to the sanctuary in 1988. (Tr. 3097.) Both the second and third deeds involve adjacent properties on Braddock Road in Fairfax County. The properties were to be the site of a new church to replace the Pickett Road facility and were purchased without contribution of funds from TEC or the Diocese. (Tr. 3135, 3172.) Apostles were unable to sell the Pickett Road property (Apostles Ex. 144) nor to build a new church on the Braddock Road properties. (Tr. 3175.) Apostles attempted unsuccessfully to sell some twenty acres of excess land on Braddock Road. (Apostles Exhibits 76, 148.)

### f. *St. Margaret's Church*

There are two deeds at issue in connection with St. Margaret's Church.

The first deed is dated June 19, 1972, and is by and between "The Right Reverend Robert F. Gibson, Jr., Bishop of the Diocese of Virginia" and "Trustees of St. Margaret's Church, Dettingen Parish, Prince William County, Woodbridge, Virginia." (DSTM-042-00323-00328.) In addition to the land itself, the real estate conveyed included a church, parish house, and rectory. The deed notes that the property conveyed upon which sits the church and parish house is the same property conveyed by deed from Glebe Properties, Inc., dated July 26, 1963, to Bishop Gibson, which deed appears in the exhibits as DSTM-005-00031-33, and that the property conveyed upon which sits the rectory is the same property conveyed by deed from "Marumsco Village, Incorporated," dated January 7, 1964, to Bishop Gibson.

The trustees agree in the deed to assume the balances due on two deeds of trust from Bishop Gibson: (1) in the original amount of $70,000, securing a note to the "Prince William Savings and Loan Association (now Perpetual Savings & Loan Association)," with a remaining balance of $51,306.21; and (2) in the original amount of $18,250, securing a note to the "Prince William Savings and Loan Association (now Perpetual Savings & Loan Association)," with a remaining balance of $15,011.87.

The deed also states the following:

> Section 3 of Canon IV of the Canons of the Protestant Episcopal Church in the Diocese of Virginia in effect at the time of the conveyance of the aforesaid property to the party of the first part continues in full force and effect as of the date of this conveyance and provides as follows:
>
> Section 3. The Bishop, or the Ecclesiastical Authority, of the Diocese is hereby authorized to administer the affairs of the Diocese in connection with the establishment of churches under the provisions of the Canons, and as such shall have power to acquire by deed, devise, gift, purchase, or otherwise any real property for use in the missionary work of the Diocese or for use as Diocesan headquarters or offices for the administration of the affairs of the Diocese. Property so acquired shall be held and transferred in accordance with the provisions of Section 57-16, Code of Virginia, 1950, as from time to time amended, and the party of the first part is the Bishop of the Diocese as of the date of this conveyance.

(DSTM-042-327.)

The second deed is dated February 13, 2004, and it is to "St. Margaret's Episcopal Church by its [named] Trustees."

The following points should be noted about St. Margaret's.

St. Margaret's grew out of the Diocese's "program for church planting" in the early 1960s. (PX-STMARG-1119-004.) "In September 1963, the Diocese inquired of the Woodbridge members of St. Martin's Episcopal Church in Triangle and Pohick Episcopal Church in Fairfax if there was interest in starting a new parish in Woodbridge. During the first week in October, a small group met with [Suffragan] Bishop [Samuel] Chilton in a furniture store." *Id.*

On October 6, 1963, St. Margaret's held its first worship service in a middle school classroom. (DSTM Exs. 6,7; PX-STMARG-1119-0004; Tr. 3899:20-3900:1.) "The Venerable W. Leigh Ribble, Archdeacon of the Diocese . . . was conducting the Eucharist." (PX-STMARG-285-001.)

On January 28, 1965, St. Margaret's was admitted to the Diocese as a Mission (PX-COM Ex. 204-33; Tr. 3900:7-8), and, on January 24, 1971, St. Margaret's was admitted to the Diocese as a church. (PX-COM Ex. 210-63; Tr. 3900:2-6.)

The first deed concerns what is called the "Church Hill Drive Property" upon which presently sits the church and related properties at issue. According to the CANA Congregations' brief, the property was initially owned by Ethel Wigglesworth, the grandmother of a St. Margaret's parishioner, who donated a ten acre parcel of land for the construction of a church. "Because St. Margaret's was not at that point organized legally to receive real property, the transaction was structured so that Ms. Wigglesworth conveyed the land to Glebe Properties, Inc., a Diocese of Virginia corporation, which, on July 26, 1963, conveyed to the Bishop of the Diocese the ten-acre parcel now located at 13900 Church Hill Drive in Woodbridge." (CANA Brief # 1B at 104, ¶ 656; DSTM Ex. 48.)

While the land was still owned by the Bishop, ground was broken for a sanctuary. (PX-STMARG-1119-004.) Funds for construction of the sanctuary and related start-up expenses were arranged by the Diocesan Missionary Society, which, in January and February 1964, borrowed from Perpetual Savings and Loan $18,250 and $70,000, respectively. (DSTM Ex. 390-00263; TR. 3901:12-21.) (These are the same loans referenced in the deed described above.) Additional start-up funds were borrowed from the Diocesan Missionary Society with promissory notes dated September 16, 1964 ($28,450), December 4, 1964 ($4,000), and April 10, 1968 ($17,200). On November 12, 1968, St. Margaret's signed a consolidated promissory note. (DSTM Ex. 12.) Between 1974 and 1975, St. Margaret's did additional construction on the property, which was funded with cash and an additional $20,000 loan from the Diocesan Missionary Society. (DSTM Ex. 26.) By 1998, St. Margaret's had paid off all six of the DMS loans. (DSTM Ex. 125, 38, 371-02201; Tr. 3930:16-20.)

In 1998 or 1999, St. Margaret's built a new parish hall, which was paid for by the congregation and by a loan from a bank, secured by a mortgage on the Church Hill Drive parcel. The mortgage has been paid off. (DSTM Ex. 520, 336, 48-00491; Tr. 3904, 3905:2-9, 3930:21-3931:9.)

The second deed involves what is called the "Cross Lane Property." This is a forty-acre parcel on the Prince William Parkway, upon which St. Margaret's plans to relocate the church. St. Margaret's closed on the property on February 13, 2004, and paid $500,000 plus $13,000 in closing costs, for which the "congregation paid cash." (CANA Brief # 1B at 102-07, ¶¶ 667-70.) St. Margaret's gave the Diocese first right of refusal regarding the sale of the original Church Hill Drive property, where the present church is located. After St. Margaret's received an offer to purchase the Church Hill Drive property from a builder (which was contingent upon securing rezoning of the property within twelve months), St. Margaret's communicated the offer to the Diocese so that the Diocese could decide whether to exercise its first right of refusal, which it declined to exercise. *Id.* at ¶¶ 673-75. After the builder failed to meet the zoning contingency, St. Margaret's completed the rezoning approval process itself. *Id.* at 676. St. Margaret's expended considerable sums of money in obtaining the

rezoning of the Church Hill Drive Property and obtaining site planning approval for the Cross Lane Property. The site planning approval process for the new property has cost St. Margaret's over one million dollars and was financed by St. Margaret's with cash on hand and a construction loan. *Id.* at 677. Including the purchase price of the Cross Lane property, the total cost expended on the effort to move St. Margaret's has been "about $2.7 million." *Id.* at 679.

This first deed is particularly significant because it demonstrates the pervasive involvement of the Diocese in the acquisition of church property and in support of its development. First, the Diocese was actively involved in the formation of the church in 1963. Second, the Diocese took ownership of the donated property and held it for almost ten years until it could be conveyed to the church itself. Third, the church was constructed while the property remained in the possession of the Diocese. Fourth, it was the Diocesan Bishop who actually conveyed the property to St. Margaret's. Fifth, the Diocesan Missionary Society provided substantial loan support *on six different occasions* that permitted both the construction of the church's core facilities and helped St. Margaret's with its start-up costs. Sixth, the 1972 deed itself quotes from one of the Diocesan canons, authorizing the Bishop "to acquire by deed, devise, gift, purchase or otherwise, any real property for use in the missionary work of the Diocese . . ." which both demonstrates the authority of the canons and the canonical requirement that property acquired be used "in the missionary work of the Diocese." Seventh, other official documents demonstrate St. Margaret's own perception over time that the Diocese had an ownership interest in the church.

Specifically, there is a Deed of Easement dated March 14, 1983, which refers collectively to St. Margaret's Rector, Trustees, and Senior Warden and the Diocesan Bishop as "St. Margaret's Episcopal Church" and "Grantors" and states that the "Grantors warrant that they [we]re the true and lawful owners of the premises described herein." (PX-STMARG-546-001, 003.) In addition, notes the Diocese, there are other official records of St. Margaret's that recognize the Diocese's ownership interest in the property at issue, specifically three documents: (1) an application for waiver of provisions of County Design and Construction Standards Manual dated May 1, 1987, which describes "Owner's Name" as "Episcopal Diocese of Virginia, Department of Missions/Trustees of St. Margaret's Episcopal Church and the owner's address as that of Diocesan headquarters," (PX-STMARG-583-001); (2) a 1988 special use permit listing "Owner" as "Episcopal Diocese of Virginia, Department of Missions," (PX-STMARG-595); and (3) a church profile prepared in or around 2003, which states in part: "Three trustees hold title to St. Margaret's property in the name of the diocese." (PXSTMARG-670-013, 015.)

Against the above, the CANA Congregations make a number of points. First, it was St. Margaret's own parishioners who provided the labor in some

of the construction done at the church. (CANA Brief # 1B at 105, ¶ 664.) Second, loans from the Diocesan Missionary Society were at market rates. Third, all loans were repaid. Fourth, the deeds contain no explicit restrictive covenant requiring that the property be used for Episcopal Church purposes. Fourth, since the property was conveyed to St. Margaret's trustees in 1972, they have always held the property for the benefit of St. Margaret's. Fifth, St. Margaret's own resources were used to fund the acquisition of the second parcel and also funded the land development and improvements to both parcels. Finally, CANA notes that neither the congregation nor vestry of St. Margaret's ever voted to convey a property, trust, or contract interest to TEC or the Diocese.

The Court is not persuaded that any of these points undermine the clear indication that the deeded properties were conveyed with the clear intent that the properties be used for *Episcopal* church purposes.

### g. *Church of the Epiphany*

There is one deed at issue in connection with Church of the Epiphany. On August 25, 1987, Glebe Properties, Inc., deeded the property to "Trustees of the Church of the Epiphany (Episcopal)." (DCOE Ex. 497-2643.)

The following points should be noted about this deed.

First, according to the Diocese, Glebe Properties, Inc., was a corporation of "certain prominent Northern Virginia Episcopalians," who decided to give Church of the Epiphany a 5.2 acre site in a large residential community for a new church building. (*See* Diocese Brief # 1 at page 176.) The CANA Congregations describe Glebe Properties, Inc., as a Diocese of Virginia corporation. (CANA Brief # 1B at page 104, ¶ 656.)

Second, the property was not sold to the Church at fair market value. According to CANA, it had an assessed value of $153,900, (*see* CANA Brief # 1B at 132, ¶ 851) but was given to the church "without cost to us now with the agreed understanding that our Parish would become firm financial supporters of the Diocesan efforts to secure additional land and develop new congregations." (DCOE Ex. 520.) Thus, the land was acquired "at no cost to the parish." (PX-EPIPH-039-003.)

Third, once the parcel was conveyed to it, the church borrowed $730,000 from George Mason Bank. Significantly, the church also sought and received financial assistance from the Diocese, specifically a $500,000 loan from the Diocesan Missionary Society to fund construction of a first phase of its new church and related expenses. (DCOE Ex. 483-02568, -02570; Tr. 2080; *see also* CANA Brief # 1B at 132, ¶ 852.) The construction loan from the Diocesan Missionary Society was secured by a mortgage and fully repaid. (DCOE Ex. 483-02568, -02570.) Ground-breaking occurred on March 27, 1988 (*see* DCOE Ex. 458-2296) and Bishop Lee visited the building site at his December 1988 Episcopal visit. (*See* DCOE Ex. 61-398.) Bishop Lee

then returned to dedicate and consecrate the church on April 23, 1989. (PX-EPIPH Ex. 3-003; PX-EPIPH Ex. 86.)

In summary then, valuable property was deeded to the Church of the Epiphany, which was described in the deed as an Episcopal church, at no cost to the church with the explicit understanding that, in return, the Church would financially support the Diocese's efforts in the future to obtain additional land and develop new Episcopal congregations. After acquisition of the land, the Diocesan Missionary Society loaned the church one-half million dollars to partially fund the construction. Bishop Lee visited the site and then, after the church construction was complete, he dedicated and consecrated the church.

## 2. *General Discussion Regarding the Deeds*

There are several general points the Court should make with regard to the deeds at issue in this case.

a. The CANA Congregations assert generally that the deeds before the Court are to the congregations and that they are the "legal title holders." (CANA Brief # 2 at 19.) The Court does not agree. With the exception of the earliest deed before the Court, which predates the existence of TEC or the Diocese, every deed is to trustees of the church itself. This is significant because CANA uses some very charged language, such as "forfeiture," (*see* CANA Brief # 2 at 16) to describe the effect of ordering the conveyance of the properties to the Diocese. It would only be a "forfeiture" if the CANA Congregations were the legal owners of the property. It is true, of course, that the CANA Congregations now *control* the properties but *control* does not equal *ownership*, and the CANA Congregations do not own the properties and, hence, the issue before the Court is not whether to "forfeit" them.

As TEC and the Diocese put it: "[The CANA Congregations] are *not* the `entity,' the local Episcopal church to whose trustees the property was deeded. They are a current local majority of individuals who claim the right to take the local church entity and its property out of the Church and the Diocese for use in another denomination." (TEC/DOV Brief # 2 at 22.)

b. The vast majority of deeds before the Court make explicit reference to the Episcopal character of the church. Of the forty-one deeds, this Court counts thirty-three that refer explicitly to the churches' being *Episcopal* churches or make other reference to their *Episcopal* character. (And even as to those deeds that do not use the word "Episcopal," the deeds were to trustees of "a local church that was at the time of the conveyance indisputably an Episcopal church." (TEC Brief # 3 at 23).) The CANA Congregations argue, however, that the reference in a deed to the *Episcopal* character

of a church merely serves to identify the church and can be attributed no deeper meaning or significance. *See,* e.g., the CANA Congregations' characterization of language in the 1874 St. Stephen's Church deed. The deed reads in part; "In trust nevertheless and for the sole use and benefit of the religious society and congregation known as the Protestant Episcopal Church." (DSTS Exs. 5, 15-00098-00099.) In St. Stephen's Church Post-Trial Brief Re Its 1874 Deed at 9, n. 6, the CANA Congregation asserts that the language identifying the congregation as the "Protestant Episcopal Church" is a "purely descriptive reference to the local congregation and with no direction that the property be used for the worship of members of a particular denomination." *See also* this argument from The Falls Church's Opening Post-Trial Brief Regarding The Falls Church Endowment Fund, at 6: "the Articles and Bylaws [of the Endowment Fund] demonstrate that these terms [Episcopal Church and Protestant Episcopal Church] are not a restriction but rather a *description*; that is, they identify the legal entity that was using the name `The Falls Church' in 1976." (emphasis in original). The Court disagrees with this "Yellow Pages" argument. CANA Brief # 1A at 37: "[I]t merits emphasis that deed language identifying a congregation as `Episcopal' or `Lutheran' or `Catholic' serves to distinguish such congregations from others bearing similar names. One need only thumb through the Yellow Pages to see that churches of different denominations often bear the same name (e.g., "St. Paul's Church")." When a deed refers to the *Episcopal* character of a church, that is not merely a reference to the location of the church, or its proper name, but rather an indication "that the designated *cestui que trust* in each deed was a unit or component of The Protestant Episcopal Church in the United States of America within the then existing diocese." *Buhrman,* 5 Va. Cir. at 503, This Court agrees, therefore, with Judge Stephenson that "a reasonable interpretation of these deeds leads inescapably to the conclusion that the trustees cannot hold title to the subject property for persons or groups who are withdrawn from and not under the authority of The Episcopal Church." *Id.*

CANA also argues that *Davis v. Mayo,* 82 Va. 97 (1885), "disposes" of the argument that there is some significance in the use of the word *Episcopal* in the deeds. (CANA Brief # 1A at 35.) The Court disagrees. *Davis* involved a completely different situation, not involving religious entities, nor a denominational reference in a deed. CANA relies upon this sentence from *Davis* at 105: "The property was not conveyed upon condition that the beneficiaries in the deed should retain the then name of their division or that they should associate themselves with, or become subject to, the orders and regulations of the Grand Division, or any other body; and, consequently, they were left free to change the name of their division whenever they might see fit to do so." As TEC and the Diocese note, that language might be applicable if the issue was the 1934 change from Zion to Truro. (*See* TEC/DOV Brief # 2, at 21.) Here, the CANA Congregations, by

dropping *Episcopal* from their name, by disaffiliating from the Episcopal denomination and affiliating with CANA, did something of a wholly different character than simply change names. In other words, for the very same reason that a church affiliating with a new denomination would drop the name of its old denomination, the presence of that old denomination in the name of the church as it appears in the deeds *is* significant.

c. As to several of the deeds, it is significant that the grantor of the deed is itself the Diocese or the Diocesan Missionary Society (Church of the Apostles 1971 deed and St. Margaret's 1972 deed) or from an entity closely associated with the Diocese (Church of Epiphany's 1987 deed from Glebe Properties.) And there are other compelling and explicit indications in several of the deeds as to their intended purpose.

For example, in the Truro 1843 Rumsey Deed, the Deed states:

> Trustees for Zion Protestant Episcopal Church . . . to have and to hold . . . forever but upon the following purposes, uses, trusts, and conditions and none other, that is to say, for the use of the members and congregation of the Protestant Episcopal Church of the Diocese of Va. worshipping and to worship in the building on said lot known as and called "Zion Church," subject to the Constitution, canons, and regulations of the Protestant Episcopal Church of the Diocese of Va.

(DX-TRU001.)

A second example is the 1874 St. Stephen's Deed, which states:

> In trust nevertheless and for the sole use and benefit of the religious society and congregation known as the Protestant Episcopal Church for the purpose of erecting a house for divine worship and such other houses as said congregation may need, and said church or house for divine worship when so built shall be used and enjoyed by said religious society or congregation according to the laws and canons of said church not inconsistent with the laws and constitution of Virginia.

(DSTS-005-031, 015-098-099.)

d. CANA argues that it is significant that TEC and the Diocese did not require the Deeds at issue in this case to include, or to be modified to include, reversionary clauses or restrictive covenants to ensure their perpetual use as *Episcopal* churches, as opposed to churches of a different denomination or for some other purpose. (*See, e.g.,* CANA Brief # 1 at 25.) But, as TEC and the Diocese note, "silence is hardly a one-way proposition; the property also was not conveyed, for example, to 'the congregation of Truro Church, regardless of what denomination it might affiliate with'." (TEC/DOV Brief

# 2 at 21, n. 19.) But the fact that TEC and the Diocese could have done more (including titling property in the name of the Bishop (CANA Brief # 1A at 24)) does not mean that what was actually done regarding the deeds was inadequate. These deeds explicitly deed property to trustees on behalf of constituent members of the *Episcopal* denomination. The CANA Congregations are not constituent members of the *Episcopal* denomination; by contrast, one of the Plaintiffs in this case is the *Episcopal* denomination itself. Moreover, it certainly would not be credible to argue that TEC's or the Diocese's failure to insist on reversionary clauses, or similar provisions, is somehow a reflection of their intent, for that intent is plainly demonstrated by the adoption of the Dennis Canon, and subsequently of Diocesan Canon 15.1, almost immediately after the Supreme Court stated in *Jones* that "the constitution of the general church can be made to recite an express trust in favor of the denominational church" as a means to insure that "the faction loyal to the hierarchical church will retain the church property." *Jones*, 443 U.S. at 606. That this Court now concludes that these Canons were unsuccessful in achieving their stated objective, due to the invalidity of denominational trusts in the Commonwealth, does not diminish this clear indication of TEC's and the Diocese's intentions. The fact that TEC and the Diocese did not do what Methodists do (CANA Brief # 1A at 29) or what Presbyterians do (CANA Brief # 1A, at 30) or what Lutherans do (CANA Brief # 1A at 31) or what Baptists do (CANA Brief # 1A at page 31) does not diminish the significance of the fact that these deeds *explicitly* conveyed property to constituent members of the *Episcopal* denomination.

e. The CANA Congregations similarly note that none of the deeds at issue contain an express trust on behalf of TEC or the Diocese. The Court does not find this to be significant, given the undisputed fact that, at least until 1993, denominational trusts were deemed invalid. *See, e.g.*, the Virginia Supreme Court's statement in *Green* that "[t]he addition of a trust clause to the deed would have provided the A.M.E. Zion Church with no additional or further interest in the Lee Chapel property," in part because the property was "already held by the trustees for that church and no other," and in part because express trusts for supercongregational churches are invalid under Virginia law, as are implied trusts. *Green*, 221 Va. at 554-55. And the fact that this Court has now held that denominational trusts continue to be invalid in the Commonwealth certainly provides additional support for the proposition that requiring a deed to reflect an express trust for TEC or the Diocese would have been a hollow and unavailing exercise in the Commonwealth.

f. TEC argues that, in construing a deed, the Court first "looks to see if the instrument on its face discloses what the grantor intended regarding the conveyed property in the particular circumstances presented," and cites

*Camp v. Camp*, 220 Va. 595, 598 (1979), for the proposition that, "[i]f the language [of the deed] is explicit and the intention is thereby free from doubt, such intention is controlling." (TEC Brief # 3 at 28.) If, however, the deeds do not contain such express language, the Court looks at "the surrounding circumstances" to surmise the grantor's intentions. *See, e.g., Schultz v. Carter*, 153 Va. 730 (1930). TEC then argues that none of the deeds contain *express* language addressing the present situation. In other words, none of the deeds *explicitly* address the grantor's intentions in the event a congregation votes to renounce its affiliation with TEC and affiliate with a different denomination.

In an effort to evaluate the "surrounding circumstances" that existed at the time these deeds were executed, TEC analyzed the forty-one deeds in chronological order, breaking them down into eight time periods.

The first time period had just one deed in it, the 1746 deed regarding The Falls Church, which TEC argues is "neutral" on the intent of grantor issue.

TEC makes the point, however, that, "even though this deed does not dispose of the issues in this case, it is the Church's view that the property conveyed by this deed, and all of the property described herein, became subject to the Church's and the Diocese's governing documents, under *Green*, by virtue of the totality of the relationship between the local church and the Church and the Diocese." (TEC Brief # 3 at 30, n. 8.) This Court agrees. As the Virginia Supreme Court said in *Green* on a related issue, "The appellees say that the church, when rebuilt in 1939, was never formally dedicated and therefore the new structure never became an A.M.E. Zion Church. We disagree. Assuming that there never was a formal dedicatory ceremony following the conveyance in 1875, we conclude that 100 years of continuous services in the church by the pastors supplied Lee Chapel by the A.M.E. Zion Church constitutes an adequate dedication of the property for its intended spiritual and ecclesiastical purposes." *Green*, 221 Va. at 554. Here, The Falls Church was a constituent member of TEC and the Diocese, subject to their Constitutions and Canons, for more than 200 years.

The second time period has one deed in it, and TEC notes no pertinent surrounding circumstances.

The third time period covers the two 1874 deeds, one involving Truro and one involving St. Stephen's. TEC notes that, by the time these deeds were executed, TEC had adopted, in 1868 and 1871, its anti-alienation canons for consecrated property. TEC also notes that one of its expert witnesses, Dr. Robert Bruce Mullen, testified that, shortly after the adoption of the anti-alienation canon but before 1874, nearly 100 congregations left the Church to join another denomination and each of those churches left its property behind, including Virginia congregations. (TEC Brief # 3 at 31.) TEC also notes that, by this point in time, the Virginia Supreme Court had issued *Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301 (1856). And, notes TEC, there

was language in *Brooke* protecting the property interests of a denomination. The pertinent language from *Brooke*, at 321, is the following:

> If, at any time before the division of the church, a controversy had arisen among the members of the society at Salem church-house in respect to the occupancy of the house — each party under the lead of a preacher claiming its exclusive use for purposes of worship — the dispute must have been determined by enquiring, not which of the two parties constituted a majority, or represented the wishes of a majority, of the members of the society, but which of the two preachers had been appointed and assigned to the society in accordance to the laws of the church; which of the two parties was acting in conformity with the discipline of the church, and submitting to its lawful government.

"In light of these circumstances," argues TEC, "any reasonable grantor would have understood that property conveyed to a local Episcopal church could not be removed from the denomination without the larger church's consent." (TEC Brief # 3, at 31.)

The fourth time period covers three deeds in the time period of 1882 to 1904. In addition to the circumstances existing at the time of the 1874 deeds, TEC notes that the Virginia Supreme Court had reiterated its *Brooke* holding in *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428, 440 (1879).

The fifth time period covers one 1918 deed involving The Falls Church. TEC notes that by this time, TEC had adopted its "rector" canon (1904), "which provides that the rector of a local church, someone required to be an Episcopal priest and thus having declared an oath of conformity with the Church's rules, is entitled to use and control local church property and must do so in accordance with the Church's rules and the Bishop's direction, (TEC-09-2) and the Diocese had adopted its abandonment canon (1906), empowering diocesan representatives to take charge of local church property that those representatives declared to be abandoned (PX-COM-144-168.)" (TEC Brief # 3 at 34.)

The sixth time period covers thirteen deeds from 1952 to 1972. TEC notes that, in addition to the canons described above, TEC "had adopted (in 1916 and 1919) canons mandating business methods to be followed by local Episcopal churches, including requiring the insurance of local church property, (TEC-10-2-3; TEC-11-2-4); the Diocese had adopted (in 1938) a canon regulating local churches' ability to incur debt, (PX-COM-177-032); and the Church and the Diocese had each adopted (in 1940) canons regulating the alienation of unconsecrated property (TEC-13-2-3; PX-COM-179-036.)" (TEC Brief # 3 at 35.)

The seventh time period covers a 1982 Truro deed. In addition to all the foregoing, TEC notes that, by this point in time, the Virginia Supreme Court had issued *Norfolk Presbytery* and *Green*, the United States Supreme Court

had issued *Jones* and two Virginia trial courts in *Buhrman* and *Wyckoff* had resolved disputes over the control of local TEC churches in favor of the denomination. In addition, notes TEC, the denomination had adopted the Dennis Canon at this point.

The final time period concerns nineteen deeds from 1986 to 2006. To the foregoing, TEC adds the fact that the Diocese had adopted its Trust Canon. (PX-COM-222-105-06.) In this context, the Court gives limited significance to TEC's adoption of the Dennis Canon and the Diocese's adoption of Canon 15.1, given its finding that neither Canons were effective in validating denominational trusts. TEC also notes that, during this time period, "courts around the country found overwhelmingly in favor of the larger Church and loyal Episcopalians in disputes over local Episcopal church property." (TEC Brief # 3 at 38.)

TEC concludes, and this Court agrees, that, "under these circumstances, any reasonable grantor would have understood that property conveyed to a local Episcopal church at that time could not be removed from the denomination without the larger church's consent and that the local church to which he or she was conveying property was bound to use, maintain, and control the property in accordance with the Church's and the Diocese's rules and ensure that property it acquired be used for the mission of The Episcopal Church and for no other denomination." *Id.*

## C. *Constitution and Canons of Church*

From the evidence and argument presented in the trial of this matter, the Court finds as follows. *See* TEC Brief # 1, at pp. 5-19.

*Structure of TEC and the Diocese*:

(1) TEC is a hierarchical church, and the Diocese of Virginia is a diocese of a hierarchical church.

(2) TEC is composed of three levels in descending order of authority: TEC's General Convention; geographically-defined dioceses, including the Diocese of Virginia; and local congregations, called parishes or churches. *See* TEC Const. Art. I (describing the General Convention), TEC Const. Art. V (describing dioceses and parishes); TEC Canon I.13 (describing parishes); Diocesan Canon 10.1 (describing local churches). Unless otherwise noted, whenever the Court refers to "Diocesan Const." or "Diocesan Canon" it is referring to the Diocese of Virginia.

(3) The governing documents of TEC is its Constitution, its Canons, and the *Book of Common Prayer*. The General Convention, which is composed of representatives from the Church's dioceses, adopts and amends the governing documents of the church. (*See* TEC Const. Preamble (adoption and amendment of Constitution); TEC Const. Art I (composition of General Convention); Const. Art. X (amendment of *Book of Common Prayer*);

TEC Const. Art. XII (amendment of Constitution); and TEC Canon V.1 (amendment of canons).)

(4) New dioceses must promise "unqualified accession" to the Church's Constitution and Canons. (TEC Const. Art V.)

(5) The Diocese of Virginia, in its Constitution Preamble, "acknowledges the authority and power of the General Convention . . . as set forth in the Constitution and Canons adopted thereby."

(6) The Diocesan Constitution also provides that "[e]very Congregation within the Diocese . . . however called, shall be bound by the Constitution and the Canons adopted in pursuance hereof." (Diocesan Const. Art. XVII.)

(7) The Canons of the Diocese require that a congregation petitioning the Diocese to be granted status as a "church" must "acknowledge the jurisdiction of the Bishop or Ecclesiastical Authority of the Diocese of Virginia." (Diocesan Canon 10.1.)

(8) The failure of a church to meet that requirement may result in its being reduced to mission status. (Diocesan Canon 10.6.)

(9) Each diocese, including Virginia's, is governed by a legislative body. In Virginia, that legislative body is called the "Annual Council." Each diocese has an ecclesiastical and administrative leader, called the Diocesan Bishop. (*See* TEC Const. Art. II (discussing Bishop); TEC Const. Art. V.1; and TEC Canon I.10(4) (discussing Diocesan Conventions).)

(10) The Diocesan Bishop is elected by the Diocesan Convention (the "Annual Council" in Virginia) and his or her selection must be consented to by a majority of the leadership of the other dioceses. (TEC Const. Art. II; TEC Canon III.11(3)-(4).)

(11) Each diocese's convention elects a "Standing Committee" that acts as the "Ecclesiastical Authority" in the absence of a Diocesan Bishop and that shares authority with the Bishop over certain matters prescribed by TEC's and the Diocese's canons. (TEC Const. Art. IV.)

(12) The Annual Council of the Diocese of Virginia is composed of representatives from the Diocese's churches and other congregations. (Diocesan Const. Art. III; Diocesan Canon 2.)

(13) The Annual Council adopts and amends the Diocese's Constitution and Canons. (Diocesan Const. Art. I, XIX, Diocesan Canon 30, which supplement but may not be inconsistent with TEC's Constitution and Canons. TEC Const. Art. V.)

(14) The Diocese also has an Executive Board, made up of elected representatives from geographical areas of the Diocese and the Bishops of the Diocese, which is responsible for the business of the Annual Council between its meetings. (Diocesan Canon 7.5.)

(15) Each church is part of the diocese in which it is located. (TEC Canon I.13.1.)

(16) In order to achieve church status, in addition to making the acknowledgements described above, a congregation must have a "vestry,"

which is a governing body of lay persons and its ecclesiastical and administrative leader, as well as a "rector," who is a priest of TEC elected by the vestry in consultation with the Bishop. (TEC Canons I.14, and III.9(3); and Diocesan Canons 10.3, and 12.1.)

(17) The rector has control over a parish's physical property, while the vestry retains control over all other parish property. (TEC Canons III.9(5)(a), 1.14(2).)

(18) A vestry may adopt by-laws so long as they are not inconsistent with TEC's canons or the Canons of the Diocese. (Diocesan Canon 11.10.)

(19) A church with no functioning vestry is deemed "inactive," and its authority is assigned to the Executive Board. (Diocesan Canon 9.3.) The Bishop, with the advice and consent of the Standing Committee, may reduce a church's status to that of a mission if the church becomes unable to satisfy the requirements of church status for any other reason, including the failure to make the acknowledgements described above. (Diocesan Canon 10.6.)

(20) All clergy, as a condition of ordination, must subscribe to a "Declaration of Conformity," affirming that they will "conform to the Doctrine, Discipline, and Worship of the Episcopal Church." (TEC Const. Art. VIII; TEC-38-513, -526, -538.)

(21) Vestry members are required by TEC's Canons to "well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [the] Church and of the Diocese." (TEC Canon I.17(8).)

(22) Every person chosen to serve on a vestry in the Diocese must subscribe to a "declaration and promise" stating that "I do yield my hearty assent and approbation to the doctrines, worship and discipline of The Episcopal Church." (Diocesan Canon 11.8.) The "discipline" of the Church "refers to the constitution, the canons, the rubrics, and the ordinal of the *Book of Common Prayer.*" (Tr. 231 (Bishop Jones); accord, PX-COM-001-164.)

*Non-Property Rules of TEC and the Diocese:*

(23) The Church's Constitution requires that the *Book of Common Prayer* "shall be in use" throughout TEC, and allows for deviation by way of "special forms of worship" only pursuant to the "rubrics," or special instructions, of the Prayer Book and with the Bishop's permission. (TEC Const., Art. X; see also TEC Canon II.3.)

(24) The Church's Canons specify the process to be followed by dioceses and local churches in the development and ordination of the Church's priests and deacons and sets out substantive standards that ordinands must meet. (TEC Canons III.2, III.5-6, III.8, and III. 15.) Under TEC's Canons, only a priest who has met these qualifications may become the rector of an Episcopal church. (TEC Canon III.9(3)(a)(3).)

184

(25) TEC's Canons establish the process by which a local church may elect a new rector, including the requirement that the church "promptly notify" the Bishop that the church needs a rector, prohibiting the local church from electing a rector without first notifying the Bishop of the nominee's identity and allowing time for the Bishop to respond, and requiring that the Bishop be "satisfied that the person so elected is a duly qualified Priest" before that person may take office. (TEC Canon III.9(3)(a)(1-3).)

(26) TEC's Constitution and Canons provide detailed procedure for the disciplining of clergy, prescribing also the standards of conduct. (TEC Const., Art. IX; TEC Canons IV.1-16.) These provisions make clergy subject to discipline for violating the Constitutions or Canons of TEC or its dioceses, violating the ordination oath, and abandonment of the communion of the Church. (TEC Canons IV.1(1)(e)-(h), IV.9, IV. 10.)

(27) TEC's Canons require every church to provide its diocese an annual report in the form specified by the Executive Council. (TEC Canon I.6(1); *see also* Diocesan Canon 16.1, 16.2 (requiring an annual "parochial report").)

(28) TEC's Canons also govern aspects of church life, prescribing for example which translations of the Bible shall be used in worship (TEC Canon II.2), and imposing rules regarding marriage, divorce, and remarriage. (TEC Canons I.18, I.19.)

(29) TEC's Canons forbid a rector from resigning without the consent of the vestry and bar a vestry from removing a rector against his or her will, except under prescribed conditions, each of which require the action of the Bishop. (TEC Canon III.9(13) (Dissolution of the Pastoral Relation); *see also* Diocesan Canon 28 (Relationships Among Clergy and Congregations).)

(30) Diocesan Canons prescribe in detail the manner in which a church of the diocese conducts its affairs, including prescribing the size of the vestry, the requirement that vestry members be elected annually, the length of a vestry member's term, the prohibition against consecutive terms, the requirement that the rector preside at vestry meetings, the qualifications for vestry members ("confirmed adult communicants in good standing of the [Episcopal] church"), who can vote in a vestry election, the manner in which a vestry election is conducted, how vestry meetings are to begin, the "declaration and promise" that each newly-elected vestry member must make before taking office, how vestry member vacancies are filled, and how often the vestry must meet. (*See* Diocesan Canons 11.2 to 11.12.)

(31) Additionally, the Diocesan Canons set out the duties of vestry members, including its obligation to annually review the rector's compensation in keeping with published guidelines of the Diocese, and to advise the Diocese by a certain date each year what percentage of its income it will contribute to the Diocese, and to provide for the appointment of trustees to hold church property, and to establish a "Finance Committee" to advise the rector, vestry, and treasurer in financial matters, and, as to

wardens or the elected leaders of the vestry, to oversee the operation and maintenance of church property, and collect the offerings. (*See* Diocesan Canons 12.3-12.7, and 25.2.)

(32) The Diocesan Canons also require that the wardens "possess a copy of the current General Convention and Diocesan Constitutions and Canons for the information and guidance of the Rector, vestry, and congregation." (Diocesan Canon 12.7.)

(33) Churches in the Diocese are required to participate in the Diocesan health insurance plan, unless the Executive Board grants them an exemption. (Diocesan Canon 31.1, 31.2.)

(34) Both TEC's and the Diocese's Canons require churches to contribute to the Church Pension Fund on behalf of their clergy. (TEC Canon I.8, Diocesan Canon 5.)

(35) The Diocese prescribes how and where local church endowment and other permanent funds may be deposited or invested. Diocesan Canon 13.2.

(36) The Diocese requires that each church's treasurer be bonded. (Diocesan Canon 13.3.)

(37) The Diocese requires the vestry to conduct an annual audit of all accounts exceeding $500. (Diocesan Canon 13.4.)

(38) The Diocese requires the provision of workers' compensation insurance for all employees. (Diocesan Canon 13.5(c).)

(39) The Diocese requires fire and casualty insurance as well as comprehensive liability insurance, and prescribes the minimum amounts of coverage. (Diocesan Canon 13.5.)

*Property Rules of TEC and the Diocese*:

As stated earlier in this opinion, in 1979, following the Supreme Court's decision in *Jones v. Wolf*, the General Convention adopted the Dennis Canon (now TEC Canon I.7(4)), which provided that all real and personal property held by or for the benefit of any parish, mission, or congregation was held in trust for TEC and the diocese in which it was located. The Diocese adopted a parallel Canon (Diocese Canon 15.1) in 1983. (PX-COM-222-105-06.) Because this Court has concluded that the Commonwealth of Virginia does not validate denominational trusts, the trust canons are not considered in this section of the Opinion.

(40) From its beginning, TEC has required Bishops to visit their parishes "for the purpose of examining the state of [the] church." (TEC-01-33.) For example, Bishop Meade of Virginia regularly commented on the physical condition of the churches in the Diocese in his annual address to the Diocese in the 1830s. (Tr. 1189-1190.)

(41) In 1799, TEC included in its Prayer Book a "Form of Consecration of a Church or Chapel." (TEC-33-01,09; Tr. 1192.)

(42) In 1868, the General Convention adopted a Canon (now Canon II.6) prohibiting parishes from encumbering or alienating "consecrated" property, without the Diocese's consent. (TEC-04-1, 2; Tr. 1193.) The same Canon provided that no church would be consecrated until the Bishop was satisfied that it was "fully paid for, and . . . free from lien or other incumbrance." (TEC-04-2.) Similarly, Diocesan Canon 15.2 requires diocesan consent for the alienation or encumbrance of consecrated church property. The CANA Congregations argue that anti-alienation and debt canons cannot create proprietary rights because they "do not purport to affect ownership. . . ." (CANA Brief # 2 at 29.) That misses the point of TEC's and the Diocese's reliance on these Canons. To use the language of *Green*, 221 Va. at 555, canons such as these give the Diocese "right[s] customarily associated with ownership," "dominion," and "control," i.e., the right to prevent property from being sold or encumbered.

(43) In 1871, the General Convention required that consecrated property be "secured . . . from the danger of alienation from those who profess and practice the doctrine, discipline, and worship of the . . . Church." (now TEC Canon II.6; TEC-05-42-43; Tr. 1197.) This Canon was adopted to "prevent . . . the alienation of church buildings to parties, congregations, or corporate bodies, no longer in accordance with the doctrine, discipline, or worship of the [Church]." (TEC-39-1.)

(44) In 1904, the General Convention adopted a Canon (now Canon III.9(5)(a)), providing that the rector be entitled to control parish property "[f]or the purpose of [his or her] office," and "subject to the [Church's] Book of Common Prayer, [its Constitution, and] Canons . . . and the godly counsel of the Bishop." (TEC-09-2; Tr. 1206.)

(45) In 1916 and 1919, the General Convention adopted a Canon entitled "On Business Methods in Church Affairs" (now Canon I.7), governing the management of parish property, including the requirement that all buildings be adequately insured. (TEC-10-2-3; TEC-11-2-4; Tr. 1208.)

(46) In 1940, the General Convention adopted a canon (now Canon I.7(3)), expanding the requirement of diocesan consent for alienation or encumbrance of real property to cover unconsecrated parish property. This Canon allowed the diocese to prescribe a condition other than diocesan consent for transactions involving unconsecrated property. (TEC-13-3.)

(47) The Diocese requires churches seeking to alienate or encumber unconsecrated real property to secure "the consent of the congregation in a meeting called for that purpose." (Diocesan Canon 15.2.)

(48) The Diocese also requires that where a church's property in not held by "duly constituted Trustees," the Executive Board "shall" take steps to "recover or secure" the property. (Diocesan Canon 15.3.)

(49) The Diocese further requires that, where church property has ceased being used by a "congregation of the Episcopal Church in the Diocese," the Executive Board may declare the property "abandoned" and "shall

have the authority to take charge and custody thereof," including selling the property or transferring it to the Bishop. (Diocesan Canon 15.3.) And, in fact, on various occasions, the dioceses in Virginia have declared local church property to be "abandoned," and Virginia courts have enforced these determinations. (*See, e.g.,* PX-COM-295 to PX-COM-307.)

(50) Churches in the Diocese may not incur debt of certain specified amounts without the consent of the Bishop and the Standing Committee. (Diocesan Canon 14.1.) The Bishop and Standing Committee must approve the church's plan for debt repayment. *Id.*

The foregoing fifty references to the Constitution and Canons of TEC and the Diocese, as significant as they are, are only some of the ways that a local Episcopal church is subject to the denominational hierarchy. Other examples include regular visitations to each church and mission in the Diocese by the Bishops; the role of the Bishop at "Initiatory Rites" (confirmation and reception), which only a Bishop may perform; the Bishop's obligation to review church records and inspect its properties; the power of the Bishop to appoint the vestry of a mission; the Bishop's control over the entire process of ordination, from "aspirant" to "postulant" to "candidate" to "deacon" and, finally, to "priest;" and the requirement that clergy obtain authorization from the Diocesan Bishop to remarry a previously divorced person or to allow a lay person to deliver the sacrament of communion. (*See* Diocese Brief # 1 at 9-12.)

And while it is certainly true that the disposition of a dispute of this nature does not depend on a determination as to whether the Diocese obtains more from a local church than the church obtains from the Diocese, it must nevertheless be observed that the Diocese does provide tangible benefits to a local church. *See, e.g.,* this statement by the Virginia Supreme Court in *Green,* 221 Va. at 556: "The fact that the general church has made no loans or grants for the benefit of Lee Chapel and that, in fact, it may have refused to contribute to the remodeling program of the local church, is not dispositive. A proprietary interest or a contractual obligation does not necessarily depend upon a monetary investment." Beyond any spiritual benefits a local church might receive, there are secular benefits like assistance in the recruitment of clergy, the provision of "supply priests" as temporary clergy at congregations, assistance in the preparation of parish profiles, investigating clergy recruited from other dioceses, the preparation of clergy compensation guidelines, the provision of help with the preparation of audits and parochial reports, serving as a resource for advice in areas like taxes and insurance, providing mandatory sexual misconduct training, providing educational programs, providing human resources assistance, providing the Church Pension Fund for a church's clergy, providing group health and dental insurance, providing investment management services through the Diocesan Trustees of the Funds, and providing loans to churches through the Diocesan Missionary Society. (Diocese Brief # 1 at 12-14.)

The foregoing provides compelling evidence that TEC is a hierarchical church and that its dioceses, including the Diocese of Virginia, exercise control, supervision, and authority over each Episcopal local church and parish. That control, supervision, and authority absolutely extends to matters related to property, even when one excludes from consideration the trust canons.

In *Green*, the Virginia Supreme Court defined a "proprietary right" as follows: "[a] proprietary right is a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls." 221 Va. at 555. TEC's and the Diocese's Constitution and Canons demonstrate *pervasive* dominion, management, and control over local church property, in a manner normally associated with ownership, title, and possession. To cite just a few examples:

(1) Consecrated property cannot be sold without the Bishop's permission, nor can it be encumbered without the consent of the Diocese, nor can a church be consecrated until the Bishop is satisfied that it is fully paid for and free from encumbrances;

(2) Unconsecrated property can only be sold in accordance with procedures established and authorized by the Diocese pursuant to authority granted the Diocese by TEC's Canons;

(3) Bishops must visit their parishes to examine the state of the church;

(4) In multiple ways, local churches are bound to act in accordance with the laws of the denomination; dioceses must promise "unqualified accession" to TEC's Constitution and Canons; every congregation in the Diocese of Virginia is "bound" by the Diocesan Constitution and Canons; and a congregation petitioning for church status must "acknowledge" the jurisdiction of the Diocesan Bishop or Ecclesiastical Authority of the Diocese;

(5) A church that fails to meet its requirements may be reduced by the Diocese to mission status; a church with no functioning vestry is deemed "inactive" and its authority is assigned to the Diocese's Executive Board; where a church's property is not held by "duly constituted Trustees," the Executive Board must step in to "recover or secure" the property; and where church property has ceased being used by a "congregation of the Episcopal Church in the Diocese," the Executive Board may declare the property "abandoned" and take custody and charge of it;

(6) By TEC's Canons, it is the Rector of a local church, an individual who is ordained by a Bishop, and who has, as a condition of ordination, subscribed to a "Declaration of Conformity" in which he or she affirms that he or she will "conform to the Doctrine, Discipline, and Worship of the Episcopal Church," and who cannot become Rector of a local church without the Diocesan Bishop being satisfied that the person selected by the local church is a duly qualified Priest, and who cannot be removed

from office by the vestry against his or her will, except under prescribed conditions, each of which require the action of the Bishop, who has control over a parish's physical property, and whose control is subject to the Constitution and Canons of the church; and

(7) By TEC's Canons, it is the Vestry of a local church, a group of parishioners each of whom must be in the "good standing of the [Episcopal] church, and each of whom has subscribed to a "declaration and promise" stating that "I do yield my hearty assent and approbation to the doctrines, worship, and discipline of The Episcopal Church," and each of whom are required by TEC's Canons to "well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [the] church and of the Diocese," and whose substantive duties and methods of operations are prescribed by Diocesan Canons, who has control of all other parish property.

CANA argues that the vestry and rector canons "add nothing to [TEC's and the Diocese's] claim of a proprietary interest." (CANA Brief # 2, at 32.) The Court disagrees. The Rector and the Vestry control the property of a church and the Canons establish the obligations, duties, authorities, and responsibilities of the Rector and Vestry. Moreover, it is only the Bishop as the Ecclesiastical Authority who can involuntarily change local church leadership. (Diocese Brief # 1 at 95; *see also* Diocesan Canon 28 (Neither the vestry nor the rector can unilaterally discharge a rector, and they are to submit any such significant problems to the Bishop).)

## D. *Course of Dealings Evidence*

Most of the facts in this section are common to all seven churches. (*See* Diocese Brief # 1 at 23-25; *and* TEC Brief # 1 at pages 15-18.)

(1) It is undisputed that, before December 2006 (and, for Church of the Epiphany, January 2007), each of the churches before the Court were constituent members of TEC and the Diocese. (Of course, it is the position of TEC and the Diocese, with which this Court agrees, that the churches remain *Episcopal* churches today, even if the Congregations now in possession of those churches are no longer in the Episcopal Church.)

(2) Each of the churches became a local church of TEC and the Diocese in accordance with the rules of the Diocese, in some cases by petitioning the Diocese for recognition as a church and in other cases by signifying, by various means, its acceptance of the authority of TEC and the Diocese.

(3) Each of these churches were known in the community as *Episcopal* churches, using the names and symbols of denominational affiliation, including street signs to point the public in the direction of an *Episcopal* church.

(4) Each of these churches have vestry manuals that acknowledge that the churches are bound by the rules of TEC and the Diocese.

(5) Each of these churches have sought consent from the Diocese to encumber or alienate real property or incur debt.

(6) Each of these churches were served by a Rector who was an ordained Episcopal priest, a Rector who made at his or her ordination the Declaration of Conformity to the Doctrine, Discipline, and Worship of the Church. Further, at each of these churches, the Diocese has been involved in the selection of one or more of its Rectors.

(7) Each of these churches used the Episcopal Church's *Book of Common Prayer*.

(8) The vestry members of each of these churches, upon taking office, have sworn to uphold the doctrine, worship, and discipline of the Church.

(9) Each of these churches used the Episcopal Church Hymnal. Some used Episcopal Sunday School materials or other Episcopal hymn books.

(10) Each of these churches followed the Canons of the Constitution and Diocese with respect to property, generally obtaining consent when required.

(11) Each of these churches organized themselves as required by Canon, electing vestries, selecting wardens, and administering the canonical oath described above.

(12) Each of these churches elected and sent lay delegates, and their clergy, to the Diocese's Annual Council.

(13) Each of these churches recognized the authority of the Diocesan Bishop and other Bishops of the Diocese, received official visitations from Bishops of the Diocese, and presented individuals to those Bishops for confirmation or reception into TEC.

(14) Each of these churches submitted annual parochial reports through the Diocese to TEC.

(15) Each of these churches contributed financially to the support of the Diocese.

(16) Each of these churches contributed to the Church Pension Fund on behalf of their clergy.

(17) Each of these churches obtained health insurance through the Diocese, as required, or obtain exemptions from the Diocese.

(18) Each of these churches obtained consent from the Diocesan Bishop as required in certain ecclesiastical matters.

(19) Each of these churches were regularly represented at the Diocese's Annual Council.

(20) In various ways, each of these churches acknowledged the authority of TEC and the Diocese, such as by applying to the Diocese for a license for a lay Eucharistic minister, or seeking permission from the Bishop of the Diocese to officiate at a wedding of a divorced person.

In addition to the foregoing, there is some "course of dealing" evidence unique or particular to individual churches.

As to The Falls Church (TFC), the Court would note the following additional facts. On at least two occasions, Diocesan Bishops vetoed the employment of clergy at TFC, and the church complied. The Diocesan Bishop made numerous visits to TFC over the years. Bishops of the Diocese, or other Bishops acting on behalf of the Diocese or at his invitation, have visited TFC in *every* year between 1934 and 2005. In January 1988, Bishop Lee wrote TFC's Vestry regarding TFC's plans for a new church building. The letter states in part that "In the Episcopal Church, all church property is held in trust for the diocese." (PX-FALLS-349.) In another letter to TFC in July 1990, Bishop Lee stated: "it is well to remember that the property which the vestry plans to mortgage in this plan is held in trust for the Episcopal Church and the Diocese of Virginia." (DX-FALLS-035-002.) TFC has been represented by one or more lay or clerical delegates at the Annual Council for the 100 year period from 1909 to 2010. Vestry members subscribed to the oath or declaration prescribed by Diocesan Canons, in *at least* each of the following years: 1874, 1876, 1877, 1880, 1889, 1890, 1894, 1899, 1902, 1908-1910, 1912-1915, 1918-1921, 1924, 1930, 1933, 1935, 1937, 1939-1942, 1944-1962, 1964-1968, 1970-1980, 1983, and 1999.

As to St. Paul's, the Court would note the following additional facts. In 1834, Bishop William Meade consecrated the former courthouse that is now St. Paul's sanctuary as St. Paul's Episcopal Church. In August 1984, St. Paul's celebrated its 150th anniversary as an Episcopal church. The Presiding Bishop, John M. Allin, sent greetings. St. Paul's has provided Episcopal ministry to a number of communities in northern Virginia. An October 1, 1987, letter from its Rector to Bishop Lee enclosed a brochure stating: "St. Paul's is a renewed parish of the Diocese of Virginia (Bishop Peter James Lee), serving Haymarket, Gainesville, Buckland, Catharpin, Waterfall, Hickory Grove, Thoroughfare, and surrounding communities within historic Haymarket Parish (1832)." (PX-STPAUL-107-003.) A letter dated August 27, 1990, from the Diocese to St. Paul's Senior Warden certifies to Post Office officials in connection with St. Paul's bulk mailing permit "that St. Paul's has been an established church and parish of the Diocese of Virginia (Episcopal) since 1833." (PX-STPAUL-115.) In 1961, in accordance with Diocesan Canons, St. Paul's requested and received permission from the Diocese to incur indebtedness to build a parish house. They did so again in 1968. When Grace Chapel had fallen into disrepair and become a safety hazard, St. Paul's obtained approval from the Diocese to deconsecrate it and tear it down. In 1892, the vestry consulted with the Diocesan Bishop regarding a request by pastors of other denominations to use the church for services. The vestry expressed concern that such use might "go in opposition to the Canons or the wishes of our Bishop." (PX-STPAUL-007.)

As to Truro Church, the Court would note the following additional facts. Truro's 1998 Vestry Handbook (PX-TRU-028) instructs vestry members

to "have a thorough understanding of the functions and operations of the Protestant Episcopal Church in the United States, the Diocese of Virginia, and Truro Episcopal Church." Toward that end, Vestry members are "strongly encouraged" to "read, or at a minimum, review, the Constitution and Canons for The Episcopal Church." Truro started four mission churches in the Diocese pursuant to Diocesan canons and processes. When Truro lacked a Rector, the Diocesan Bishop assigned or approved a deacon or priest-in-charge. When it needed to hire clergy, Truro obtained guidance from the Diocese and used the resources of TEC and the Diocese. At various points in time, the Bishop assigned and subsidized the costs of deacons and licensed clergy to assist Truro's Rectors. Since 1844, Bishops of the Diocese have regularly visited Truro. Bishops of the Diocese have consecrated Truro buildings on four separate occasions. Truro members have served as Diocesan deputies or alternates at TEC's General Conventions. Truro members have participated actively in Diocesan governance and have served in numerous leadership capacities, including the service by one member as Chancellor of the Diocese for several years. In 1934 and 1974, Truro executed and delivered to the Bishops "Instrument[s] of Donation" in connection with the consecration of new church buildings. These instruments are optional. They state, in part, that the instruments (i) "appropriate and devote [the buildings] to the worship and service of Almighty God . . . according to the provisions of the Protestant Episcopal Church in the United States of America, in its Ministry, Doctrine, Discipline, Liturgy, Rites and Usages, and by a Congregation in communion with said Church, and in union with the Convention thereof in the Diocese of Virginia," (ii) request that the Bishop "take the said building under his spiritual jurisdiction;" (iii) "relinquish all claim to any right of disposing of said building, or allowing of the use of it in any way inconsistent with the terms and true meaning of this Instrument of Donation, and with the consecration;" and (iv) "certify . . . that said building and ground are secured from danger of alienation from those who profess the Doctrine, Discipline, and Worship of the said Church, except as provided by laws and canons in such case applicable." Both instruments were signed by the Rector and Register of the Vestry. While the parties dispute the legal enforceability of these Instruments of Donation, their significance to the Court is not based on the presumption that they are legally enforceable transmittals of title but, rather, that they demonstrate the understanding of the parties that Truro Church's property was to be used for the "mission and ministry" of TEC and the Diocese. (Diocese Brief # 1 at 111.)

As to St. Stephen's, the Court would note the following facts. On April 30, 1881, Bishop Whittle consecrated its building as St. Stephen's Church. Bishops of the Diocese have visited St. Stephen's regularly and preached and/ or confirmed, received, reaffirmed, and/or baptized one or more members in many years. The church and its leaders were aware of the Constitution and

Canons of TEC and the Diocese and complied with them regarding incurring debt and encumbering property. Like the other six churches, St. Stephen's obeyed canonical rules regarding the vestry, wardens, meetings, and the duties and prerogatives of Rectors. Rector Jeffrey Cerar's prepared remarks for the 2003 Annual Meeting stated, in part, as follows: "Given the canons of the Episcopal Church and the Diocese of Virginia, we cannot just change our sign and no longer be Episcopalians." (PX-SSH-334.) St. Stephen's had a policy governing use of the parish house, which incorporated "Episcopal Church Policy on Serving of Alcoholic Beverages at a Local Parish" and required parish house users to sign a form stating, "If alcoholic beverages are to be served, I have read and will comply with the Episcopal Church policy and St. Stephens policy." (PX-SSH-280.) The Senior Warden's Annual Report in 2004 contained a lengthy criticism of the actions of the 2003 General Convention but nevertheless noted that "[t]wo person control over church collections was instituted in compliance with National Church Guidelines." (PX-SSH-254.) St. Stephen's received financial assistance from both the Diocese and the Diocesan Missionary Society. St. Stephen's also made financial contributions to the Diocese. Even though St. Stephen's was opposed to the 1979 *Book of Common Prayer*, it accepted the mandate to use the book in its services. St. Stephen's Rector described the General Convention as "our national governing body" and as "the legislative body of our denomination. . . ." (PX-SSH-334; PX-SSH-174.) In the minutes of the vestry meeting in February 2005 (PX-SSH-137), it was reported that the Rector explained to the vestry the meaning of the term "doctrines and discipline" of the Episcopal Church that is a part of the vestry oath: " 'Discipline' refers to the Constitution and canons of the Episcopal Church and the Diocese of Virginia, by which we are bound as a member of ECUSA."

As to St. Margaret's, the Court would note the following facts. As set forth in more detail in the deeds section, *supra*, St. Margaret's Episcopal Church grew out of the Diocese's "program for church planting" in the early 1960's and began as an organized mission of the Diocese. When the vestry of St. Margaret's held its organizational meeting, it had the assistance of a Diocesan representative from the Department of Missions, who provided substantial assistance in St. Margaret's early years. (*See* Diocese Brief # 1 at 143, n. 46.) There are numerous references in St. Margaret's records to the distribution of and instruction concerning TEC's and the Diocese's Constitution and Canons. The vestry minutes for May 2003 recorded the appointment of individuals "to serve as trustees of St. Margaret's Episcopal Church, in accordance with the Constitution and Canons of the Protestant Episcopal Church in the United States of America and the Constitution of St. Margaret's Episcopal Church." (PX-STMARG-261.) St. Margaret's complied with canonical rules regarding the sale or encumbrance of property, including the rules requiring the consent of the Diocesan Bishop

and Standing Committee. St. Margaret's recognized the controlling authority of TEC's and the Diocese's Constitution and Canons. *See, e.g.*, PX-STMARG-601 ("No action of the Stewardship Commission shall be authorized if it does not conform with National and Diocesan Canons"); PX-STMARG-677 (Notes to Financial Statements, stating: "St. Margaret's Episcopal Church is guided and directed by the Constitution and Canons of the Protestant Episcopal Church of the Diocese of Virginia").) St. Margaret's received startup gifts from other Episcopal churches. St. Margaret's received substantial assistance from the Diocese when it needed to locate and employ a new rector or priest-in-charge. In addition, Bishops of the Diocese visited St. Margaret's and installed its rectors. According to St. Margaret's First Annual Report to the Parishioners, dated September 30, 1980, the vestry approved a church constitution "delineating purpose, organization, responsibility, and leadership of the church, under the authority of the Constitution and Canons of the Protestant Episcopal Church in the Diocese of Virginia." (PX-STMARG-516.) There are various versions of St. Margaret's Constitution in the record, from 1980, 1982, 1986, 1995, 1999, and 2003. Each version begins: "St. Margaret's Episcopal Church in Woodbridge, Virginia, is guided and directed by the Constitution and Canons of the Protestant Episcopal Church in the Diocese of Virginia." The 1995, 1999, and 2003 church Constitutions also describe the purpose of "Parish Organization" as "[t]o comply with the Constitution and Canons of the Protestant Episcopal Church in the Diocese of Virginia. . . ." and provide, further, that "[n]o amendment contrary to canon law will be permitted to take effect." (PX-STMARG-698, 700, and 701.) St. Margaret's written Policies and Procedures state in their first paragraph: "No policy, procedure, or amendment thereto may be adopted which conflicts with St. Margaret's Constitution, the Constitution and Canons of this Diocese, or the Constitution and Canons of the Episcopal Church." (PX-STMARG-718, 719, and 724.) Similar provisions appeared in the By-Laws of St. Margaret's Day School, approved by the Vestry in 1966. In every year between 1963 and 2006, a Bishop of the Diocese visited St. Margaret's. The vestry oath was routinely taken by incoming vestry members. A Check List for Vestry Nominees (PX-STMARG-450) included the requirement that vestry members "subscribe to the canonically required vestry declaration."

As to Church of the Apostles, the Court would note the following facts. As further described in the deeds section, *supra*, Church of the Apostles was formed as a mission of the Diocese in 1968 through planning and coordination between the Diocese and Truro Church. The deeds section, *supra*, also set forth the assistance provided by the Diocese in the formation and establishment of Church of the Apostles. In 1985, the Church called the Rev. David Harper, a New Zealand priest. Bishop Lee accepted a letter dimissory for him, issued a formal call to him "subject to the

requirements of the Canons of The Episcopal Church," and installed him as Rector in 1986. In "Submitted Questions and Rector's responses" for a congregational meeting in February 2004, Rector Harper acknowledged the Diocese's interest in the church's property: "[p]arishes hold title to their buildings in trust for the diocese, which is the real owner. Should a parish violate the canons in a way that brings it into conflict with the diocese . . . the diocese might very well claim its rights to own, occupy, and use the property, including the church's assets, by suing the church." (PX-APOST-033.) The Church understood that it needed Diocesan approval for certain transactions regarding real property and repeatedly sought such permission, including seeking approval to sell and encumber property. Apostles purchased copies of the Canons and, from 1985 through 2006, when the Rev. Harper was Rector, he always had a copy of the Canons. The Vestry handbook verified that the vestry would follow the Canons. The Church submitted parochial reports to the Diocese in every year from 1987 to 2005. The Church donated money to the Diocese in every year from 1968 to 2003. Apostles acknowledged that it had a "responsibility to tithe to the next higher authority." (Apostles-Ex-013.012.)

As to Church of the Epiphany, the Court would note the following facts. Epiphany began through the efforts of the Diocese and Truro and began worshipping in 1986. In 1986, Epiphany petitioned the Annual Council for admission as a church under the Constitution and Canons of the Diocese. The petition stated that the congregation was "a group of people which acknowledge and accept the doctrine, worship, and discipline of the Protestant Episcopal Church and the jurisdiction of the Bishop or Ecclesiastical Authority of the Diocese of Virginia." (PX-EPIPH-001.) Bishop Lee installed Epiphany's first rector, the Rev. Reardon, on February 1, 1987. As stated in the deed section, *supra*, the land upon which the Church was to be constructed was acquired from Glebe Properties at no cost to the parish. Bishop Lee consecrated the church on April 23, 1989. Since its beginning, Epiphany was aware of its obligation to adhere to the Constitution and Canons of the Diocese. A document signed by the Rev. Reardon sometime during his tenure states that "[t]he Bylaws of The Church of the Epiphany (a non-profit organization), are the Constitution and Canons of the Episcopal Church in the U.S.A. and the Constitution and Canons of the Diocese of Virginia." (PX-EPIPH-014.) New By-Laws were adopted in May 2001 that state that Epiphany "is a constituent part of the Diocese of Virginia of [the Episcopal Church] and is subject to the Canons of the Protestant Episcopal Church in the Diocese of Virginia." (PX-EPIPH-002.) Article VIII of the By-Laws, *Id.*, concerns "Parish Property" and provides:

8.01 *Ownership and Use*: All Parish property assets and funds shall be owned and held by the Parish in trust for the uses purposes

and the benefit of the Diocese of Virginia of the Protestant Episcopal Church in the United States of America. . . .

8.04 *Dissolution*: In the event of dissolution of the Parish, all property assets and funds of the Parish and Parish corporation shall be distributed exclusively for exempt purposes to the Diocese of Virginia of the Protestant Episcopal Church in the United States of America.

The notes to Epiphany's financial statement dated December 31, 2002, state: "the Church is a constituent part of the Episcopal Church, U.S.A., and the Diocese of Virginia require the real property of all Episcopal parishes to be held in trust for the national church and the Diocese even though the individual churches hold legal title for all other purposes." (PX-EPIPH-048.)

## E. *Neutral Principles of Law Conclusion*

The Court concludes that TEC and the Diocese have carried their burden of proving that they have a contractual and proprietary interest in the seven Church's properties at issue. In coming to this conclusion, the Court has carefully considered the factual and legal arguments tendered by the CANA Congregations on these issues. Many of their arguments are addressed elsewhere in this opinion. Others are addressed here.

(1) *CANA argues that it was the CANA Congregations and not TEC and the Diocese that fulfilled the responsibilities "customarily associated with ownership, title, and possession," and who "exercise[d] dominion" over, and "manage[d] and control[led]," the properties. See Green, 221 Va. at 555. (CANA Brief # 1A at 2.)*

It is undoubtedly true that the Episcopal congregations who held stewardship over these properties for generations largely (but not exclusively) paid for the land and the buildings on the land out of congregant funds, maintained the properties with congregant funds and their own labors, and preserved and improved the properties over time. But that does not diminish at all the reality that TEC and the Diocese, through their Constitutions and Canons and through the direct involvement of the Diocese, its Bishop, and its personnel, had *pervasive* and *controlling* involvement in these churches and their properties. The power and authority that TEC and the Diocese held to forbid alienation of property, to forbid encumbrance of property, to declare property abandoned and to take it over, to require oaths and affirmances of fidelity to Constitutions and Canons containing numerous property provisions, to discipline and even authorize removal of a Rector in control of property, to inspect the property, to require annual reports, to require audits and other financial systems are all indicia of dominion, management, and control.

(2) *CANA argues that the CANA Congregations had the power to exclude third parties from access to their property, including Diocesan representatives. (CANA Brief # 1A at 2.)*

That is true, but it must be evaluated in the context of the pervasive control which TEC and the Diocese exercised over the seven churches.

(3) *CANA argues that the Congregations exercised autonomy over their personal property, making contributions and withholding contributions as they chose. Id.*

The Court does not agree at all that the Congregations were truly autonomous with regard to their real and personal property. When a denomination delegates or assigns authority to a local congregation, or reserves to a local congregation certain powers, the exercise of that authority by that congregation does not constitute "autonomy." Thus, if the Congregations had the power to withhold contributions, it was because the Constitutions and Canons of TEC or the Diocese did not compel such contributions. What is directly at odds with this assertion of "autonomy" is the indisputable fact that each Congregation within TEC and the Diocese was obligated to obey the Constitution and Canons of TEC and the Diocese and to act only in accordance with these governing documents. The powers these local churches exercised are not proof that the churches existed outside or beyond the hierarchy; rather, they are merely proof of the way in which the hierarchy chose to organize and structure itself.

Although the CANA Congregations certainly do not deny the undeniable fact that these seven churches were a part of a hierarchical denomination for decades and, in some cases for centuries, at every turn throughout their post-trial pleadings, they portray themselves as if they were an independent congregational-type church, free from hierarchy in every pertinent respect. Their assertions of independence and autonomy, however, are contradicted by the overwhelming body of evidence before this Court.

(4) *CANA argues that TEC's own annotations to their Constitution and Canons indicate that the property Canons are ineffective as a means of preventing alienation of property. Id. at 4.*

TEC and the Diocese challenge whether any statement made in these annotations can be legally attributed to TEC or the Diocese as admissions. More to the point, however, is this. It is for the Court, not the annotators, to determine the legal significance attached to the Constitution and Canons as part of the "neutral principles of law" analysis. For example, this Court has

concluded that neither the Dennis Canon nor Diocesan Canon 15.1 creates a denominational trust in the Commonwealth.

(5) *CANA argues that neither TEC nor the Diocese made any material contribution toward the improvement of these church properties and the land was acquired almost entirely without help from TEC or the Diocese.*

The CANA Congregations are correct that it is the Episcopal church congregations, rather than TEC or the Diocese, that largely paid for the properties and the improvements upon them. As *Green* makes clear, however, that does not control the proprietary interest analysis. Indeed, if it were true that any proprietary interest claim asserted by a general church could be defeated by proof that a local congregation paid for the property in question, or for most of the property in question, or, for that matter, simply paid more than the general church paid, a Court would not need to apply a "neutral principles of law" analysis to the controversy but, rather, simply apply its calculator and give judgment to the party who spent the most. That is not the law. And, while one can hypothesize that circumstances could exist in which a court conducting a "neutral principles of law" analysis might conclude that some language in a deed, or in the terms of the constitution of the general church, or in the course of dealings between the parties, established that they had, in fact, defined their relationship in a way that attached dispositive significance to who spent the most amount of money, *here* there is nothing in the deeds, the Constitutions or Canons of TEC and the Diocese, or in the course of dealings between the parties to suggest that is the case.

(6) *CANA argues that, if the Court does consider "course of dealing" evidence, it cuts in the CANA Congregations' favor. The CANA Congregations assert that they "not only exercised dominion over the properties at issue by purchasing, designing, building, improving, maintaining, mortgaging, zoning, leasing, managing, insuring, possessing, using, and worshiping at them [but they] gave tens of millions of dollars to the Diocese, receiving a pittance in return. Elsewhere, the CANA Congregations describe the denomination's contributions to the local churches as the "proverbial drop in the bucket." (CANA Brief # 3, at 68.) They selected their own rectors and staff. They chose their own Sunday school curricula, education materials, and forms of worship. They designed their own liturgies. They set their own service schedules. They secured copyrights and licenses for their worship music. They ran their own day schools. They designed and carried out their own ministries and outreach. They operated their own youth programs. And they commissioned their own missionaries, all with little or no involvement of TEC or the Diocese. To be sure, the Congregations used Episcopal hymnals and the Book of Common Prayer (materials for which they paid standard rates), were occasionally visited by Episcopal bishops, respected*

*Diocesan standards for incurring debt, and received occasional spiritual input from denominational bishops." (CANA Brief # 1A at 89.)*

Thus is portrayed the denomination and the Diocese as essentially uninvolved bystanders in the life of the church, their biggest contribution to the CANA congregations being to provide some hymn and prayer books and occasionally visits. Yet this portrayal is wholly at odds with the lengthy recitation that precedes this section, which is itself only a small sampling of almost 140 pages of detailed, documented indications of active involvement and participation in the life of these churches, and the understanding and acceptance of those churches that they were part of a hierarchical denomination and subject to its laws. (*See* Diocese Brief # 1 at 56-194.) Put simply, the Court finds far more persuasive TEC's and the Diocese's presentation on the course of dealings between the parties.

To be clear, the Court does not doubt that the congregations that held these churches over the years actually managed the churches on a day-to-day basis and contributed most of the funds used to buy land, build sanctuaries and parish houses and rectories, maintain them, and improve them. Nor does the Court doubt that the local congregations ran these churches on a daily basis. Neither TEC nor the Diocese has claimed otherwise. (*See* CANA Brief # 1A at nn. 52 and 53.) Nor does the Court doubt CANA's chart indicating that, since 1950, the seven churches contributed a total of $11.97 million to the Diocese. (CANA Brief # 1A at 105-06. The salient point, however, is that none of this is inconsistent with a hierarchical or connectional polity.

If CANA is correct, no hierarchy could have a proprietary interest based on "course of dealing" testimony, because the circumstances CANA is focusing upon, the local congregation's day to day management of the local church, the local congregation's purchase of land and the construction of church buildings, and the local congregation's making of contributions to its diocese,- are not at all inconsistent with a supercongregational polity. And, more to the point, none of this evidence undermines the compelling evidence offered and accepted by this Court that TEC's and the Diocese's course of dealings with the seven congregations strongly support their assertion of a contractual and proprietary interest.

(7) *CANA argues that the CANA Congregations' "affiliation with TEC and the Diocese was more of a burden than a benefit." (CANA Brief # 1A at page 121.)*

That this is a sincere expression of the CANA Congregations' view is hardly to be doubted, given their disaffiliation from TEC and the Diocese. Nevertheless, it is not the province of a civil court to evaluate the "pluses

and minuses" of denominational affiliation, in general, or as applied to a particular denomination.

(8) *CANA disputes the Diocese's assertion that vestries are agents for the church. Rather, CANA argues that "[a] closer analogy" of the relationship between the denomination and a local congregation is that between a "franchisor and a franchisee." Thus, "McDonalds may dictate the restaurant's accounting practices, layout, menu, promotions, prices, employee uniforms, employee training, and placement of the golden arches," and a "franchisee [that] fails to do business in a prescribed manner . . . may be enjoined from continuing to operate in any manner that suggests an affiliation with the franchise, "but that does not mean a disaffiliating franchisee will forfeit any land it purchased with its own money in furtherance of the franchise relationship." (CANA Brief # 2 at 35-36.)*

This analogy is not apt at any level. The nature of the relationship between a hierarchical denomination, its diocese, and a local congregation is not analogous to that between a hamburger company and a hamburger outlet. The contributions made by a diocese to a local church, especially one which begins as a diocesan mission, and the contributions made by a local church to its diocese, is not analogous at any level to the fast food industry or its franchisees. The constitutional and canonical requirements for serving as a rector or a member of a vestry and the requirements governing the alienation and encumbrance of consecrated and unconsecrated properties and the role that lay leaders in a congregation may play in the governance of the Diocese and even of the denomination simply do not compare to the business of running a McDonald's franchise. While it is true that "placement of the golden arches" may be no more complicated than the placement of a street sign announcing the presence of an Episcopal Church, what lies behind that sign is infinitely more complex.

When this Court considers the applicable statutes, deeds, the Constitution and Canons of TEC and the Diocese, and the course of dealings between the parties, and applies "neutral principles of law" as established by United States and Virginia Supreme Court precedent, it is clear — indeed, to this Court, it is overwhelmingly evident — that TEC and the Diocese have contractual and proprietary interests in the real and personal property of each of these seven churches. Simply put, the facts here are at least as compelling as the facts in *Norfolk Presbytery* and *Green* and therefore require this Court to reach a similar judgment. Similarly, the facts here are at least as compelling as the facts before Judge Stephenson and Judge Koontz in *Buhrman* and *Wyckoff* and warrant this Court in reaching the same result.

The CANA Congregations suggest that a ruling for the denomination would be to defer to the hierarchy "with a vengeance." This Court disagrees. Rather, the finding here that TEC and the Diocese have a contractual and proprietary interest in the property of these *Episcopal* churches is no more than a recognition that, while the CANA Congregations had an absolute right to depart from TEC and the Diocese, they had no right to take these seven *Episcopal* churches with them.

In light of this Court's determination that TEC and the Diocese have contractual and proprietary interests in the church property at issue, the Court does not need to address TEC's and the Diocese's alternative "identity" approach to the resolution of church property disputes.

TEC describes the identity approach as one that focuses on "who is the local church" and, in the case of a dispute involving a local church that is part of a hierarchical denomination, resolves it by finding that the congregants who remain loyal to the denomination are entitled to retain control of church property. (TEC Brief # 1 at page 47.) In support of this proposition, TEC cites *Brooke, Hoskinson,* and *Finley* and notes that "when faced with the question, 'Who is the local church?' the Supreme Court of Virginia has consistently and repeatedly answered: 'Those persons remaining loyal to the hierarchical denomination'." (TEC Brief # 1, at 49.)

## VII. *Amended Counterclaims of CANA Congregations*

The amended counterclaims, which were filed individually against TEC and the Diocese in January 2011 each sought the same relief: (1) a declaration that each of the properties at issue were in the sole and exclusive ownership of their respective congregation free and clear of any claim of right or interest by TEC or the Diocese; (2) a claim for unjust enrichment/ quantum meruit if the Court should determine that TEC or the Diocese had rights to the individual church's real or personal property that were "superior or otherwise" to the rights of the CANA Congregation; and (3) a request for imposition of a constructive trust on TEC or the Diocese if the Court should determine that TEC or the Diocese had rights to the individual church's real or personal property that were "superior or otherwise" to the rights of the CANA Congregation.

This Court has already determined that TEC and the Diocese have contractual and proprietary interests in the church properties and that the trustees must promptly convey the properties to the Diocese and the CANA Congregations must promptly relinquish control over the properties to the Diocese. In such an event, the Amended Counterclaims seek recovery for unjust enrichment/quantum meruit and imposition of a constructive trust. TEC and the Diocese moved to strike these Counterclaims, but the Court took the motions under advisement in order to permit the CANA

Congregations to fully present their evidence. The Court now orders that these Counterclaims be stricken.

A. *Unjust Enrichment/Quantum Meruit Counterclaim*

To state a cause of action for unjust enrichment, the counter-plaintiff must allege: (1) that he conferred a benefit on the counter-defendant; (2) that the counter-defendant knew of the benefit and should reasonably have expected to repay the counter-plaintiff; and (3) that the counter-defendant accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp.*, 276 Va. 108, 116 (2008).

The CANA Congregations' evidence fails on all three elements. First, the Court agrees with the Diocese that "[t]he unjust enrichment counterclaims ask the Court to hold that its own adjudication, applying the law of the Commonwealth, would be unjust, a contradiction, and indeed an absurdity." (Diocese Brief # 1 at page 49.) Second, these seven churches were, and remain, *Episcopal* churches that are part of the *Episcopal* hierarchy. These churches no more "unjustly enriched" the Diocese or TEC than the Diocese or TEC "unjustly enriched" the seven churches. The fact that the *Episcopal* congregations that held stewardship over these churches purchased property with congregants' funds, constructed churches with congregants' funds, improved these churches with congregants' funds, maintained these churches with congregants' funds, and made substantial contributions to the Diocese over the years with congregants' funds, in no way constitutes an "unjust enrichment." Indeed, this point is obvious when one considers the second element of an unjust enrichment claim, i.e., that the defendant knew of the benefit and should reasonably have expected to repay the plaintiff. There is no support in the evidence for the notion that TEC or the Diocese should "reasonably have expected to repay" the individual congregations.

The Court also finds no merit in CANA's assertion that, *after* disaffiliation, the CANA Congregation unjustly enriched TEC or the Diocese. From 2007 forward, the CANA Congregations have had the use and control of these seven churches *over the strenuous objection* of TEC and the Diocese, as manifested not only by the resolution declaring the property to be abandoned, not only by their unsuccessful effort to direct the trustees of the properties to convey them to the Diocese, but by the filing of the instant litigation itself. If proof of unjust enrichment requires that a defendant know of the benefit received and should reasonably have expected to repay it, the proof here is utterly lacking.

In short, before disaffiliation, the congregations were constituent members of TEC and the Diocese; whatever contributions they made are not subject to recovery on a claim of unjust enrichment. After disaffiliation, any financial outlays made by the congregations for maintenance, upgrades, improvements, etc. on properties which this Court now holds should not

have remained in the possession of non-*Episcopal* congregations in the first place and remained in their possession for the past five years over the vociferous objection of TEC and the Diocese are not subject to an unjust enrichment claim. The Court would also note the assertion by TEC and the Diocese that no court considering a church property dispute has ever granted an unjust enrichment claim. (TEC/DOV Brief # 2 at 101.)

Having rejected CANA's unjust enrichment claim, the Court need not address the various arguments related to the proper value to place on such a claim, including those arguments related to property appraisals, valuation dates, maintenance and improvement costs, replacement value, and fair market value.

## B. *Constructive Trust Counterclaim*

Constructive trust is not a cause of action but, rather, a remedy "against unjust enrichment, usually after an act of fraud or breach of confidence or duty." *Pair v. Rook*, 195 Va. 196, 213 (1953). Here the Court finds no unjust enrichment, and there is no basis for consideration of a constructive trust.

## VIII. *Falls Church Endowment Fund*

This Court has previously had two occasions upon which to address issues related to the Falls Church Endowment Fund. *See* 76 Va. Cir. 975; *see also* 76 Va. Cir. at 986. The question before the Court in these two decisions was whether the Fund was subject to The Falls Church's § 57-9(A) petition. The Court summarized the position of the parties as follows:

> The Diocese and TEC argue that, because the Endowment Fund is a corporation, because it is a distinct legal entity from TFC, because its Directors are appointed by the vestry of TFC rather than by its trustees, and because TFC cannot have a "personal property" interest in a charitable non-profit entity, there is no basis for a finding that its property is subject to TFC's 57-9(A) petition. TFC does not dispute a number of these assertions. It agrees that the Endowment Fund is a corporation, that it has a distinct legal existence, that its assets are not property held by TFC's trustees, that its directors are not elected by TFC's trustees, and that it is indeed a charitable non-profit entity. TFC asserts, however, that it does have a "personal property" interest in the Endowment fund that brings the Endowment Fund within the scope of its 57-9(A) petition.

76 Va. Cir. 975. The "personal property" interest asserted by TFC was the power of the vestry to appoint the Endowment Fund's Directors. On December 19, 2008, the Court ruled that the power to appoint Directors to

a charitable, non-stock, non-profit corporation is not a "personal property" interest. 76 Va. at 986. Therefore, the Court held that the Endowment Fund was not subject to The Falls Church's § 57-9(A) petition and would be reserved for resolution in the Declaratory Judgment actions. *Id.*

In the Court's Letter Opinion of October 17, 2008, *see In re Multi-Circuit Episcopal Church Property Litigation*, 76 Va. Cir. 975 (2008), the Court provided this brief description of the Fund:

> The Endowment Fund is a non-profit corporation, organized in 1976, whose "main purpose" is "to further the ministry and outreach of the Christian Church." (Articles of Incorporation of the Endowment Fund at page 1.) The Articles provide that the membership of the Corporation is comprised of two classes. Class A members are individuals serving as the vestry of TFC [The Falls Church]. Class B members are members of the parish who are eligible to vote for the vestry at TFC's annual meeting. According to the Articles, Class A members, i.e., the vestry of TFC, have the duty of electing Directors of the Endowment Fund.

*Id.* at 975. Specifically, the Endowment Fund's Articles of Incorporation provide, in part, "Membership shall be comprised of Class A and Class B members, as described below: A. Class A members shall be those individuals who are members of the vestry of The Falls Church, Episcopal Church. B. Class B members shall be those members of the parish who are defined as eligible to vote for the vestry at each of the annual meetings of The Falls Church." (DX-FALLS-367-002.) The By-Laws of the Endowment Fund are also instructive. Article I, § 2, of the By-Laws provides, "None but members of The Falls Church, Protestant Episcopal Church, Falls Church, Virginia, shall be members of the Board of Directors." Article I, § 3, of the By-Laws provides, in part, "The Directors shall be elected by the vestry of The Falls Church, Episcopal Church, as set forth in Articles of Incorporation." (PX-FALLS-368-001; *see* Diocese Brief # 1 at 79-80.) The sole question before the Court is which vestry, that of the CANA congregation or that of the Episcopal "continuing congregation" recognized by the Episcopal Diocese of Virginia, has the power and duty to elect the directors of the Fund.

TEC and the Diocese's position is that the issue has been resolved by the fact that the Annual Council of the Diocese has seated the delegates elected by the Vestry of The Falls Church (Episcopal) at every meeting of Annual Council since 2007, and that "a civil court may not second-guess or review that decision." (*See* Diocese Brief # 1 at 80.)

The Falls Church makes six arguments in support of the position that it is the CANA congregation whose vestry now has authority to appoint the Endowment Fund's directors: (1) the Endowment Fund has historically been funded primarily by contributions from TFC and its congregants;

(2) the Endowment Fund has consistently been described as one method of donating to The Falls Church or supporting its ministry; (3) The Falls Church's annual reports have described the Endowment fund as "formed in 1975 to administer bequests to The Falls Church" and as a way to contribute to The Falls Church; (4) the Endowment Fund's audited annual financial statements for the years up to 2006 were consolidated with The Falls Church's annual audited financial statements; (5) in The Falls Church consolidated audited financial statements, the Endowment Fund was "treated" as a "subsidiary" and a "ministry" of The Falls Church and the Endowment Funds' assets were treated as assets of the consolidated operation; and (6) even with the vote to disaffiliate imminent, the five directors of the Endowment Fund in November 2006 voted unanimously to recommend to the vestry of The Falls Church the reappointment of two directors, thus acknowledging that vestry's control over the appointment of directors.

The Court does not find any of CANA's arguments persuasive, for several reasons.

First, this Court has already determined that it is the Diocese, not the CANA Congregation, that has control and ownership over The Falls Church. In other words, it is the Diocese that owns the church whose vestry is charged with appointing the Endowment Fund's directors.

Second, to the extent that the CANA brief makes it clear that the Endowment Fund is closely linked to and associated with The Falls Church, even to the point of noting that the church's consolidated audited financial statements "treat[] the fund as a subsidiary and a ministry of The Falls Church," (The Falls Church's Opening Post-Trial Brief Regarding the Falls Church Endowment Fund at 3), it would make little sense to hold that the Diocese controls and owns The Falls Church but it is the CANA Congregation that controls and owns this closely-related entity.

Third, the Court rejects The Falls Church's assertion that the multiple references in the governing documents of the Endowment Fund to "The Falls Church, Episcopal Church" and "The Falls Church, Protestant Episcopal Church" are merely a description identifying the church, rather than a substantive reference to its character as a constituent member of the Episcopal Church. In fact, these references make it clear that the vestry that is authorized to elect directors is an *Episcopal Church* vestry, not a vestry of a different denomination. Since it is beyond dispute that the CANA Congregation is no longer a member of the Episcopal denomination, its vestry no longer has the authority to elect the Endowment Fund's directors.

Fourth, the bylaws of the Endowment Fund are explicit as to who may serve as directors: "None but members of The Falls Church, Protestant Episcopal Church, Falls Church, Virginia, shall be members of the Board of Directors." The CANA Congregation is not a Protestant Episcopal Church; its vestry is not a vestry of a Protestant Episcopal Church. To hold that it

is the CANA Congregation that has the authority to elect the Endowment Fund's directors would essentially be to hold that the CANA Congregation may elect the Endowment Fund's directors so long as they do not select any of their own members.

Therefore, the Court finds that it is The Falls Church (Episcopal), the congregation recognized by the Diocese as The Falls Church's Episcopal congregation, whose vestry has the power, authority, and duty to elect Directors to the Endowment Fund.

One more point should be stated regarding this matter. In making this decision, the Court categorically rejects The Falls Church's assertion that to rule for the Diocese is to "exalt semantics over substance." The Concluding paragraph of The Falls Church's Opening Post-Trial Brief Regarding The Falls Church Endowment Fund, at page 10, reads as follows:

> At heart, the conflict here is over whether the purpose of the vestry of The Falls Church in establishing the Fund in 1976 was to ensure that the Fund supported and was controlled by a specific congregation, The Falls Church, or by any congregation (including one that did not yet exist at that time) so long as the congregation had a particular name and a particular affiliation. To adopt the second perspective would exalt semantics over substance and contravene the governing documents of the Fund and thirty years of actual practice by the Fund and The Falls Church. TFC respectfully submits that the first perspective correctly focuses on the continuity of the church; TFC is the same church that originally established the Fund in 1976 and must continue to exercise the same right to appoint directors that it exercised for more than thirty years.

In the § 57-9 litigation, this Court was persuaded by the CANA Congregations over the strenuous objections of TEC and the Diocese that a major division had occurred within The Episcopal Church. Much of the § 57-9(A) litigation concerned whether, in fact, there was a division within TEC and the Diocese of such dimension as to permit invocation of § 57-9(A). The Court concluded as follows:

> [I]t blinks at reality to characterize the ongoing division within the Diocese, ECUSA, and the Anglican Communion as anything but a division of the first magnitude, especially given the involvement of numerous churches in states across the country, the participation of hundreds of church leaders, both lay and pastoral, who have found themselves "taking sides" against their brethren, the determination by thousands of church members in Virginia and elsewhere to "walk apart" in the language of the Church, the creation of new and substantial religious entities, such as CANA, with their own structures

and disciplines, the rapidity with which the ECUSA's problems became that of the Anglican Communion, and the consequent impact — in some cases the extraordinary impact — on its provinces around the world, and, perhaps most importantly, the creation of a level of distress among many church members so profound and wrenching as to lead them to cast votes in an attempt to disaffiliate from a church which has been their home and heritage throughout their lives, and often back for generations. Whatever may be the precise threshold for a dispute to constitute a division under § 57-9(A), what occurred here qualifies.

76 Va. Cir. 785, 872. The Falls Church congregation disaffiliated from The Episcopal Church precisely *because* of this major division and it became a CANA Congregation as a *direct consequence* of this major division. Thus, and contrary to The Falls Church's assertion in its opening brief on the Endowment Fund, it is not "exalt[ing] semantics over substance" to attribute significance to a "particular name" and a "particular affiliation." What this Court previously described as the "profound and wrenching" decision of each of these congregations to renounce their affiliation with TEC and to affiliate with CANA cannot under any conceivable construct be termed a matter of "semantics." Indeed, it is just the opposite, for the Court's decision attributes dispositive significance to the fact that, while the CANA Congregation is still *called* "The Falls Church," it is no longer an *Episcopal* entity.

## IX. *Conclusion*

For the reasons stated above, the Court finds for TEC and the Diocese in the Declaratory Judgment actions and against each of the seven CANA Congregations. The trustees of the churches must, therefore, promptly convey the properties to the Diocese and the CANA Congregations must promptly relinquish control over the properties to the Diocese. Further, the Court finds the Amended Counterclaims to be without merit and grants TEC's and the Diocese's Motions to Strike the claims for unjust enrichment, quantum meruit, and constructive trust. Further, the Court finds that the Vestry entitled to elect the directors of the Falls Church Endowment Fund is the Falls Church Episcopal congregation recognized by the Diocese.

It remains to determine the disposition of the personal property of the seven churches. Virginia Code § 57-10 provides as follows:

When personal property shall be given or acquired for the benefit of an unincorporated church or religious body, to be used for its religious purposes, the same shall stand vested in the trustees having the legal title to the land, to be held by them as the land is held, and upon the

same trusts or, if the church has created a corporation pursuant to § 57-16.1, to be held by it as its land is held, and for the same purposes.

Thus, the disposition of the personal property of these churches follows the disposition of the real property of these churches, that is to say, it must also be turned over to the Diocese. There is a significant caveat to this, however, and it arises from the fact that there came a point in time when it was absolutely clear that a contribution or donation or the payment of membership dues to one of the seven congregations was *not* a contribution to an *Episcopal* congregation. Therefore, the personal property acquired by the CANA congregations after this point in time should remain with the CANA congregations. There are four possible points in time which the Court has considered.

First, the Court has considered using as a point of demarcation the various points in time when the congregations made varying arrangements to withhold contributions from the Diocese. According to CANA, "all of the CANA Congregations curtailed or terminated their donations to the Diocese in response to the actions of the denomination at its 2003 General Convention." (CANA Brief # 1A at 159.) Congregants were given the opportunity to designate that no portion of their title should go to the Diocese; or the congregation stopped giving money to the Diocese entirely; or the congregation established a congregation only fund. *Id.* at n. 120. Putting aside the accounting difficulties in applying these various dates to the various circumstances and whether it would even be possible to account for the individual choices of parishioners where they were given the opportunity to designate, there is a much more dispositive objection to using this as the point of demarcation. Whatever may have been the level of discord and disenchantment with TEC and the Diocese, each of the seven churches in 2003, 2004, 2005, and through most of 2006 remained *Episcopal* churches, constituent members of the Diocese and TEC.

Second, the Court has considered using as the point of demarcation the date upon which each of the CANA Congregation voted to disaffiliate pursuant to § 57-9(A), December 2006 to January 2007). (Alternatively, the Court could use the date when each congregation filed its § 57-9(A) petition.) Here, too, there are significant problems: first, it has now been conclusively determined that § 57-9(A) is inapplicable to these proceedings; second, it is not the act of taking a vote, or even the filing of a petition, that renders a decision to affiliate with a different denomination final and conclusive, rather it is the Court's *approval* of the petition. That did not come until January 8, 2009, and in any event was reversed by the Virginia Supreme Court.

Third, the Court has considered using as the point of demarcation the Diocese's January 22, 2007, Notice of Inhibition, or January 22, 2007, resolution determining the properties to have been abandoned, or the

August 1, 2007, Notice of Removal. While arguments could be made in support of each of these dates, especially the January 22, 2007, resolution declaring the properties to be abandoned, they do not have the public notice character of the fourth possibility, which is the one this Court adopts.

This fourth possibility, which this Court adopts as the point of demarcation, is the filing date of the Declaratory Judgment actions by the Diocese against each congregation on either January 31, 2007 (involving five of the congregations) or February 1, 2007 (involving the two remaining congregations). After this date, no contribution made, no donation made, no dues paid by a congregant, could reasonably have been made with the understanding that the money was going to *Episcopal* congregations. (While the seven churches, for the reasons stated in this opinion, never lost their character as *Episcopal* churches, the Court's focus here is on the actions taken by and the Declaratory Judgment actions filed against the CANA congregations.)

Therefore, the Court orders that all personal property acquired by the congregations before January 31, 2007, or February 1, 2007 (depending on the congregation) shall be conveyed to the Diocese and all *liquid* personal property (e.g., contributions and donations of money) acquired after these dates shall remain with the CANA Congregations. As to *tangible* personal property acquired by the CANA Congregations after these dates, they shall be delivered to the Diocese unless the CANA Congregations can establish that they were purchased solely with funds acquired after these dates or were donated to the CANA Congregations after these dates.

As to the argument that the CANA Congregations should not have to deliver to the Diocese funds on hand as of January 31, 2007, because such funds were used to maintain the church facilities since then, the Court would note the obvious fact that the CANA Congregation had the use of the property since that point in time as well.

TEC and the Diocese seek an accounting as part of their requested relief. To the extent an accounting is necessary to implement the Court's orders, an accounting is ordered.